UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALISON MCDANIEL, | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | C.A. No. 1:23-cv-00292-WES-LDA |
| | : | JURY TRIAL DEMANDED |
| | : | |
| PRESERVE PROPERTY MANAGEMENT | : | |
| COMPANY, LLC; | : | |
| THE PRESERVE AT BOULDER HILLS, LLC; and | : | |
| PAUL MIHAILIDES, | : | |
| Defendants | : | |

## AMENDED VERIFIED COMPLAINT

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiff Alison McDaniel ("McDaniel"), by and through her attorney, hereby amends the Complaint filed on July 11, 2023 (ECF Doc. No. 1) to add additional claims. McDaniel alleges the following:

### The Parties

1.     Plaintiff ALISON MCDANIEL ("McDaniel") is an individual, female person of legal age, who, at all times relevant to this action, was an employee of Defendants PRESERVE PROPERTY MANAGEMENT COMPANY, LLC and THE PRESERVE AT BOULDER HILLS, LLC and a resident of the State of Texas.  McDaniel is an "employee" within the meanings of 42 U.S.C. § 2000e(f); R.I. Gen. Laws § 28-5-6(7); and R.I. Gen. Laws § 28-14-1(2); and is a "person" within the meaning of R.I. Gen. Laws § 42-112-1(a).

2.     Defendant PRESERVE PROPERTY MANAGEMENT COMPANY, LLC ("PRESERVE PROPERTY MANAGEMENT COMPANY") is a domestic limited liability company organized under the laws of the State of Rhode Island, trading under the fictitious name The Preserve Sporting Club & Residences, and is authorized by the Rhode Island Secretary of State's Office to conduct business within the state.  At all times relevant to this action, Defendant PRESERVE PROPERTY MANAGEMENT COMPANY had the right or power to exercise control over the methods and means of how McDaniel performed her work and was an "employer" within the meanings of 42 U.S.C. § 2000e; R.I. Gen. Laws § 28-5-6(8)(i); and R.I. Gen. Laws § 28-14-1(3).

3.      Defendant THE PRESERVE AT BOULDER HILLS, LLC ("THE PRESERVE AT BOULDER HILLS") is a domestic limited liability company  organized under the laws of the State of Rhode Island and is authorized by the Rhode Island Secretary of State's Office to conduct business within the state.  At all times relevant to this action, Defendant THE PRESERVE AT BOULDER HILLS had the right or power to exercise control over the methods and means of how McDaniel performed her work and was an "employer" within the meanings of 42 U.S.C. § 2000e; R.I. Gen. Laws § 28-5-6(8)(i); and R.I. Gen. Laws § 28-14-1(3).

4.      Defendant PAUL MIHAILIDES ("Mihailides") is an individual, male person of legal age and a resident of the State of Rhode Island.  Upon information and belief, at all times relevant to this action, Defendant MIHAILIDES was a member, manager, and/or agent of Defendant THE PRESERVE PROPERTY MANAGEMENT COMPANY, LLC and THE PRESERVE AT BOULDER HILLS, LLC.  At all times relevant to this action, Defendant MIHAILIDES had the right or power to exercise control over the methods and means of how McDaniel performed her work, including having the sole authority to terminate her employment.

## Jurisdiction and Venue

5.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 as Plaintiff and each Defendant are citizens of different states, and the amount in controversy exceeds $75,000.

6.      This Court has federal question jurisdiction over Plaintiff's claims under 42 U.S.C. § 2000e pursuant to 28 U.S.C. § 1331.

7.      This Court's exercise of supplemental jurisdiction with respect to Plaintiff's state law claims is warranted because they are so related to Plaintiff's federal claims that they form part of the same case or controversy.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendants have offices, conduct business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred herein.

9.      Personal jurisdiction exists over Defendants in that they maintain sufficient minimal contacts in the State of Rhode Island.  Specifically, Defendants engage in systematic and continuous activity in the State of Rhode Island.  Moreover, a substantial portion of the actions complained of herein occurred in the State of Rhode Island.

## Administrative Procedures

10. On October 4, 2022, McDaniel filed with the Equal Employment Opportunity Commission (the "EEOC") a Charge of Discrimination for discrimination based on sex for violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (EEOC Charge No. 523-2022-02147), which was simultaneously filed with the Rhode Island Commission for Human Rights ("RICHR") for violations of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et seq. (RICHR No. 23 ESE 136) and, therefore, McDaniel has administratively exhausted her claims under 42 U.S.C. § 2000e et seq. and R.I. Gen. Laws § 28-5-1 et seq.

11. On April 13, 2023, the EEOC issued a Notice of Right to Sue Letter.

12. On April 24, 2023, RICHR issued a Notice of Right to Sue Letter.

## Factual Allegations

13. The Preserve Sporting Club & Residences ("The Preserve") is a luxury resort located in Richmond, Rhode Island where guests can stay in luxury upscale accommodations, enjoy fine dining and luxury spa services, and participate in outdoor, year-round activities such as fishing, clay shooting, indoor target practice, equestrian, hiking, and golf.

14. Mihailides is the owner of The Preserve and controls all aspects of its operations, including the hiring, managing, and firing of employees such as McDaniel.

15. In December 2019, Mihailides hired McDaniel to work at The Preserve.

16. At all times relevant to this matter, Defendant Mihailides had the right or power to exercise control over the methods and means of how McDaniel performed her work, including having the sole authority to terminate her employment.

17. McDaniel worked at The Preserve from in or about December 2019 to February 17, 2022, at which time she was constructively discharged from her valuable employment because Defendant Mihailides subjected her to a hostile work environment based on her sex (female).

18. McDaniel has worked as an actress and professional model since 2005.

19. McDaniel also operates the Alison McDaniel Agency, which helps non-profits meet their fundraising goals at charity events.

20. Defendants hired McDaniel to perform the following job duties at The Preserve: Acting as a Spokesperson for The Preserve; acting in commercials; creating and appearing in videos for social media; providing her image for print, social media, advertisements, and magazines; acting as the social media manager; appearing at special events; appearing in videos for the Sporting Shoppe located on The Preserve property; creating marketing campaigns and ideas; shooting photography and videography; editing social media videos, brochures, and ad campaigns; creating the 3rd Hobbit House Concept; collaborations with other brands

and/or people; working as editor for OEL magazine and managing its *Instagram* page; working and staffing trade shows to represent The Preserve in North Carolina, Texas and Pennsylvania; creating Fall Hobbit House décor; and hiring other professionals such as actors and videographers.

21.     During the time period McDaniel performed work for The Preserve, Defendants had the right to control when, where, and how she performed her job.

22.     In fact, Defendants had creative control over all of McDaniel's work product, having the final say in all decisions regarding social media, marketing strategy, and video content.

23.     During the time period McDaniel performed work at The Preserve, Defendants furnished the tools, materials, and equipment necessary for her to perform her job.

24.     During the time period McDaniel performed work at The Preserve, she performed work on Defendants' premises.

25.     In fact, Defendants controlled McDaniel's work schedule even when she was not on site.

26.     During the time period McDaniel performed work at The Preserve, there was a continuing relationship between her and Defendants.

27.     During the time period McDaniel performed work at The Preserve, Defendants had the right to assign additional projects to McDaniel.

28.     During the time period McDaniel performed work at The Preserve, she was paid a monthly salary of $6,000 beginning in December 2019, rather than the agreed cost of performing a particular job.

29.     During the time period McDaniel performed work at The Preserve, she did not regularly hire and pay assistants.

30.     During the time period McDaniel performed work at The Preserve, the work McDaniel performed was part of Defendants' regular business.

31.     During the time period McDaniel performed work at The Preserve, Defendants were a business.

32.     During the time period McDaniel performed work at The Preserve, Defendants could discharge McDaniel.

33.     During the time period McDaniel performed work at The Preserve, McDaniel and Defendants believed that they created an employer-employee relationship.

34.     Defendants paid for all supplies that McDaniel used to perform her work.

35.     Defendants reimbursed McDaniel for her travel expenses.

36.     Defendants provided free housing to McDaniel when she worked at The Preserve.

37.     McDaniel also waited tables on one occasion and helped to stock the Hilltop Lodge before its opened for business.

38.     Beginning on McDaniel's first visit to The Preserve, she became concerned with Mihailides' behavior towards her, which she felt was flirty, overly-friendly, and inappropriate.

39.     McDaniel expressed her concerns about Mihailides to a friend mutual to her and Mihailides, who assured her that Mihailides was "happily married" and that she had nothing to worry about.

40.     During McDaniel's employment at The Preserve, Mihailides subjected her to repeated sexual advances including attempts to kiss her on the mouth, requests for sexual favors, inappropriate touching, ogling with suggestive overtones, and verbal and physical harassment of a sexual nature, which were unwelcome and offensive to McDaniel.

41.     On May 31, 2021, Mihailides told multiple guests at The Preserve that McDaniel was his "mistress," "future ex-wife," and "girlfriend."

42.     Also, Mihailides would not stop hanging on McDaniel's body and tried to kiss her on the mouth multiple times.

43.     On June 7, 2021, when McDaniel texted Mihailides to thank him for something, he responded: "Do kisses come after that?"

44.     On August 1, 2021, when McDaniel was unable to travel to The Preserve for the Fourth of July holiday due to illness, Mihailides told her:  "I'm glad you didn't die from your asthma attack.  I would still have sex with you as long as your body wasn't cold yet" or words to that effect.

45.     On August 2, 2021, Mihailides told McDaniel that she made him mad because she wouldn't kiss him or tell him that she loved him,

46.     Mihailides also called McDaniel a "prude."

47.     On August 6, 2021, while in the presence of Dant Hirsch, President and Managing Director of Ocean House,[1] and Robert Button ("Button"), a self-employed videographer, Mihailides talked about McDaniel's body in a sexualized manner, describing what he wanted to do to her.

48.     Later, Button asked McDaniel if Mihailides was always so "creepy" to her and asked her how she was able to put up with it.

---

[1] Ocean House is a seaside resort located at Watch Hill, Rhode Island that includes a luxury hotel and spa and fine dining.

49. On August 10, 2021, Mihailides told McDaniel that her lips were "so juicy," and he can "only imagine what they can do."

50. Later, McDaniel was told by another Preserve employee named "Lucas" that Mr. Mihailides insinuated to others that he was having sex with McDaniel.

51. Mihailides often disclosed to McDaniel that he was having multiple, extra-marital affairs, which she found to be unwelcome and offensive.

52. On August 13, 2021, Mihailides attempted to confide in McDaniel about a fight he had with his mistress, but McDaniel told him it was not something she wanted to discuss and that it was inappropriate and made her feel uncomfortable.

53. On or about August 20, 2021, during the filming of a photo shoot, Mihailides attempted to touch McDaniel's buttocks.

54. Mihailides also bragged about receiving oral sex from a Preserve employee who worked at the front desk, claiming "she loves to get on her knees" and "she gives the best blowjobs."

55. In or about late August 2021, while McDaniel was working on a photo shoot in the Spa with a young woman named "Lindsey," who worked at The Preserve clubhouse, Mihailides entered with an unknown man and began to make sexual comments to McDaniel and Lindsey.

56. Mihailides told this unknown man that McDaniel and Lindsey were his "future ex-wives" at which time Mihailides attempted to grab and kiss the two women.

57. McDaniel pushed away Mihailides, but he still continued to hang all over Lindsey.

58. On September 14, 2021, Mihailides told McDaniel that he loved her and tried to kiss her on the mouth.

59. On September 15, 2021, Mihailides showed McDaniel a room in the Hilltop Lodge where he claimed he brought his mistresses for sexual encounters, referring to it as his "stabbin' cabin," which McDaniel perceived to be a sexual reference.

60. On September 25, 2021, McDaniel was forced to sit through an un-necessary meeting, which happened regularly, where Mihailides was verbally abusive to her.

61. Mihailides told McDaniel that he could make her life easier if she just gave him what he wanted, "kisses."

62. Mihailides said this after McDaniel unsuccessfully attempted to get a paycheck from him that Defendants owed to her.

63. On October 8, 2021, Mihailides would not stop staring at McDaniel's breasts.

64. Mihailides asked McDaniel if she was having her "period," telling her that her "boobs look bigger."

65. Mihailides made this comment about the size of McDaniel's breasts in connection to her having her period on multiple occasions.

66. On October 9, 2021, Mihailides tried to kiss McDaniel on the mouth three times.

67. On October 11, 2021, McDaniel met with Mihailides again in yet another attempt to get an overdue paycheck.

68. During this meeting, Mihailides told McDaniel that he was a "good lover" and that if she "wasn't such a prude, [her] life could get a lot better," or words to that effect, telling her again, "You give a little, you get a lot."

69. On several occasions, Mihailides would give McDaniel the slip when it was time to pay her, often making an excuse to leave the clubhouse before a check could be cut.

70. Sometimes Mihailides would mislead McDaniel into believing she was receiving a paycheck only to give her a reimbursement check for expenses.

71. On October 18, 2021, Mihailides called McDaniel to tell her that he loved her.

72. Mihailides also told McDaniel that a movie producer told him that McDaniel was in her late 40's, which is older than what Mihailides believed her age to be.

73. Mihailides told McDaniel that he was upset to learn that she was older because sleeping with her "wouldn't be so creepy" since she would be closer to him in age.

74. On December 18, 2021, McDaniel begged Mihailides to pay her the money that The Preserve owed to her, but instead, he got angry, and called her a "liar."

75. Later, Mihailides told McDaniel: "You know. If you just give me what I want, this would be a lot easier" or words to that effect.

76. On December 19, 2021, when McDaniel left The Preserve, Mihailides tried to kiss her on the mouth.

77. After knowing Mihailides for only a few months, he mentioned to McDaniel that his mistress ended an affair with him that was going on for many years after they had a fight.

78. McDaniel told Mihailides that she did not believe in adultery and that she did not want to discuss it.

79. On another occasion, Mihailides implied to McDaniel that he had sex on The Preserve property with a Preserve member and resident named "Karen" and that he liked to text her and ask her to show him her breasts when he drove by her.

80. On another occasion, Mihailides told McDaniel that his mistress, whom McDaniel did not know, disliked McDaniel because she was jealous of their "relationship."

81. McDaniel reasonably and in good faith believed that Mihailides told his mistress that he and McDaniel were sleeping together.

82. McDaniel was greatly offended that Mihailides was telling people that they were in a sexual relationship together.

83. Mihailides also played bizarre mind games with McDaniel.

84. By way of example, Mihailides would demand that he and McDaniel set up a telephone conference call for which Mihailides would ultimately be a no-show.

85. Mihailides would then berate McDaniel and "gas-light" her into believing that she was the cause for the missed connection.

86. When Mihailides would make himself available for a telephone conference call, it was never about business, but rather, it was always personal.

87. Mihailides would constantly tell McDaniel he missed her and that he loved her.

88. When McDaniel would not reciprocate and tell Mihailides that she loved him too, he would berate her and say she was "unthankful" and "difficult to work with."

89. As a result of McDaniel's rebuffing Mihailides's sexual advances, Mihailides refused to pay McDaniel the wages owed to her, falsely claiming that it was due to the COVID pandemic.

90. Mihailides also became obsessed with connecting with McDaniel on social media.

91. On several occasions, Mihailides shared photos of McDaniel on his *Facebook* and *Instagram* pages with unusual and inappropriate comments.

92. For example, Mihailides would make comments on photos of McDaniel with her male friends and McDaniel with her dog, stating that he was "jealous."

93. Sometimes, Mihailides would make a comment that McDaniel was "hot."

94. On other occasions, when McDaniel was staying overnight in a cabin at The Preserve, Mihailides would insist on driving her back to her cabin even though it was a short walk from where she was.

95. Sometimes, McDaniel would bring her dog to the clubhouse so she would have a justifiable excuse for walking back to the cabin alone.

96. On the rare occasion when McDaniel allowed Mihailides to drive her back to her cabin late at night, he would insist on coming inside the cabin.

97.     To keep it from appearing to others that McDaniel and Mihailides were in a relationship, McDaniel would stand in the doorway, making herself clearly visible to others who drove by.

98.     On one occasion, while McDaniel was staying at a cabin at The Preserve, as she was getting out of the shower in the morning, she heard someone downstairs and discovered that it was Mihailides.

99.     When McDaniel yelled at Mihailides asking what he was doing in her cabin, he stated that he was just making sure that she was awake.

100.    McDaniel was so distressed by Mihailides' invasion of her privacy, especially since her cabin door was locked while she was in the shower, that going forward, she placed objects in front of the door to alert her in case Mihailides entered while she was showering or sleeping.

101.    Mihailides' sexually-harassing behavior was so open and notorious that even Mihailides' wife Maureen joked about it in the presence of others.

102.    On one occasion, Maureen stated to McDaniel in the presence of guests: "Have you ever had to deal with sexual harassment at work besides from my husband?" or words to that effect, provoking laughter from everyone at the table.

103.    Mihailides' sexual harassment of McDaniel was so severe and pervasive that she was forced to take anti-anxiety medication so she could interact with Mihailides.

104.    McDaniel also hired friends to film with her so she could be around people she trusted.

105.    On one occasion, McDaniel had to go to The Preserve for one day for a single meeting, so she took the train from New York City, where she lives part-time, to Kingston, Rhode Island.

106.    McDaniel was expecting an employee from The Preserve to pick her up at the train station to drive her to The Preserve.

107.    Instead, Mihailides showed up at the train station and drove McDaniel to The Preserve.

108.    When McDaniel entered Mihailides' vehicle, he told her how "hot" she was.

109.    During the ride from the train station to The Preserve, Mihailides tried to hold McDaniel's hand and touch her thigh which made her very uncomfortable.

110.    When it was time for McDaniel to return to the train station, she snuck away from Mihailides and had a Preserve employee drive her back to the train station.

111.    When Mihailides discovered that McDaniel had given him the slip, he was irate and punished her by not reimbursing her for the trip.

112.    On several occasions, Mihailides would come up from behind McDaniel and rub her ears and touch her neck.

113. Every time McDaniel was on The Preserve property, Mihailides would attempt to kiss her on the mouth, hug her, and hold her hand.

114. Mihailides was obsessed with McDaniel's appearance and scrutinized how she looked, telling her: "I notice everything about you."

115. On multiple occasions, Mihailides brought up the same story about a dildo sex toy that a guest mistakenly left behind in one of the houses, referring to it as a "big, black dildo."

116. Mihailides then asked McDaniel if she had a dildo of her own.

117. Mihailides also talked to McDaniel regularly about how a very young woman – the daughter of a Preserve member – was a lesbian, asking McDaniel what she thought lesbians did, which McDaniel interpreted to mean what kind of sex they had.

118. Mihailides told McDaniel that he was going to sneak over to watch this young woman having a camp out with her friends so he could "watch the lesbians."

119. Unfortunately, McDaniel is not the only person at The Preserve that Mihailides subjected to a hostile work environment based on sex.

120. Mihailides made unwelcome, offensive, sexual comments to a former Preserve employee named Alexandra Beahm ("Beahm").

121. Mihailides also touched Beahm in a sexual manner that were unwelcome and offensive.

122. From on or about September 1, 2020 to in or about March 2021, Beahm was employed by The Preserve as a membership and real estate executive.

123. During Beahm's employment, Mihailides approached her in the workplace on numerous occasions and tickled her which she found to be unwelcome and offensive.

124. On one occasion, Mihailides got on his knees so he could reach underneath Beahm's desk so he could tickle her feet.

125. Mihailides told Beahm to lower her COVID mask in the presence of others so she could show her "pretty face."

126. On another occasion, Mihailides made a joke about the size of his penis while he was in the presence of Beahm and a client.

127. Eventually, Beahm complained about Mihailides' improper conduct to Daniel Hostettler ("Hostettler"), President of Ocean House Management ("OHM"), the entity which managed many functions for The Preserve.

128. Unfortunately, after Beahm complained about Mihailides, his sexually-harassing conduct did not stop.

129. Shortly after Beahm's complaint to Hostettler, Mihailides approached her in the workplace and touched her feet.

130. Mihailides also regularly made inappropriate comments about the way Beahm dressed.

131. On one occasion, while Beahm was conducting a property tour with a media client, Mihailides pulled over in his truck and said: "Hey, sexy."

132. A few months after Beahm complained about Mihailides, Hostettler mentioned the complaint to her and stated that he assumed Mihailides' improper conduct had stopped because he had not heard anything further from Beahm.

133. However, Beahm explained to Hostettler that Mihailides continued to act inappropriately towards her.

134. Beahm complained a second time about Mihailides, this time to Ann Reynolds ("Reynolds"), OHM's Director of Human Resources.

135. Reynolds informed Beahm that there was no documentation of her first complaint and that she would look into the matter and get back to Beahm.

136. Shortly after Beahm's second complaint about Mihailides, Hostetler informed her Mihailides had been spoken to by Hostetler and the OHM legal team about her complaints.

137. A day or two later, Beahm was told that she was permitted to return to the property with the understanding that she had to turn in her keys to avoid ever being alone in the building with Mihailides and that she was required to work six days a week instead of five.

138. When Beahm declined to accept this new condition of her employment, she was offered several alternative positions, but Beahm considered them to be demotions, so she declined them.

139. Beahm was also told that these alternate positions would better suit her needs as a new mother.

140. Upon information and belief, Defendants took no meaningful action to stop or prevent further harassment from Mihailides.

141. Beahn was constructively discharged shortly thereafter as it became clear to her that Defendants were unwilling to take any action against Mihailides to stop or prevent further harassment by him, so she resigned her employment.

142. During the time McDaniel worked at the Preserve, there was no Human Resources Department there and no procedures in place for reporting discrimination in the workplace.

143. In fact, Mihailides would often joke: "I am the HR Department!"

144. Mihailides also joked: "You know what you get if you complain to HR? You get fired!"

145.    Because there was no HR Department at the Preserve and because Mihailides was the owner of the Preserve, McDaniel complained about Mihailides' sexually-harassing behavior several times to a Preserve manager named "Christine," telling her that she did not know how much longer she could take Mihailides' inappropriate sexual comments and conduct.

146.    Christine confided in McDaniel that Mihailides made inappropriate sexual advances and comments to her as well.

147.    Christine told McDaniel that Mihailides' own daughter Nikki Rodin was trying to get rid of him because he was a "liability."

148.    Because there was no HR Department at the Preserve and because Mihailides was the owner of the Preserve, McDaniel had no power to stop Mihailides' sexually-harassing conduct, and she was constructively discharged on February 17, 2022.

149.    On March 8, 2022, McDaniel posted on her *Instagram* account that she was constrictively discharged from her valuable employment from The Preserve because of the sexually-harassing environment created by Mihailides and tolerated by her employer.

150.    McDaniel received over a dozen comments and direct messages to her *Instagram* post from followers who either worked with Mihailides at The Preserve and had similar experiences with him or those who remember McDaniel telling them of the sexual harassment the previous year.

151.    One *Instagram* follower wrote:

> I'm glad someone is speaking up cus that mad is a weirdo
> ❤️

152.    Another *Instagram* follower wrote:

> Thank you for standing up and sharing your story! I am currently employed at Oceanside Aesthetics and Wellness and it was recently announced that our medical director has begun a business partnership with this man and we are now expected to work and provide medical aesthetic services at the preserve.
>
> I have only had very brief encounters with him and none of them have been positive. I have

always gotten the sense that he thinks his money can and will buy him everything and everyone. My most recent encounter with him showed me that he had an utter lack of disrespect for patient and their privacy. We had a cosmetic laser training and some women had private/sensitive areas exposed (as was neccessary for their procedures), and he thought it was totally kosher to enter the room without introducing himself to the patient, explaining his role on the team, and why he wanted to be there. Most importantly, he never asked permission to be in the room while these patients were exposed!

Myself and several colleagues are utterly disgusted and will be quitting our position as our medical director seems to be standing by him and we want no part of it.

We have had many private citizens and company reps also echo concern about him, which made us uneasy.

Thank you again fo having courage to speak your truth! You have our full support ❤️

Utter lack of respect*

153.    Another *Instagram* follower wrote:

Yesssss he's disgusting honestly I'm not even shocked


154.    Another *Instagram* follower wrote:

> Look, you have been thru a horrific experience, I saw what was going on within seconds. Those involved can not see it. I also saw what was going on with that poor girl that works in the range. You can not blame yourself for anything!!! Please go see a professional, please, please 🥹, what you have done takes so much courage that it make take you years to understand it all.

155.    Another *Instagram* follower wrote:

> Happy for you! I quit my job there because of him and his daughter!

8:42 AM

> Such a terrible and toxic place.
> ❤️

> It's awful. Absolutely awful

156.    Another *Instagram* follower wrote:

> This guy is bad I did the framing for him in the hill top lodge and he did a lot complaining for no pay us I lost $70k work for him

157.   Another *Instagram* follower wrote:

> He told me "you're so empathetic I bet you're amazing in bed". That was one of many horrifying and disgusting things he said to me. Thank you for speaking up 🧡

> He honestly terrified me. And made me feel so uncomfortable. And bullied me relentlessly , I can only assume, because he felt rejected. There are so many things wrong with him. I couldn't be there for another second. It was a place that made me feel frozen with fear.

158.   Another *Instagram* follower wrote:

> Ofc! I don't think it was easy for any woman that has unfortunately met him. But thank you for speaking up and saying something, I tried to speak up for myself when I worked there and it only made matters worse for myself.
> However, I think someone like yourself has the power to really shine light on this terrible situation. Let me know if there's anything you may need and stay safe!

159.   Another *Instagram* follower wrote:

> I am so, so proud of you for coming forward and exposing this guy for all of the harm he has done! I remember you telling me stories well over a year ago about the things he had been putting you through, and I just can't even imagine how you must have felt. It's very brave of you, and I'm so glad you are out of there and holding him accountable.

160.   Another *Instagram* follower wrote:

> Ummm yes hi!! 🙋‍♀️ I literally remember you talking to me about it at length, & hearing about the intense stress & pressure you were under bc of him over 2 years ago.... Then I saw it with my own eyes when I was there with you that one weekend working. 😩 Anytime you need a witness, I am here. No way can we let this scumbag get away with continuing to treat women this way. Not in 2022. Nope. Ain't nobody got time for that. I can't put into words how proud I am of you for standing up & speaking out. I can't imagine how hard this is for you, & how scary it is, bc you of all people know the level of psycho you are dealing with. But at the end of the day, this behavior is NOT OKAY. And he should be held accountable 1000%. You are doing women everywhere a service by calling him out. ❤️ 🙏

161.   Another *Instagram* follower wrote:

> At least a full year ago (maybe longer than that) you first shared with me about some of what this disgusting man had said to you.

162.   Another *Instagram* follower wrote:

> I am guilty of hearing several stories from current and past employees in multiple departments and shrugging it off because of how much I enjoy what The Preserve is in its' concept. Stories about inappropriate touching on young girls and comments about having plenty of money to support them as side chicks.

> You can use that message in your story I only ask that you block out my name and photo

> Since I still work there I will most likely be looking for new work Because I cannot simply support him or the business no matter how much I enjoy what I do

163.    Another *Instagram* follower wrote:

> Hi Sis! You told me and Chris about the horrible sexual harassment you were experiencing at least a year ago. It is disgusting how this pig has treated you. So glad you found a way to remove yourself and speak out. You have my full support.

164.    Another *Instagram* follower wrote:

> We've never talked regarding this but working there I've been witness to his inappropriate remarks and interactions with you and many other woman. He's had a reputation for this behavior for quite some time now. Upon being hired two years ago I was given a warning about the owners "overly friendly" behavior, this is far from something new. A warning that is given to many other woman sent to the preserve. So many people are aware of the man he is and unfortunately just remain quiet. I'm glad someone has said something.

165.    Defendants' actionable conduct complained of herein proximately caused McDaniel to suffer grave and substantial pecuniary damages, including lost wages, bonuses, commissions, fringe benefits, vacation pay, as well as other pecuniary damages, now, and in the future.

166.    Defendants' actionable conduct complained of herein forced McDaniel to suffer substantial compensatory damages, including personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, emotional distress with resulting physical and emotional manifestations, loss of enjoyment of life, humiliation, embarrassment, adverse working conditions, offensive working conditions, abusive working conditions, stress anticipating the next confrontational incident of workplace harassment, and retaliation, despair regarding McDaniel's inability to stop or limit the continuing workplace harassment and retaliation, fear and discomfort triggered by suffering a loss of income, fear regarding McDaniel's ability to find new suitable employment, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

167.  The conduct of each Defendants warrants the imposition of statutory punitive or exemplary damages, because Defendants intentionally and maliciously and without justification or excuse subjected McDaniel to discriminatory terms and conditions of employment, harassed McDaniel because of her sex and illegally retaliated against McDaniel for resisting sexual advances, thereby demonstrating each Defendants' reckless and callous indifference to McDaniel's right to work in an environment free from unlawful gender discrimination, and demonstrating each Defendants' malice or ill will.

168.  Defendants stand jointly and severally liable to McDaniel for her damages resulting from the Defendants' illegal and wrongful actions complained of herein.

**CLAIMS AGAINST DEFENDANTS PRESERVE PROPERTY MANAGEMENT COMPANY, LLC AND THE PRESERVE AT BOULDER HILLS, LLC**

**COUNT I**
**VIOLATION OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e ET. AL.**
**DISCRIMINATION BASED ON SEX**
**HOSTILE WORK ENVIRONMENT — SEXUAL HARASSMENT**

169.  McDaniel incorporates by reference paragraphs 1-168 of this Complaint as though fully set forth herein.

170.  Mihailides had the right or power to exercise control over the methods and means of how McDaniel performed her work, including having the sole authority to terminate her employment.

171.  Mihailides intentionally subjected McDaniel to harassment that was based on McDaniel's sex as a female.

172.  The harassment was unwelcome and uninvited.

173.  The harassment was subjectively offensive and McDaniel did, in fact, perceive it to be offensive, hostile, and abusive.

174.  The harassment was objectively offensive such that a reasonable woman would have found it to be offensive, hostile, and abusive.

175.  The harassment was sufficiently severe or pervasive so as to alter the conditions of McDaniel's employment and create an abusive working environment.

176.  All of Mihailides' discriminatory acts towards McDaniel were sufficiently similar.

177.  Mihailides' discriminatory acts towards McDaniel occurred with such frequency and repetition that they were not discrete and isolated, but rather, the discriminatory acts were continuous such that they collectively constitute one unlawful employment practice.

178.  Mihailides' harassment of McDaniel occurred up until the time of her constructive discharge.

179.	Because Mihailides is the owner of The Preserve, and upon information and belief, the sole member or majority member of Defendants Preserve Property Management Company and The Preserve at Boulder Hills – entities that served as McDaniel's employer – thereby having the power and authority to control both entities, Mihailides is an individual sufficiently senior in each entity such that he is the proxy of each defendant.

180.	Furthermore, because Mihailides is an individual sufficiently senior in each entity such that he is the proxy of each defendant, McDaniel was not required to first report Mihailides' sexually-harassing conduct in order to establish the liability of each defendant.

181.	Accordingly, because Mihailides is the proxy of each defendant, Defendants Preserve Property Management Company and The Preserve at Boulder Hills are vicariously liable for Mihailides' harassing conduct of McDaniel.

182.	As a direct and proximate result of such illegal conduct, McDaniel has suffered grave and substantial damages, wherefore Defendants stand joint and severally liable to McDaniel for the damages more fully alleged in paragraphs 165-167 above.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT II
## VIOLATION OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e ET. AL.
## QUID PRO QUO SEXUAL HARASSMENT

183.	McDaniel incorporates by reference paragraphs 1-182 of this Complaint as though fully set forth herein.

184.	Mihailides made sexual advances against McDaniel that were unwelcome.

185.	McDaniel refused Mihailides' sexual advances.

186.	Mihailides exerted significant control over the terms and conditions of McDaniel's employment.

187.	Mihailides used his position of authority over McDaniel to try to extract sexual favors from her.

188.	On several occasions, Mihailides told McDaniel: "You know. If you just give me what I want, your life could get a lot easier" or words to that effect.

189.	On several occasions, Mihailides told McDaniel: "You give a little. You get a lot."

190.	When McDaniel refused Mihailides' sexual advances, he retaliated against her by being verbally abusive to her, thereby creating a hostile work environment.

191.	When McDaniel refused Mihailides' sexual advances, he retaliated against her by refusing to pay her for work performed.

192.  When McDaniel refused Mihailides' sexual advances, he retaliated against her by refusing to reimburse her for expenses.

193.  Because Mihailides was McDaniel's direct supervisor, and he took actions against her adversely affecting her employment because she refused his sexual advances, Defendants are vicariously liable for Mihailides' actions.

194.  As a direct and proximate result of such illegal conduct, McDaniel has suffered grave and substantial damages, wherefore Defendant stand joint and severally liable to McDaniel for the damages more fully alleged in paragraphs 161-163 above.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT III
## VIOLATION OF THE RHODE ISLAND FAIR EMPLOYMENT PRACTICES ACT
## R.I. GEN. LAWS 28-5-1 ET. AL.
## DISCRIMINATION BASED ON SEX
## HOSTILE WORK ENVIRONMENT — SEXUAL HARASSMENT

195.  McDaniel incorporates by reference paragraphs 1-194 of this Complaint as though fully set forth herein.

196.  Mihailides had the right or power to exercise control over the methods and means of how McDaniel performed her work, including having the sole authority to terminate her employment.

197.  Mihailides' intentionally subjected McDaniel to harassment that was based on McDaniel's sex as a female.

198.  The harassment was unwelcome and uninvited.

199.  The harassment was subjectively offensive and McDaniel did, in fact, perceive it to be offensive, hostile, and abusive.

200.  The harassment was objectively offensive such that a reasonable woman would have found it to be offensive, hostile, and abusive.

201.  The harassment was sufficiently severe or pervasive so as to alter the conditions of McDaniel's employment and create an abusive working environment.

202.  All of Mihailides' discriminatory acts towards McDaniel were sufficiently similar.

203.  Mihailides' discriminatory acts towards McDaniel occurred with such frequency and repetition that they were not discrete and isolated, but rather, the discriminatory acts were continuous such that they collectively constitute one unlawful employment practice.

204.  Mihailides' harassment of McDaniel occurred up until the time of her constructive discharge.

205. Because Mihailides is the owner of The Preserve, and upon information and belief, the sole member or majority member of Defendants Preserve Property Management Company and The Preserve at Boulder Hills – entities that served as McDaniel's employer – thereby having the power and authority to control both entities, Mihailides is an individual sufficiently senior in each entity such that he is the proxy of each defendant.

206. Furthermore, because Mihailides is an individual sufficiently senior in each entity such that he is the proxy of each defendant, McDaniel was not required to first report Mihailides' sexually-harassing conduct in order to establish the liability of each defendant.

207. Accordingly, because Mihailides is the proxy of each defendant, Defendants Preserve Property Management Company and The Preserve at Boulder Hills are vicariously liable for Mihailides' harassing conduct of McDaniel.

208. As a direct and proximate result of such illegal conduct, McDaniel has suffered grave and substantial damages, wherefore Defendants stand joint and severally liable to McDaniel for the damages more fully alleged in paragraphs 165-167 above.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT IV
## VIOLATION OF THE RHODE ISLAND FAIR EMPLOYMENT PRACTICES ACT
## R.I. GEN. LAWS 28-5-1 ET. AL.
## QUID PRO QUO SEXUAL HARASSMENT

209. McDaniel incorporates by reference paragraphs 1-208 of this Complaint as though fully set forth herein.

210. Mihailides made sexual advances against McDaniel that were unwelcome.

211. McDaniel refused Mihailides' sexual advances.

212. Mihailides exerted significant control over the terms and conditions of McDaniel's employment.

213. Mihailides used his position of authority over McDaniel to try to extract sexual favors from her.

214. On several occasions, Mihailides told McDaniel: "You know. If you just give me what I want, your life would be a lot easier" or words to that effect.

215. On several occasions, Mihailides told McDaniel: "You give a little. You get a lot."

216. When McDaniel refused Mihailides' sexual advances, he retaliated against her by being verbally abusive to her, thereby creating a hostile work environment.

217. When McDaniel refused Mihailides' sexual advances, he retaliated against her by refusing to pay her for work performed.

218. When McDaniel refused Mihailides' sexual advances, he retaliated against her by refusing to reimburse her for expenses.

219. Because Mihailides was McDaniel's direct supervisor, and he took actions against her adversely affecting her employment because she refused his sexual advances, Defendants are vicariously liable for Mihailides' actions.

220. As a direct and proximate result of such illegal conduct, McDaniel has suffered grave and substantial damages, wherefore Defendant stand joint and severally liable to McDaniel for the damages more fully alleged in paragraphs 165-167 above.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT V
## VIOLATION OF THE RHODE ISLAND CIVIL RIGHTS ACT OF 1990
## R.I. GEN. LAWS 42-112-1 ET. AL.
## DISCRIMINATION BASED ON SEX
## HOSTILE WORK ENVIRONMENT — SEXUAL HARASSMENT

221. McDaniel incorporates by reference paragraphs 1-220 of this Complaint as though fully set forth herein.

222. Mihailides had the right or power to exercise control over the methods and means of how McDaniel performed her work, including having the sole authority to terminate her services.

223. Mihailides' intentionally subjected McDaniel to harassment that was based on McDaniel's sex as a female.

224. The harassment was unwelcome and uninvited.

225. The harassment was subjectively offensive and McDaniel did, in fact, perceive it to be offensive, hostile, and abusive.

226. The harassment was objectively offensive such that a reasonable woman would have found it to be offensive, hostile, and abusive.

227. The harassment was sufficiently severe or pervasive so as to alter the conditions of McDaniel's employment and create an abusive working environment.

228. All of Mihailides' discriminatory acts towards McDaniel were sufficiently similar.

229. Mihailides' discriminatory acts towards McDaniel occurred with such frequency and repetition that they were not discrete and isolated, but rather, the discriminatory acts were continuous such that they collectively constitute one unlawful employment practice.

230. Mihailides' harassment of McDaniel occurred up until the time of her constructive discharge.

231. Because Mihailides is the owner of The Preserve, and upon information and belief, the sole member or majority member of Defendants Preserve Property Management Company and The Preserve at Boulder Hills – entities that served as McDaniel's employer – thereby having the power and authority to control both entities, Mihailides is an individual sufficiently senior in each entity such that he is the proxy of each defendant.

232. Furthermore, because Mihailides is an individual sufficiently senior in each entity such that he is the proxy of each defendant, McDaniel was not required to first report Mihailides' sexually-harassing conduct in order to establish the liability of each defendant.

233. Accordingly, because Mihailides is the proxy of each defendant, Defendants Preserve Property Management Company and The Preserve at Boulder Hills are vicariously liable for Mihailides' harassing conduct of McDaniel.

234. Mihailides' conduct as described above interfered with McDaniel's ability to make and enforce contracts with Defendants because of her sex in violation of R.I. Gen. Laws § 42-112-1 et seq.

235. As a direct and proximate result of such illegal conduct, McDaniel has suffered grave and substantial damages, wherefore Defendants stand joint and severally liable to McDaniel for the damages more fully alleged in paragraphs 165-167 above.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT VI
## VIOLATION OF THE RHODE ISLAND CIVIL RIGHTS ACT OF 1990
## R.I. GEN. LAWS 42-112-1 ET. AL.
## QUID PRO QUO SEXUAL HARASSMENT

236. McDaniel incorporates by reference paragraphs 1-235 of this Complaint as though fully set forth herein.

237. Mihailides made sexual advances against McDaniel that were unwelcome.

238. McDaniel refused Mihailides' sexual advances.

239. Mihailides exerted significant control over the terms and conditions of McDaniel's employment.

240. Mihailides used his position of authority over McDaniel to try to extract sexual favors from her.

241. On several occasions, Mihailides told McDaniel: "You know. If you just give me what I want, your life would be a lot easier" or words to that effect.

242. On several occasions, Mihailides told McDaniel: "You give a little. You get a lot."

243. When McDaniel refused Mihailides' sexual advances, he retaliated against her by being verbally abusive to her, thereby creating a hostile work environment.

244. When McDaniel refused Mihailides' sexual advances, he retaliated against her by refusing to pay her for work performed.

245. When McDaniel refused Mihailides' sexual advances, he retaliated against her by refusing to reimburse her for expenses.

246. Because Mihailides was McDaniel's direct supervisor, and he took actions against her adversely affecting her employment because she refused his sexual advances, Defendants are vicariously liable for Mihailides' actions.

247. Mihailides' conduct as described above interfered with McDaniel's ability to make and enforce contracts with Defendants because of her sex in violation of R.I. Gen. Laws § 42-112-1 et seq.

248. As a direct and proximate result of such illegal conduct, McDaniel has suffered grave and substantial damages, wherefore Defendant stand joint and severally liable to McDaniel for the damages more fully alleged in paragraphs 165-167 above.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT VII
## VIOLATION OF R.I. GEN. LAWS § 28-14-1 ET SEQ.
## FAILURE TO PAY WAGES DUE

249. McDaniel hereby incorporates by reference paragraphs 1-248 of this Complaint as though fully set forth herein.

250. R.I. Gen. Laws § 28-14-1 et. seq. establishes the right of employees to be paid wages for their work.

251. McDaniel and Defendants had an agreement whereupon Defendants agreed to pay McDaniel a salary of $6,000 per month beginning in December 2019 for work performed at The Preserve.

252. However, during the time McDaniel performed work at The Preserve, Defendants never compensated her fully for her work.

253. McDaniel worked at The Preserve for twenty-five (25) months, which entitled her to $150,000 in gross wages ($6,000 per month * 25 months = $150,000).

254. However, Defendants only paid McDaniel $30,087 in 2020 and $13,850 in 2021, leaving unpaid back wages in the amount of $106,063 [$150,000 − ($30,087 + $13,850) = $106,063].

255. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, violated R.I. Gen. Laws § 28-14-1 et. seq. by failing to pay wages as provided therein, thereby causing McDaniel to suffer damages as aforesaid, for which she is entitled pursuant to R.I. Gen. Laws § 28-14-19.2 to recover all unpaid wages and benefits, compensatory damages, liquidated damages in an amount up to two (2) times the amount of unpaid wages and/or benefits owed, and reasonable attorneys' fees and costs.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT VIII
## VIOLATION OF R.I. GEN. LAWS § 28-14-19.1
## MISCLASSIFICATION OF EMPLOYEE

256. McDaniel incorporates by reference paragraphs 1-255 of this Complaint as though fully set forth herein.

257. At all times relevant to this matter, Defendant Mihailides had the right or power to exercise control over the methods and means of how McDaniel performed her work, including having the sole authority to terminate her employment and, therefore, McDaniel did not serve Defendants as an independent contractor, but rather, she served as an employee.

258. Because McDaniel did not serve Defendants as an independent contractor, they were required to remit to the IRS and the Rhode Island Division of Taxation the employer's matching contribution of the taxes it was required by law to pay.

259. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, violated R.I. Gen. Laws § 28-14-19.1 by misclassifying McDaniel as an independent contractor, thereby causing McDaniel to suffer damages as aforesaid, for which she is entitled to recover.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## COUNT IX
## BREACH OF CONTRACT

260. McDaniel incorporates by reference paragraphs 1-259 of this Complaint as though fully set forth herein.

261. McDaniel and Defendants had an agreement whereupon Defendants agreed to pay McDaniel a salary of $6,000 per month beginning in December 2019 for work performed at The Preserve.

262. However, during the time McDaniel performed work at The Preserve, Defendants never compensated her fully for her work.

263. McDaniel worked at The Preserve for twenty-five (25) months, which entitled her to $150,000 in gross wages ($6,000 per month * 25 months = $150,000).

264. However, Defendants only paid McDaniel $30,087 in 2020 and $13,850 in 2021, leaving unpaid balance in the amount of $106,063 [$150,000 − ($30,087 + $13,850) = $106,063].

265. Defendants' conduct as described herein constitutes a breach of contract.

266. McDaniel has been harmed thereby.

WHEREFORE, McDaniel prays for the relief hereinafter set forth.

## CLAIMS AGAINST DEFENDANT PAUL MIHAILIDES

## COUNT X
## DEFAMATION

267. McDaniel incorporates by reference paragraphs 1-266 of this Complaint as though fully set forth herein.

268. Mihailides uttered false and defamatory statements about McDaniel when he stated that she was involved in a sexual relationship with him by telling others that she was his mistress.

269. Mihailides communicated these false and defamatory statements to a third party.

270. The communication of these false and defamatory statements to a third party were not privileged.

271. Mihailides knew the defamatory statements were false when he communicated them to a third party.

272. Mihailides was negligent for allowing the false and defamatory statements to be communicated to a third party.

273. The false and defamatory statements constitute defamation per se because it charged McDaniel with serious sexual misconduct as Mihailides was married at the time of the defamatory statements.

274. The false and defamatory statements constitute defamation per se because it charged McDaniel with having a sexual relationship with her direct supervisor – a matter incompatible with her business, trade, or profession.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

## COUNT XI
## BATTERY

275.  Plaintiff hereby incorporates by reference paragraphs 1-274 of this Complaint as though fully set forth herein.

276.  On many occasions, Mihailides intentionally touched McDaniel's body, including her buttocks, without her consent.

277.  Mihailides' actions as described herein did, in fact, cause offensive contacts with or unconsented touching upon the body of McDaniel.

278.  McDaniel has been harmed thereby.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ALISON MCDANIEL prays that the Court grant the following relief:

1.  An order directing Defendants to place Plaintiff in the position Plaintiff would have occupied but for Defendants' discriminatory treatment of Plaintiff, and make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendant's discriminatory treatment, including, but not limited to, wages and employment benefits.

2.  A finding that the Defendants stands joint and severally liable to make Plaintiff whole for all damages suffered as a result of the wrongful acts and omissions alleged in each Count herein, including inter alia damages for emotional harm, back pay, and front pay, and the value of lost fringe benefits;

3.  A finding that the Defendants stand joint and severally liable to Plaintiff for the imposition of statutory exemplary or punitive damages, because Defendants intentionally and maliciously and without justification or excuse illegally discriminated against Plaintiff on the basis of her sex, thereby demonstrating Defendants' reckless and callous indifference to Plaintiff's right to work in an environment free from unlawful discrimination, and demonstrating Defendants' malice or ill will;

4.  An order declaring that the acts and practices complained of herein are in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et seq.; the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1 et. seq.; and the Rhode Island Minimum Wage Act, R.I. Gen. Laws § 28-12-1 et seq.

5.  A permanent injunction against Defendants prohibiting future acts of discrimination against Plaintiff and similarly-situated employees;

6.  An order enjoining and permanently restraining Defendants from further violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et seq.; the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1 et. seq.; and the Rhode Island Minimum Wage Act, R.I. Gen. Laws § 28-12-1 et seq.

7.  An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

8.  An award of unpaid wages in the amount of $106,063;

9.  An award of liquidated damages pursuant to R.I. Gen. Laws § 28-14-19.2 equal to two times the amount of wages owed in the amount of $212,126;

10. Impose a civil penalty in the amount of $3,000 pursuant to R.I. Gen. Laws § 28-14-19.1(b) to be shared equally between Plaintiff and the Rhode Island Department of Employment and Training.

11. An award of $500,000 for emotional pain and suffering;

12. An award of $500,000 for damage to reputation;

13. An award of $2,000,000 for punitive damages;

14. A finding that Defendants stand joint and severally liable to Plaintiff for an award of her reasonable attorneys' fees, litigation costs and other costs of this action, together with a post-trial hearing to determine the amount of Plaintiff's reasonable attorneys' fees taxable to Defendant, along with a determination of Plaintiff's litigation costs and expenses taxable to Defendant;

15. An appropriate award of pre-judgment interest at twelve percent (12%) per annum on all sums recovered; and

16. Such other and further relief as this Court deems just and proper.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this **19**th day of July 2023.

/s/Alison McDaniel
ALISON MCDANIEL

Respectfully Submitted by:

Plaintiff
ALISON MCDANIEL
By and Through Her Attorney,

/s/Mark P. Gagliardi
Mark P. Gagliardi (R.I. Bar ID#6819)
mark@markgagliardilaw.net

LAW OFFICE OF MARK P. GAGLIARDI
56 Pine Street, Suite 200
Providence, RI 02906
(401) 277-2030 (office)
(401) 487-6666 (cell)
(401) 274-2780 (fax)

Date: July 19, 2023