UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALISON MCDANIEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No.: 1:23-CV-00292- |
| | : | WES-LDA |
| PRESERVE PROPERTY MANAGEMENT | : | |
| COMPANY, LLC, THE PRESERVE AT BOULDER | : | |
| HILLS, LLC and PAUL MIHAILIDES, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' ANSWER TO AMENDED VERIFIED COMPLAINT AND COUNTERCLAIMS

Pursuant to Rule 12(a)(2) of the Federal Rules of Civil Procedure, Defendants Preserve Property Management Company, LLC ("Preserve Property Management Company"), The Preserve at Boulder Hills, LLC ("Preserve at Boulder Hills") and Paul Mihailides (collectively, "Defendants") hereby respond to the allegations in Plaintiff Alison McDaniel's Amended Verified Complaint dated July 19, 2023 as follows:

1.      Denied.

2.      Defendants admit that Preserve Property Management Company is a limited liability company organized under the laws of the State of Rhode Island and is authorized to do business in Rhode Island. Defendants further admit that the fictious name Preserve Sporting Club & Residences was filed with the Rhode Island Secretary of State on September 12, 2022. Defendants deny the remaining allegations set forth in paragraph 2 and state that Preserve Property Management Company did not ever employ McDaniel and was not organized at the time McDaniel alleges she was hired. Defendants further state that the fictious name Preserve Sporting Club &

Residences was not filed with the Rhode Island Secretary of State until approximately 10 months after the Alison McDaniel Agency's consultancy with the Preserve at Boulder Hills ended.

3. Defendants admit that the Preserve at Boulder Hills is a limited liability company organized under the laws of the State of Rhode Island and is authorized to do business in Rhode Island. Defendants deny the remaining allegations in paragraph 3.

4. Defendants admit that Mihailides is a resident of the State of Rhode Island and is male and of legal age. Defendants deny the remaining allegations in paragraph 4.

**Response to
Jurisdiction and Venue**

5. Paragraph 5 is a conclusion of law to which no response is required.

6. Paragraph 6 is a conclusion of law to which no response is required.

7. Paragraph 7 is a conclusion of law to which no response is required. Defendants deny that McDaniel's alleged state law claims are related to McDaniel's alleged federal law claims.

8. Paragraph 8 is a conclusion of law to which no response is required.

9. Paragraph 9 is a conclusion of law to which no response is required.

**Response to
Administrative Procedures**

10. Denied. A true and accurate copy of the Charge of Discrimination McDaniel filed with the Equal Employment Opportunity Commission (the "EEOC") is attached hereto as **Exhibit A**. A true and accurate copy of the Charge of Discrimination McDaniel filed with the Rhode Island Commission for Human Rights (the "RICHR") is attached hereto as **Exhibit B**.

11. Denied. Defendants state that on April 13, 2023, the EEOC issued a Dismissal and Notice of Rights to McDaniel, which states, in part:

**DISMISSAL OF CHARGE**

The EEOC is closing this charge because you were not in an employment relationship with the Respondent.

The Respondent in the EEOC was the Preserve Sporting Club. The EEOC's Dismissal and Notice of Rights gave McDaniel notice of her right to sue the Preserve Sporting Club. A true and accurate copy of the EEOC's Dismissal and Notice of Rights is attached hereto as **Exhibit C**.

12.     Denied. Defendants state that on April 14, 2023, the RICHR issued a Notice of Right to Sue Letter with respect to the Preserve Sporting Club because more than 120 days and less than 2 years had elapsed since the charge was filed, the RICHR was unable to secure a settlement or conciliation agreement, the RICHR had not commenced hearings on a complaint and McDaniel requested a Right to Sue. A true and accurate copy of the RICHR's Notice of Right to Sue Letter is attached hereto as **Exhibit D**. The RICHR's Notice of Right to Sue Letter also states: "In the event that the above-cited matter includes allegations against individually-named employees of a respondent employer under the Rhode Island Fair Employment Practices Act, please note that recent Rhode Island Supreme Court decision in <u>Mancini v. City of Providence</u>, 155 A.3d 159 (RI 2017), held that employees of a respondent employer are not individually liable under the Act. Please consult the decision and/or an attorney to determine how the decision affects this case." *Id*.

**Response to
Factual Allegations**

13.     Admitted that the Preserve Sporting Club & Residences is a luxury resort as described in paragraph 13. Defendants deny that the characterization of the Preserve Sporting Club & Residences as "The Preserve" is an accurate characterization for purposes of this Amended Verified Complaint.

14.     Denied.

15.     Denied.

16.     Denied.

17.     Denied.

18.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18.

19.     Defendants admit that McDaniel operates the Alison McDaniel Agency.   On information and belief, the Alison McDaniel Agency is not a separate legal entity and it is not registered to do business in the State of Rhode Island.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.   Defendants state that during the time McDaniel performed work as an independent contractor to Preserve at Boulder Hills through the Alison McDaniel Agency, the Preserve at Boulder Hills at times furnished certain tools, materials and equipment necessary for the projects.  At other times, McDaniel furnished her own tools, materials, clothing, props, supplies and equipment for the projects.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Denied.

29.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     The Preserve at Boulder Hills admits that it reimbursed McDaniel for her *alleged* travel expenses.  Defendants deny the remaining allegations in paragraph 35.  Defendants further state that, on information and belief, there were occasions when the Preserve at Boulder Hills reimbursed McDaniel for her *alleged* travel expenses (based on her word and without documentation) but later learned that McDaniel did not, in fact, incur those travel expenses.

36.     Defendants admit that McDaniel stayed overnight at various locations at the Preserve in Richmond, Rhode Island (the "Preserve") when she requested that accommodation. To accommodate her, the Preserve Property Management Company sometimes permitted McDaniel to utilize the homes of members with properties at the Preserve, with their permission. Other times, McDaniel would inform the front desk that she needed to stay on site and the Preserve Property Management Company would do what it could to accommodate her.  The remaining allegations in paragraph 36 are denied.

37.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37, however, Defendants state that if McDaniel waited tables on one occasion or helped to stock the Hilltop Lodge before its opening, she did so without

having been asked (volunteering to help) and, later though, charged the Preserve at Boulder Hills for those services, for which it paid her.

38. Defendants deny that Mihailides acted inappropriately on McDaniel's first visit to the property at the Preserve. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38.

39. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39.

40. Denied.

41. Denied.

42. Denied.

43. Denied as alleged.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

92.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92.

93.     Defendants admit that Mihailides may have used the word "hot" but are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 without additional context.  Defendants state that McDaniel held herself out as "hot."   For example, on June 20, 2014, Sports Illustrated included eight images of McDaniel—some in swimsuits and some in undergarments—under the heading "Wednesday's A.M. Hot Clicks."

94.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94.

95.     Defendants are without knowledge or information sufficient to form a belief as to McDaniel's state of mind as alleged in paragraph 95.  The remaining allegations in paragraph 95 are denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105.

106.    Defendants are without knowledge or information sufficient to form a belief as to McDaniel's state of mind as alleged in paragraph 106.

107.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107.

108.    Denied

109.    Denied

110.    Denied.

111.    Denied.

112.    Denied.

113. Denied.

114. Denied.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

119. Denied.

120. Denied.

121. Denied.

122. Denied.

123. Denied.

124. Denied.

125. Admitted that Mihailides asked Beahm to lower her mask so that prospective purchasers could become more familiar with her. The remainder of the allegations in paragraph 125 are denied.

126. Denied.

127. Denied.

128. Denied.

129. Denied.

130. Denied.

131. Denied.

132. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132.

133.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133.

134.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134.

135.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135.

136.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136.

137.     Defendants are without knowledge or information sufficient to form a belief as to what, if anything, Beahm was told as alleged in paragraph 137.  The remaining allegations in paragraph 137 are denied.

138.     Denied.

139.     Denied.

140.     Denied.

141.     Denied.

142.     Denied.

143.     Denied.

144.     Denied.

145.     Denied.

146.     Denied.

147.     Denied.  Defendants state that at all relevant times, human resources was available to employees of certain entities at the Preserve.  Until June 2021, Ocean House Management

provided human resources services for certain entities at the Preserve. Thereafter, John Bergantino was retained to provide human resources services to certain entities at the Preserve.

148.     Denied.

149.     Defendants deny that McDaniel was constructively discharged and deny that McDaniel was subjected to a hostile work environment. Her services had ended, the Preserve at Boulder Hills had fully paid for her billed services and she was not engaged for any additional services. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 149.

150.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150.

151.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 151 or the authenticity of the Instagram post incorporated in that paragraph.

152.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 152 or the authenticity of the Instagram post incorporated in that paragraph.

153.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 153 or the authenticity of the Instagram post incorporated in that paragraph.

154.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 or the authenticity of the Instagram post incorporated in that paragraph.

155.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155 or the authenticity of the Instagram post incorporated in that paragraph.

156.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 or the authenticity of the Instagram post incorporated in that paragraph.

157.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 or the authenticity of the Instagram post incorporated in that paragraph.

158.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158 or the authenticity of the Instagram post incorporated in that paragraph.

159.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 159 or the authenticity of the Instagram post incorporated in that paragraph.

160.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160 or the authenticity of the Instagram post incorporated in that paragraph.

161.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161 or the authenticity of the Instagram post incorporated in that paragraph.

162.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 162 or the authenticity of the Instagram post incorporated in that paragraph.

163.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 163 or the authenticity of the Instagram post incorporated in that paragraph.

164.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164 or the authenticity of the Instagram post incorporated in that paragraph.

165.    Denied.

166.    Denied.

167.    Denied.

168.    Denied.

**Response to**
**COUNT I**
**VIOLATION OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e et al.**
**DISCRIMINATION BASED ON SEX**
**HOSTILE WORK ENVIRONMENT – SEXUAL HARASSMENT**

169.    Defendants incorporate their responses to paragraphs 1 – 168 of McDaniel's Complaint as though set forth fully herein.

170.    Denied.

171.    Denied.

172.    Denied.

173.    Denied.

174.    Denied.

175.     Denied.

176.     Denied.

177.     Denied.

178.     Denied.

179.     Denied.

180.     Denied.

181.     Denied.

182.     Denied.

**Response to**
**COUNT II**
**VIOLATION OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e et al.**
**QUID PRO QUO SEXUAL HARASSMENT**

183.     Defendants incorporate their responses to paragraphs 1 – 182 of McDaniel's

Complaint as though set forth fully herein.

184.     Denied.

185.     Denied.

186.     Denied.

187.     Denied.

188.     Denied.

189.     Denied.

190.     Denied.

191.     Denied.

192.     Denied.

193.     Denied.

194.    Denied.

**Response to**
**COUNT III**
**VIOLATION OF THE RHODE ISLAND FAIR EMPLOYMENT PRACTICES ACT**
**R.I. GEN. LAWS 28-5-1 et al.**
**DISCRIMINATION BASED ON SEX**
**HOSTILE WORK ENVIRONMENT – SEXUAL HARASSMENT**

195.    Defendants incorporate their responses to paragraphs 1 – 194 of McDaniel's Complaint as though set forth fully herein.

196.    Denied.

197.    Denied.

198.    Denied.

199.    Denied.

200.    Denied.

201.    Denied.

202.    Denied.

203.    Denied.

204.    Denied.

205.    Denied.

206.    Denied.

207.    Denied.

208.    Denied.

**Response to**
**COUNT IV**
**VIOLATION OF THE RHODE ISLAND FAIR EMPLOYMENT PRACTICES ACT**
**R.I. GEN. LAWS 28-5-1, et al.**
**QUID PRO QUO SEXUAL HARASSMENT**

209.    Defendants incorporate their responses to paragraphs 1 – 208 of McDaniel's Complaint as though set forth fully herein.

210.    Denied.

211.    Denied.

212.    Denied.

213.    Denied.

214.    Denied.

215.    Denied.

216.    Denied.

217.    Denied.

218.    Denied.

219.    Denied.

220.    Denied.

**Response to**
**COUNT V**
**VIOLATION OF THE RHODE ISLAND CIVIL RIGHTS ACT OF 1990**
**R.I. GEN. LAWS 42-112-1 et al.**
**DISCRIMINATION BASED ON SEX**
**HOSTILE WORK ENVIRONMENT – SEXUAL HARASSMENT**

221.    Defendants incorporate their responses to paragraphs 1 – 220 of McDaniel's Complaint as though set forth fully herein.

222.    Denied.

223.    Denied.

224. Denied.

225. Denied.

226. Denied.

227. Denied.

228. Denied.

229. Denied.

230. Denied.

231. Denied.

232. Denied.

233. Denied.

234. Denied.

235. Denied.

**Response to**
**COUNT VI**
**VIOLATION OF THE RHODE ISLAND CIVIL RIGHTS ACT OF 1990**
**R.I. GEN. LAWS 42-112-1 et al.**
**QUID PRO QUO SEXUAL HARASSMENT**

236. Defendants incorporate their responses to paragraphs 1 – 235 of McDaniel's Complaint as though set forth fully herein.

237. Denied.

238. Denied.

239. Denied.

240. Denied.

241. Denied.

242. Denied.

243. Denied.

244. Denied.

245. Denied.

246. Denied.

247. Denied.

248. Denied.

**Response to**
**COUNT VII**
**VIOLATION OF R.I. GEN. LAWS § 28-14-1 et seq.**
**FAILURE TO PAY WAGES DUE**

249. Defendants incorporate their responses to paragraphs 1 – 248 of McDaniel's Complaint as though set forth fully herein.

250. Denied.

251. Denied.

252. Denied.

253. Denied.

254. Defendants admit that in 2020 the Preserve at Boulder Hills paid the Alison McDaniel Agency $30,087. Defendants deny the remainder of the allegations in paragraph 252. Defendants state that the Preserve at Boulder Hills paid the Alison McDaniel Agency and/or McDaniel a total of $33,447 in 2021. The payments making up that total are identified in paragraphs 45-72 and 74-110 of the Counterclaims asserted herein and the corresponding exhibits.

255. Denied.

**Response to**
**COUNT VIII**
**VIOLATION OF R.I. GEN. LAWS § 28-14-19.1**
**MISCLASSIFICATION OF EMPLOYEE**

256.     Defendants incorporate their responses to paragraphs 1 – 255 of McDaniel's Complaint as though set forth fully herein.

257.     Denied.

258.     Denied.

259.     Denied.

**Response to**
**COUNT IX**
**BREACH OF CONTRACT**

260.     Defendants incorporate their responses to paragraphs 1 – 259 of McDaniel's Complaint as though set forth fully herein.

261.     Denied.

262.     Denied.

263.     Denied.

264.     Defendants admit that in 2020 the Preserve at Boulder Hills paid the Alison McDaniel Agency $30,087.  Defendants deny the remainder of the allegations in paragraph 252. Defendants state that the Preserve at Boulder Hills paid the Alison McDaniel Agency and/or McDaniel a total of $33,447 in 2021.  The payments making up that total are identified in paragraphs 45-72 and 74-110 of the Counterclaims asserted herein and the corresponding exhibits.

265.     Denied.

266.     Denied.

**Response to
COUNT IX
DEFAMATION**

267.     Defendants incorporate their responses to paragraphs 1 – 266 of McDaniel's Complaint as though set forth fully herein.

268.     Denied.

269.     Denied.

270.     Denied.

271.     Denied.

272.     Denied.

273.     Denied.

274.     Denied.

**Response to
COUNT XI
BATTERY**

275.     Defendants incorporate their responses to paragraphs 1 – 274 of McDaniel's Complaint as though set forth fully herein.

276.     Denied.

277.     Denied.

278.     Denied.

WHEREFORE, Defendants demand judgment against Plaintiff plus costs.

## <u>JURY TRIAL DEMAND</u>

Defendants hereby demand a trial by jury on all counts so triable.

## DEFENSES

### FIRST DEFENSE

Some or all of McDaniel's claims fail to state a claim upon which relief may be granted, including, but not limited to, the following reasons:

a. Counts I and II, which purport to state claims for violation of the Civil Rights Act of 1964, fail to state a claim against Defendants because McDaniel was not an employee of any of them. Rather, McDaniel's agency, the Alison McDaniel Agency, was at times an independent contractor of the Preserve at Boulder Hills. McDaniel acknowledged this fact in her Charge of Discrimination filed with the RICHR, which states, in part, "I was hired as an independent contractor." **Exhibit B.**

b. Counts I and II, which purport to state claims for violation of the Civil Rights Act of 1964 ("Title VII"), also fail to state a claim against Mihailides because Title VII does not impose individual liability on employees or supervisors. *See Fantini v. Salem State College*, 557 F.3d 22, 24 (1st Cir. 2009).[1]

c. Counts III and IV, which purport to state claims for violation of the Rhode Island Fair Employment Practices Act, fails to state a claim against Defendants because McDaniel was not an employee of any of them. Rather, McDaniel's agency, the Alison McDaniel Agency, was an independent contractor of the Preserve at Boulder Hills. McDaniel acknowledged this fact in her Charge of Discrimination filed with the RICHR, which states, in part, "I was hired as an independent contractor." **Exhibit B.**

---

[1] Although McDaniel has included a header on page 18 of her Amended Verified Complaint suggesting that Counts I – IX are pled only against Preserve Property Management Company and the Preserve at Boulder Hills, McDaniel's prayer for relief at pages 27 and 28 of her Amended Verified Complaint seeks damages, injunctive relief and other remedies against all three Defendants, as well as a finding of joint and several liability as to all three Defendants.

d.  Counts III and IV, which purport to state claims for violation of the Rhode Island Fair Employment Practices Act, also fails to state a claim against the Preserve at Boulder Hills because the Preserve at Boulder Hills has no employees.  *See* R.I. Gen. Laws § 28-5-6(8)(i) (defining "[e]mployer" to include "any person in this state employing four (4) or more individuals").

e.  Counts III and IV, which purport to state claims for violation of the Rhode Island Fair Employment Practices Act, also fail to state a claim against Mihailides because the Rhode Island Fair Employment Practices Act does not provide for individual liability. *See Mancini v. City of Providence*, 155 A.3d 159 (R.I. 2017) (answering a question certified to it from this Court).

f.  Counts VII, which purports to state a claim for failure to pay wages due, fails to state a claim against Defendants because McDaniel was not an employee of any of them.

g.  Count VIII, which purports to state a claim for misclassification of employee, fails to state a claim against Defendants because McDaniel was not an employee of any of them.

## SECOND DEFENSE

Some or all of McDaniel's claims are barred for failure to exhaust her administrative remedies, including but not limited to the following:

a.  Some or all of McDaniel's claims against the Preserve at Boulder Hills are barred for failure to exhaust her administrative remedies as she never pursued any administrative remedies against the Preserve at Boulder Hills.

b.  Some or all of McDaniel's claims against Mihailides are barred for failure to exhaust her administrative remedies as she never pursued any administrative remedies against Mihailides.

c.  Some or all of McDaniel's claims against Preserve Property Management Company are barred for failure to exhaust her administrative remedies as she never pursued any administrative remedies against Preserve Property Management Company.  McDaniel pursued claims in the EEOC and the RICHR against the Preserve Sporting Club.  There is no legal entity with that name.  The Preserve Sporting Club & Residences was registered as a fictitious name for Preserve Property Management Company on September 12, 2022, however, it was not registered as a fictitious name at any point during the period of time that the Alison McDaniel Agency performed consulting services for the Preserve at Boulder Hills.

d.  McDaniel's claims against Defendants relating to the alleged experiences of other employees, including the allegations in paragraphs 119 – 141, and relief sought on the basis of "similarly-situated employees" are barred for failure to exhaust her administrative remedies and for her lack of standing to assert such claims.

**THIRD DEFENSE**

Some or all of McDaniel's claims are barred by the applicable statutes of limitation, including but not limited to the following:

a.  Counts I, II, III, IV, V and VI are all barred by the applicable statutes of limitations.

b.  Count X, which purports to state a claim against Mihailides for defamation, is barred by the one-year statute of limitations applicable to actions for words spoken set forth in R.I. Gen. Laws § 9-1-14.

c. Count VII, which purports to state a claim for failure to pay wages due under R.I. Gen. Laws § 28-14-1, et seq., is barred in part because any claim related to wages that allegedly were not paid before July 11, 2020 are barred by the applicable statute of limitations.

d. Count IX, which purports to state a claim for breach of contract for an unpaid "salary" and "wages," is barred in part because any claim related to wages that allegedly were not paid before July 11, 2020 are barred by the applicable statute of limitations.

e. To the extent that McDaniel may attempt to cure her failure to exhaust her administrative remedies by filing a Charge of Discrimination in the EEOC or the RICHR, any such claim would be barred by the applicable statutes of limitations.

### FOURTH DEFENSE

Some or all of McDaniel's claims are barred by the doctrine of laches.

### FIFTH DEFENSE

McDaniel's breach of contract claim is barred by the doctrine of accord and satisfaction.

### SIXTH DEFENSE

Any damages recoverable for McDaniel's breach of contract claim must be reduced by McDaniel's failure to mitigate her damages.

### SEVENTH DEFENSE

In the event that it is determined that McDaniel was an employee of any one of the Defendants, which Defendants expressly deny, then the Rhode Island Workers' Compensation Act's exclusivity provision would bar some or all of her claims and/or remedies.

## EIGHTH DEFENSE

In the event that McDaniel is entitled to compensatory damages on Counts I and II, which Defendants expressly deny she has any entitlement to, any such compensatory damages must be capped by the limits established by 42 U.S.C.S. § 1981a(b)(3).

## NINTH DEFENSE

McDaniel's Complaint fails to state a claim against Defendants with respect to any alleged punitive damages as McDaniel has not pled the type of conduct on Defendants' part that would satisfy the standards for awarding punitive damages.

## TENTH DEFENSE

The alleged conduct of Defendants cannot support an award of punitive damages and any award of punitive damages in this matter would violate the Due Process Clause of the United States Constitution and the provisions of the State of Rhode Island Constitution.

## ELEVENTH DEFENSE

Any award of punitive damages to McDaniel would be in violation of the constitutional rights and safeguards provided to Defendants under the United States Constitution and, to the extent applicable, the Rhode Island Constitution, including, without limitation, that there are no constraining limitations placed on a jury's discretion in considering the imposition or amount of punitive damages; there are no meaningful trial court and appellate review mechanisms to constitutionally confirm any punitive damage award; the imposition of a punitive damage award would allow and authorize a jury verdict tainted by bias, passion and prejudice; and such an award would allow McDaniel impermissibly to seek damages which bear no constitutional relationship to the alleged actual amount of compensatory claimed damages in question.

## COUNTERCLAIMS AGAINST ALISON MCDANIEL

Defendant/Counterclaim Plaintiff The Preserve at Boulder Hills, LLC (the "Preserve at Boulder Hills") and Defendant/Counterclaim Plaintiff Paul Mihailides hereby assert the following counterclaims against Alison McDaniel, individually and doing business as the Alison McDaniel Agency.

### I.      The Parties

1.      Defendant/Counterclaim Plaintiff the Preserve at Boulder Hills is a limited liability company organized under the laws of the State of Rhode Island.

2.      The Preserve at Boulder Hills does not have any employees.

3.      Located in Richmond, Rhode Island, the property marketed as the Preserve consists of 178 acres of amenities and a clubhouse that make up one part of a luxury resort, master-planned community consisting of residential and commercial properties, an 18-hole, par 3 golf course designed by Robert McNeil, and open space and conservation land.  Designed for outdoor enthusiasts, in addition to golf, equestrian activities, archery, hunting, clay shooting, fly fishing, fitness and yoga, kayaking and canoeing, among other activities, are offered.

4.      Defendant/Counterclaim Plaintiff Mihailides is a resident of the Town of North Kingstown in the State of Rhode Island.

5.      On information and belief, Plaintiff/Counterclaim Defendant Alison McDaniel is a resident of Dallas, Texas.

6.      McDaniel does business as the Alison McDaniel Agency.

7.      On information and belief, the Alison McDaniel Agency is an unincorporated entity, sometimes referred to as the Ali McDaniel Agency, and is not registered to do business in any state.

## II.    Jurisdiction and Venue

8.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as Defendant/Counterclaim Plaintiff the Preserve at Boulder Hills, Defendant/Counterclaim Plaintiff Mihailides and McDaniel are citizens of different states and the amount in controversy exceeds $75,000.

9.    Venue is proper in this district because a substantial part of the events giving rise to the claim occurred in this judicial district.

## III.    The Alison McDaniel Agency Maximizes Funds Raised at Charity Events.

10.    In February 2019, Mihailides met McDaniel at an event hosted by the non-profit organization Ducks Unlimited, an organization dedicated to the conservation of wetlands and associated upland habitats for waterfoul, and other wildlife, and people.

11.    McDaniel suggested that she could help bring awareness to the properties marketed as the Preserve and doing so would help her career.

12.    McDaniel told Mihailides about her business, the Alison McDaniel Agency, and her relationships in the sporting community.

13.    The Alison McDaniel Agency held itself out as a fundraising specialist. The Alison McDaniel Agency prides itself on McDaniel's ability to influence and prevail upon men at fundraising events to maximize funds raised at charity events, galas, banquets, golf tournaments, clay shoots, festivals, tradeshows and corporate events.

14.    The following is a true and accurate copy of a portion of the Ali McDaniel Agency website (www.alimcdanielagency.com) as it existed on March 14, 2023:



One of the nation's top fundraising agencies, the Ali McDaniel Agency provides fundraising specialist for events all over the US. We specialize in maximizing fundraising efforts at any charity event, including galas, banquets, golf tournaments, clay shoots, festivals, tradeshows and corporate events. If you want to take your event to the next level bring in the "A-Team" to get the job done!

15.　　Until recently, the Ali McDaniel Agency website depicted photographs of McDaniel at fundraising events.

16.　　The following are true and accurate photos that appeared on the Ali McDaniel Agency website as it existed on March 14, 2023:
























 

www.alimcdanielagency.com (last accessed March 14, 2022).

17. Before this lawsuit was filed, the website www.alimcdanielagency.com was deactivated.

18. In addition to providing support with fundraising, McDaniel serves as a promotional model through the Alison McDaniel Agency.

19. In 2014, Sports Illustrated featured McDaniel in its "Wednesday's A.M. Hot Clicks."

20. The following is a true and accurate copy of a portion of the June 20, 2014 "Wednesday's A.M. Hot Clicks":



https://www.si.com/extra-mustard/2014/06/21/wednesdays-m-hot-clicks-820#gid=ci02558df6a001279d&pid=almi5jpg (last accessed July 19, 2023)

21. The following are a true and accurate copies of photos featured on the June 20, 2014 "Wednesday's A.M. Hot Clicks":



Alison McDaniel :: Meredith Benfield



Alison McDaniel :: Robert Hart

https://www.si.com/extra-mustard/2014/06/21/wednesdays-m-hot-clicks-820#gid=ci02558df6a001279d&pid=almi5jpg (last accessed July 19, 2023).

22.     Before this lawsuit was commenced, McDaniel activated a new website for the Alison McDaniel Agency available at https://www.alisonmcdaniel.com/.

23.     Representative examples of McDaniel's promotional modeling are featured on the Alison McDaniel Agency website, https://www.alisonmcdaniel.com/.

24.     The following is a true and accurate photo that appears on the Alison McDaniel Agency website:



https://www.alisonmcdaniel.com/portfolio (last accessed July 19, 2023).

## IV. The McDaniel Agency's Engagement as an Independent Contractor for the Preserve at Boulder Hills.

25.     In mid-2019, the Preserve at Boulder Hills engaged McDaniel to provide some promotional modeling services.

26.     McDaniel billed the Preserve at Boulder Hills for those services and, on July 9, 2019, the Preserve at Boulder Hills issued a check to McDaniel in the amount of $2,000 for those services.

27.     The "memo" line on the check reads: "Promo Services Model."

28.     A true and accurate copy of the Preserve at Boulder Hills's July 9, 2019 check and McDaniel's endorsement of that check is attached hereto as **Exhibit E.**

29.     Later that year, the Preserve at Boulder Hills retained McDaniel's agency, the Alison McDaniel Agency, to provide a wider range of consulting services.

30.     In connection with the Preserve at Boulder Hills's retention of the Alison McDaniel Agency, on November 24, 2019, Mihailides emailed McDaniel a list of suggested projects for McDaniel to consider.

31.     A true and accurate copy of Mihailides's November 24, 2019 email is attached hereto as **Exhibit F.**

32.     Mihailides's wrote to McDaniel that he was "happy to give [her] a stipend / partnership / percentage split," recognizing that McDaniel would need to decide "as much or as little as [she] could handle." *Id*.

33.     Mihailides further expressed that he would defer to McDaniel's judgment, observing that "[o]nly you know what the best opportunity for us is and the time you can commit." *Id*.

34.     Ultimately, the Preserve at Boulder Hills agreed that it would pay McDaniel on a per-project basis and she would submit invoices for her services.

35.     Soon thereafter McDaniel began work, through the Alison McDaniel Agency, as an independent contractor for the Preserve at Boulder Hills.

36.     McDaniel set her own hours and chose the projects on which she worked.

37.     McDaniel provided (or solicited others to provide) her attire, accessories, props and other related supplies necessary for her image and appearance.

38.     For example, on occasion, McDaniel would ask Hound & Hare, for whom she also provided consulting services, to provide her with clothes for photo shoots at the Preserve at Boulder Hills.

39.     Often, she utilized her own camera equipment, as evidenced by text messages between McDaniel and Mihailides:



40.     Occasionally, McDaniel enlisted the assistance of others with photography and videography.

41.     Consistent with the Preserve at Boulder Hills's arrangement with McDaniel, McDaniel invoiced the Preserve at Boulder Hills and the Preserve at Boulder Hills paid the Alison McDaniel Agency on a per-project basis.  The Preserve at Boulder Hills paid the Alison McDaniel Agency a daily fee for McDaniel's modeling services and reimbursed the Alison McDaniel Agency for McDaniel's out-of-pocket expenses.

42.     On December 8, 2019, the Preserve at Boulder Hills issued a check to the Ali McDaniel Agency in the amount of $6,000 for "consulting" services.

43.     The "memo" line on the check reads:  "Consulting."

44.     A true and accurate copy of the Preserve at Boulder Hills's December 8, 2019 check and McDaniel's endorsement of that check is attached hereto as **Exhibit G.**

45.     In January 2020, McDaniel, through the Alison McDaniel Agency, provided services at a Dallas Safari Club event.  At the event McDaniel handed out brochures at the Preserve's booth.

46.     On January 16, 2020, the Preserve at Boulder Hills issued a check to the Alison McDaniel Agency in the amount of $7,457 for those services.

47.     The "memo" line on the check reads:  "JANUARY / DALLAS SAFARI CLUB."

48.     A true and accurate copy of the Preserve at Boulder Hills's January 16, 2020 check and McDaniel's endorsement of that check is attached hereto as **Exhibit H.**

49.     On February 29, 2020, the Preserve at Boulder Hills issued a check to the Ali McDaniel Agency in the amount of $6,430.

50.     The "memo" line on the check reads:  "Consulting."

51.     A true and accurate copy of the Preserve at Boulder Hills's February 29, 2020 check and McDaniel's endorsement of that check is attached hereto as **Exhibit I.**

52. In early April 2020, McDaniel emailed wire instructions for her bank account.

53. Before wiring the funds to McDaniel the Controller at the Preserve called McDaniel, requested backup for the amount McDaniel claimed was due to her and made note of the call in her records.

54. McDaniel's failure to provide backup materials to support her requests for reimbursement was a reoccurring problem throughout the Alison McDaniel Agency's work as an independent contractor. The Controller at the Preserve not only would request the backup, she also would remind McDaniel that if she failed to provide the backup, the reimbursements would be treated as payments for tax purposes.

55. McDaniel never provided the requested backup but on April 7, 2020, the Preserve at Boulder Hills wired $6,000 to McDaniel's account as payment for consulting services.

56. A true and accurate copy of the wire confirmation is attached hereto as **Exhibit J.**

57. On May 29, 2020, the Preserve at Boulder Hills wired another $3,000 as payment for consulting services.

58. A true and accurate copy of the wire confirmation is attached hereto as **Exhibit K.**

59. In June 2020, Mihailides expressed frustration to McDaniel he was not seeing a return on its investment in consulting services with the Alison McDaniel Agency.

60. When Mihailides informed McDaniel that the Ocean House would be taking over the Preserve's social media, McDaniel defended her work, texting the following to Mihailides:



Message received from Alison McDaniel Marketing Rm House 6/5/2020 3:46:27 PM

I would love to chat with you about this as I have worked hard to strategize and build your social media. It has doubled in TRUE followers, (not fake followers that are bought and are unhelpful to the mission) since I took over just a few months ago. We now have true organic followers that are growing everyday and I have created a gallery that people compliment all the time. It looks like a magazine.

I looked at their social media and they may have more followers because they are more well known but their representation and gallery is nothing compared to ours. Our social media presence on Instagram only continues to grow and pick up traction and interest.

I literally just auditioned for a commercial which talks about what I've been saying all along. How important it is to not just put out content but to have a strategy with the content you are putting out. I think it is unfortunate to take something away, that is going really well and doing what it's supposed to do, which is make people take notice of the Preserve. I have done a great job at this.

61.     Mihailides responded:

Message sent 6/5/2020 9:18:48 PM

Posting every 5 to 10 days is not boosting anyting sadly if you look at what we have been posting daily within the sporting shop in The Preserve you'll see both viewership in customer interaction. Biggest sporting clubs in Europe that have millions of followers they post regularly three to five times a day showing things like lifestyle guns close food adventure and then dining.
You will see over the next month what I'm going to do with all OEL.
While it may not be the direction that you wanted it will make money yeah that's a good the world is full of people who want to post their successes in wall clean and neat and classy is great it doesn't sell in today's world. I can't stand text and phone calls where you get no traction I only do good in face-to-face meetings if you want to meet at the end of the month I'd be happy to meet. The ocean House in there five properties would love to do video sketch which I think could be good for us but I'll wait till I can see you again I hope you and your family are safe talk to you soon....

62.     McDaniel continued to defend her work and urged Mihailides to give her a further

opportunity to build the Preserve's brand.

63.     On July 13, 2020, the Preserve at Boulder Hills issued a check to the Ali McDaniel Agency in the amount of $1,500.

64.     The "memo" line on the check reads:  "Consulting."

65.     A true and accurate copy of the Preserve at Boulder Hills's July 13, 2020 check and McDaniel's endorsement of that check is attached hereto as **Exhibit L.**

66.     On August 3, 2020, McDaniel texted Mihailides that the amount due for consulting services was $4,350.

67.     The following is a true and accurate copy of McDaniel's text message to Mihailides on August 3, 2020.



Message received from Alison McDaniel Marketing Rm House 8/3/2020 10:23:54 AM

Check Total-
$4350

68.     In turn, that same day, the Preserve at Boulder Hills issued a check to the Alison McDaniels Agency in the amount of $4,350 for consulting services.

69.     A true and accurate copy of the Preserve at Boulder Hills's August 3, 2020 check and McDaniel's endorsement of that check is attached hereto as **Exhibit M.**

70.     On December 21, 2020, the Preserve at Boulder Hills issued a check to the Alison McDaniels Agency in the amount of $1,350 for additional consulting services.

71.     A true and accurate copy of the Preserve at Boulder Hills's December 21, 2020 check and McDaniel's endorsement of that check is attached hereto as **Exhibit N.**

72.     For tax year 2020, the Preserve at Boulder Hills issued an IRS Form 1099-NEC to McDaniel titled "Nonemployee Compensation," which specified that McDaniel received $30,087 in "Nonemployee compensation."  **Exhibit O**.

73. The Alison McDaniel Agency continued providing consulting services to the Preserve at Boulder Hills in 2021.

74. On February 14, 2021, the Preserve at Boulder Hills issued a check to the Alison McDaniels Agency in the amount of $1,500.

75. A true and accurate copy of the Preserve at Boulder Hills's February 14, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit P**.

76. On March 29, 2021, the Preserve at Boulder Hills issued a check to the Alison McDaniels Agency in the amount of $2,000.

77. A true and accurate copy of the Preserve at Boulder Hills's March 29, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit Q**.

78. On April 2, 2021, the Preserve at Boulder Hills issued a check to the Alison McDaniels Agency in the amount of $1,200.

79. A true and accurate copy of the Preserve at Boulder Hills's April 2, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit R**.

80. On May 12, 2021, the Preserve at Boulder Hills issued a check to the Alison McDaniels Agency in the amount of $5,500.

81. A true and accurate copy of the Preserve at Boulder Hills's May 12, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit S**.

82. Also in or about May 2021, the Controller at the Preserve mailed to McDaniel the IRS Form 1099-NEC for the Alison McDaniel Agency's work as an independent contractor in tax year 2020. When the IRS Form 1099-NEC was returned undeliverable, the Controller at the Preserve emailed a copy of it to McDaniel.

83.     On June 1, 2021, the Preserve at Boulder Hills issued a check to Alison McDaniel in the amount of $2,150.

84.     A true and accurate copy of the Preserve at Boulder Hills's June 1, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit T.**

85.     On August 10, 2021, MTM Development issued a check to Alison McDaniel in the amount of $4,247.

86.     This payment was issued by MTM Development for convenience purposes. Subsequently, an intercompany transfer was made so that these payments were accounted for on the Preserve at Boulder Hills's books.

87.     The "memo" line on the check reads:  "Reimbursement and Pay."

88.     A true and accurate copy of the Preserve at Boulder Hills's August 10, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit U.**

89.     On August 24, 2021, MTM Development issued a check to Alison McDaniel in the amount of $3,000.

90.     This payment was issued by MTM Development for convenience purposes. Subsequently, an intercompany transfer was made so that these payments were accounted for on the Preserve at Boulder Hills's books.

91.     A true and accurate copy of the Preserve at Boulder Hills's August 24, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit V.**

92.     On September 27, 2021, the Preserve at Boulder Hills issued a check to Alison McDaniel in the amount of $1,500.

93.     The "memo" line on the check reads:  "Consulting."

94.     A true and accurate copy of the Preserve at Boulder Hills's September 27, 2021 check and McDaniel's endorsement of that check is attached hereto as **Exhibit W.**

**V.      McDaniel's Alteration of the Preserve at Boulder Hills's Check to the Ali McDaniel Agency.**

95.     On October 19, 2021, McDaniel submitted an invoice from the Ali McDaniel Agency to the Preserve at Boulder Hills in the total amount of $11,700.  The invoice included an $8,000 charge for September and October services, which McDaniel described as "Influencer Weekend/Hobbit House/NY Rangers/Equestrian Video/Dining and Spa filming/Photos and Videos around property/First Hunt."  The invoice also included a $2,700 charge for expenses for the months of September and October and expenses incurred for services to be delivered in the month of December.  Additionally, the invoice reflected a $1,000 charge for a "Dec Hunt."  The invoice stated that the "Balance Due" on the account was $11,700.  McDaniel later informed Mihailides that the Preserve at Boulder Hills owed an additional $650, which Mihailides noted on the invoice, bringing the total amount due to $12,350.

96.     On December 18, 2021, the Preserve at Boulder Hills paid the October 19, 2021 invoice (plus the additional $650) and issued its final payment to the Alison McDaniel Agency in the amount of $12,350.00.

97.     The "memo" line on the check reads:  "Influencer, Modeling, Advertising Coordination Mgr."

98.     In accordance with the invoice, the Preserve at Boulder Hills made the check payable to the Ali Mcdaniel Agency.

99.     A true and accurate copy of the Preserve at Boulder Hills's December 18, 2021 check is attached hereto as **Exhibit X.**

100.    Although the Preserve at Boulder Hills issued that check to "Ali Mcdaniel Agency," the Preserve subsequently discovered that before the check had been cashed, the check was altered. The word "Agency" was stricken from the "Pay to the Order of" line and the strikeout was fraudulently initialed "PM." The Preserve at Boulder Hills has confirmed, based on a review of its records, that the check Mihailides issued was made payable to "Ali Mcdaniel Agency," and that the strike out and initials that appear on the cashed check were not made by him.

101.    A true and accurate copy of the December 18, 2021 check endorsed by Alison McDaniel is attached hereto as **Exhibit Y**.

102.    Upon this discovery, the Preserve at Boulder Hills promptly notified its bank.

103.    Contemporaneous with the Preserve at Boulder Hills's issuance of the December 18, 2021 check, it noted on the invoice that it was "PAID IN FULL THRU 12-18."

104.    A true and accurate copy of the October 19, 2021 invoice with the notation "PAID IN FULL THRU 12-18" is attached hereto as **Exhibit Z.**

105.    The Preserve at Boulder Hills never received some of the subcontracted work it paid for as part of the December 18, 2021 payment, including work performed by Robert Button for the Alison McDaniel Agency.

106.    Neither McDaniel nor the Alison McDaniel Agency performed any services for the Preserve at Boulder Hills after December 18, 2021.

107.    Neither McDaniel nor the Alison McDaniel Agency presented any other invoice for services to the Preserve at Boulder Hills.

108.    At no time did the Preserve at Boulder Hills withhold any payroll taxes from its payments to the Alison McDaniel Agency or McDaniel as McDaniel was an independent contractor, not an employee.

109.	For tax year 2021, the Preserve at Boulder Hills issued an IRS Form 1099-NEC to McDaniel titled "Nonemployee Compensation," which specified that McDaniel received $26,200 in "Nonemployee compensation." **Exhibit AA**.

110.	For tax year 2021, MTM Development Corporation also issued an IRS Form 1099-NEC to McDaniel titled "Nonemployee Compensation," which specified that McDaniel received $7,247 in "Nonemployee compensation." **Exhibit BB**. Subsequently, an intercompany transfer was made so that this nonemployee compensation was correctly accounted for on the Preserve at Boulder Hills's books.

111.	On April 13, 2023, the U.S. Equal Employment Opportunity Commission determined McDaniel was not an employee, dismissed her charge of discrimination on that basis and closed her case. *See* **Exhibit C.**

## XI.	During the Alison McDaniel Agency's Consultancy, McDaniel Tried to Infiltrate the Mihailides Family by Developing a Close Personal Relationship with Them.

112.	Through the course of her agency's engagement as an independent contractor for the Preserve at Boulder Hills, McDaniel developed a close relationship with the Mihailides family.

113.	McDaniel befriended Mihailides's wife and children, as well as close friends of the Mihailides family. McDaniel was warmly welcomed into the Mihailides home and, given her closeness with the Mihailides family, never needed a formal invitation to join the family.

114.	McDaniel accompanied the Mihailides family on outings and beach days and to special events and concerts. McDaniel's interactions with Mihailides were in the presence of others, and, on many occasions, they were with the Mihailides family, including Mrs. Mihailides who had befriended McDaniel. McDaniel's interactions with Mihailides were in the public eye and documented through photographs and video footage.

115.    On December 12, 2019, shortly after the Alison McDaniel's Agency's retention had been formalized, McDaniel joined the Mihailides family at the Mohegan Sun Casino for Mariah Carey's Christmas concert.

116.    The following is a true and accurate photograph of McDaniel with the Mihailides family at the Mohegan Sun Casino:



*December 12, 2019*

117.    On August 3, 2020, McDaniel joined the Mihailides family at the beach for Mihailides's birthday and attended a family celebration thereafter of both Mihailides's and his daughter's birthdays at the Ocean House.

118.    The following are true and accurate photographs of McDaniel on August 3, 2020, the day she accompanied the Mihailides family to the beach:





*August 3, 2020*

119.    Other photos that summer depict McDaniel at the beach with Mihailides and his wife.

120.    The following is a true and accurate photograph of McDaniel with Mr. and Mrs. Mihailides:



*August 2020*

121.     On July 2, 2021, McDaniel chose to join the owners of properties at the Preserve

and their families at a social gathering.

122.     The following is a true and accurate photograph from that evening:



123.    On other occasions, McDaniel joined Mihailides, his wife and his brother and sister-in-law in social gatherings at the Preserve.



124.    On August 3, 2021, while the Mihailides family was having a family dinner for Mihailides's birthday, McDaniel sought out the family to wish Mihailides and his daughter a happy birthday. Although she was not invited to join the family, she stopped and posed for a photo and brought gifts.

125.    The following are true and accurate photos of that evening:

 

*August 3, 2021*

126.     On August 5, 2021, McDaniel joined the Mihailides family and posed for family photos along with Mihailides's wife and children and others, including state dignitaries, at the grand opening of the Hilltop Lodge.

127.     The following is a true and accurate photograph from the August 5, 2021 grand opening:



128.     Days later, on August 8, 2021, McDaniel joined the Mihailides family for Mihailides's daughter's bridal shower.

129.     The following are true and accurate photographs depicting McDaniel at the bridal shower:









131.     On August 28, 2021, McDaniel took selfies with Mr. and Mrs. Mihailides and joked that she was in the family's last will and testament.

132.     The following is a true and accurate copy of the selfie and McDaniel's text message:



Aug 28, 2021, 7:32 PM

I'm in the will now

133.     On August 31, 2021, McDaniel insisted on riding with Mr. and Mrs. Mihailides in their vehicle and, when she did so, proudly reported in a text message that it was "family day."

134.     The following is a true and accurate copy of McDaniel's text message:



Aug 31, 2021, 1:40 PM

Family daaaaaaay

135.     That same day, McDaniel enjoyed an afternoon at the beach with Mr. and Mrs. Mihailides.

136. The following are true and accurate copies of photographs from that day:






*August 31, 2021*

137. During the month of August 2021, McDaniel spent weeks at a time at the Preserve and McDaniel similarly spent weeks at the Preserve in October 2021.

138. Finally, in January 2022, after the Alison McDaniel Agency's work as an independent contractor for the Preserve at Boulder Hills had ended, McDaniel responded to a social media post by Mihailides's son, suggesting that she is Mrs. Mihailides (mom's) favorite.

Mihailides' son wrote: "when the rest of the family finally realizes im my moms favorite," to which McDaniel (using the user name awesomealimac) responded: "It's actually me…"



**XII.    Mihailides Refuses to Hire McDaniel as an Employee.**

139.    In late 2021, Preserve Property Management Company became interested in hiring a full-time Director of Marketing and Recruitment.

140.    The Preserve Property Management Company advertised for that position on Indeed.com.  The full-time position offered dental insurance, health insurance and paid time off. The advertised responsibilities included designing and implementing comprehensive marketing strategies to create awareness of the company's business activities, supervision of the department

and provision of guidance and feedback to other marketing professionals, production of ideas for promotional events or activities, planning and execution of campaigns for corporate promotion, responsibility for producing valuable content for the company's online presence and editorial design for the company's publications, among other things.

141.     The Preserve Property Management Company received 97 applications.  Those applications were initially reviewed and screened and, ultimately, five finalists were identified. Those five candidates interviewed with John Bergantino who served as the Human Resources Director at that time.

142.     McDaniel did not apply for the position.

143.     McDaniel expressed to Mihailides and others that she could perform many of the responsibilities that Evans was performing for $5,000 per month.  Mihailides, however, did not believe McDaniel was qualified for that role and refused to hire her as an employee of Preserve Property Management Company.

144.     After interviewing the five finalists, on or about December 16, 2021, Lindsey Evans was hired as Director of Marketing.

145.     Evans has a bachelor's degree in graphic design and had worked as a graphic designer, marketing and web development coordinator and online digital marketing specialist and webmaster.

146.     Thereafter, in February 2022, another of the five finalists—Sean Rayburn—was hired as a Digital Marketing Executive.

**XIII.    McDaniel's Refuses to Return Preserve at Boulder Hills's Laptop, External Hard Drive and Other Data and Instead Asks to Perform More Projects.**

147.     After Preserve Property Management Company refused to hire McDaniel as an employee, on or about December 29, 2021, Mihailides and others learned that a 3-terabyte external

hard drive containing data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills was missing.

148.     Mihailides contacted McDaniel and inquired whether she had the drive.

149.     Without responding to the inquiry about the missing drive, on January 1, 2022, McDaniel contacted Mihailides and inquired whether the Preserve at Boulder Hills would engage her to attend a Dallas Safari Club event.

150.     The following is a true and accurate copy of McDaniel's January 1, 2022 text message:

Message received from Alison McDaniel Marketing Rm House 1/1/2022 11:54:03 AM

**AH**

Happy New Year! Let me know about DSC. I have to figure out my schedule.

151.     A day later, McDaniel inquired about whether she could come to a hunt at the Preserve later that week.

152.     The following is a true and accurate copy of McDaniel's January 2, 2022 text message:

Message received from Alison McDaniel Marketing Rm House 1/2/2022 9:54:57 AM

**AH**

Do you want me to come for the hunt Thursday?
Rental car is very cheap right now so I want to book it ASAP.

153.     Mihailides declined, informing McDaniel that they were only expecting 7 shooters.

154.     McDaniel's responded "Okie doke!"

155.     The following is a true and accurate copy of McDaniel's text message, Mihailides's response and McDaniel's reply:



156.    In an attempt to deflect the Preserve at Boulder Hills's request for return of its hard drive, McDaniel sent the Preserve at Boulder Hills a hard drive, but that drive was not the 3-terabyte drive containing the Preserve at Boulder Hills's data, digital photos, digital videos and other files.

### XIV.    McDaniel Demands $50,000 for the Return of the Preserve at Boulder Hill's Hard Drive.

157.    Thereafter, in phone conversation with Mihailides, McDaniel acknowledged that she had the Preserve at Boulder Hills's hard drive and demanded $50,000 to return it to the Preserve at Boulder Hills. When the Preserve at Boulder Hills refused to be extorted for the return of its property, the Preserve at Boulder Hills informed her that it intended to file suit, if necessary to secure the drive, its property.

158.    McDaniel also refused to return to the Preserve at Boulder Hills a laptop it had provided to her.

159.     On May 1, 2023, the Preserve at Boulder Hills, through its counsel, renewed its request for return of the laptop, the hard drive and the data thereon.

160.     Notwithstanding the Preserve at Boulder Hill's repeated demands, to date, McDaniel has not returned the laptop, the hard drive or the data thereon.

### XV.     McDaniel Attempts to Sabotage the Preserve at Boulder Hills's Social Media Accounts.

161.     On or about January 22, 2022, approximately a month after McDaniel's last assignment for the Preserve at Boulder Hills and after the Preserve Property Management Company refused to hire her as an employee, Mihailides, Evans and others learned that the Preserve's Instagram site was inaccessible.

162.     In lieu of the content typically available on the Preserve's Instagram page, the following message appeared stating "User not found" and "No posts yet":



163. Over the next several days, a number of individuals tried in vain to reach McDaniel. Evans sent multiple emails to McDaniel and Mihailides texted McDaniel.

164. The following are true and accurate copies of Mihailides's texts to McDaniel.

 

165. McDaniel refused to respond or to provide the requested usernames and passwords.

166. Evans continued her efforts to gain access to the accounts and, after contacting Meta (the parent company for Facebook and Instagram), finally learned that McDaniel had,

without authorization or permission, changed the contact information for the lead administrator role for the "@thepreserveri" Instagram account to her personal email address (ali@alisonmcdaniel.com) and her personal phone number and then canceled the account.

167.     Through the assistance of a Meta employee, Evans was able to secure the Preserve's Instagram account on February 16, 2022.

168.     If these steps had not been taken quickly, the Preserve would have lost all of its data 31 days after McDaniel canceled the account.

169.     A day after McDaniel's unlawful plan to destroy the Preserve's social media presence had been discovered and thwarted, on February 17, 2022, in an email titled "Ending Relationship with Preserve," McDaniel informed Mihailides that she would no longer be performing marketing services for the Preserve going forward.

170.     In her February 17, 2022 email, McDaniel claimed that Mihailides's conduct was "more than anyone should have to endure from *a client*."  (emphasis added).

171.     The Preserve at Boulder Hills had stopped giving McDaniel assignments two months before.

172.     The first and only time McDaniel accused Mihailides of any inappropriate conduct was after McDaniel attempted to extort $50,000 from the Preserve at Boulder Hills for the return of its property, refused to return the drive, laptop and data thereon, and learned that Evans had successfully thwarted her effort to sabotage the Preserve's social media sites.

### XVI.    McDaniel Embarks on Public Campaign to Harass, Embarrass, Threaten, Intimidate, Defame and Slander the Preserve and Mihailides.

173.     After the Preserve at Boulder Hills rebuffed McDaniel's extortive demand for $50,000 for return of its hard drive and after McDaniel had tried to sabotage the Preserve's social

media sites and successfully thwarted that effort, McDaniel then embarked on a public campaign to harass, embarrass, threaten, intimate, defame and slander Mihailides.

174.     She sent her email titled "Ending Relationship with Preserve" to at least five employees of the Ocean House, which at that time, through Ocean House Management, LLC, managed certain of the Preserve entities.

175.     Then, from March 9, 2022 to March 11, 2022, she used media paid for and belonging to the Preserve at Boulder Hills to published 63 Instagram stories with negative and accusatory content on her Instagram account (@awesomealimac), which, at that time, had 15,800 followers.

176.     The nature of her posts ranged from superimposing her face on Nancy Regan to photos of McDaniel with Mihailides where an "x" has been drawn across his face.

177.     The Instagram posts contained harassing and false and damaging allegations related to and/or directed at Mihailides and the Preserve.

178.     In her posts, McDaniel encouraged media to contact her directly for more information.

179.     In several of her posts, McDaniel also explained the nature of her business relationship with the Preserve, stating that she is "a contract worker" and questioning why the Preserve continued to hire her for projects if she was not performing well and describing the Preserve Sporting Club as her "client" and "former client."

180.     In one post, McDaniel wrote:

> ***This client*** continues to spread the narrative that I am after his money.  Lol.  This would imply that I think he has money which [emoji].  And that me speaking out is "retaliation" for me not being good at my job and getting fired (after I already cut ties over a month ago).  I was hired to be the spokesperson, which was essentially to be the face of the property.  So me being bad at my job

means??????lol. ***why hire me over and over***? ***I'm a contract worker.*** I didn't make myself the spokesperson.

(emphasis added).

181. In another post, McDaniel wrote: "Yes I should have cut ***this client*** off a long time ago." (emphasis added).

182. In yet another post McDaniel wrote:

> I will say, in all honesty what bothers me most is that I know God was prompting me to leave this situation many, many months ago. If I'm gut checking myself I guess I just did not trust God to provide for me even though He has always been faithful before. As if God didn't part the seas and close the mouth of lions. How could I not trust he would bring a better a [sic] ***client*** and provide ***other gigs*** even during a pandemic and with crazy restrictions.

(emphasis added).

## XVII. The Preserve Learns of McDaniel's Misrepresentations.

183. After McDaniel's work as an independent contractor for the Preserve at Boulder Hills ended, the Preserve learned that McDaniel had made numerous misrepresentations to it and others.

184. For example, McDaniel claims that before starting the Alison McDaniel Agency, she worked as Director of Operations and Events for a celebrity restaurant. *See* Pardon Moi Productions New York City, *available at* https://www.pardonmoinyc.com/about (last accessed July 15, 2023).

185. That celebrity restaurant was Southern Hospitality, which was owned and operated by 1460 Second Avenue Restaurant Group, LLC ("1460 Group"). Eytan Sugarman was the majority owner of 1460 Group. Singer and entrepreneur Justin Timberlake and Trace Ayala were partners in 1460 Group.

186.    In or about 2009, McDaniel filed a complaint in the Supreme Court of the State of New York, County of New York in which she alleged that she was "an aspiring actress" who "supplemented her income by finding other work" including "working in such capacities as waitstaff, bartender and restaurant manager." *McDaniel v. 1460 Second Avenue Restaurant Group, L.L.C.*, Index No. 106837/09 (N.Y. Sup. Ct.), Amended Compl. ¶ 9.

187.    McDaniel alleged that in or about May 2007, she was hired as a waitress and bartender for Southern Hospitality but in or about October 2007, she was "appointed" the "General Manager." *Id.* ¶¶ 10, 13.

188.    McDaniel claimed that when she was appointed General Manager, Southern Hospitality agreed to pay her a salary of $75,000 per year. *Id.* ¶ 13.

189.    McDaniel alleged in her litigation against Justin Timberlake and others that once she became the General Manager, she "became the subject of vile and discriminatory conduct, and of a hostile working environment, because of her gender." *Id.* ¶ 14.

190.    McDaniel alleged that Timberlake and others "engaged in and allowed others to engage in the viewing of internet pornography on the restaurant's premises, in [her] presence and to her extreme emotional distress and humiliation." *Id.* ¶ 16.

191.    McDaniel further alleged that on at least one occasion certain of those defendants "viewed the pornography while in a locked room with [her], and made fun of her when she began crying about what she was being subjected to." *Id.* ¶ 17.

192.    On the basis of these and other allegations, McDaniel asserted claims against Timberlake and others for gender discrimination, retaliation, intentional infliction of emotional distress, and negligent infliction of emotional distress. *Id.* ¶¶ 24-45.

193. On information and belief, McDaniel settled her case against Timberlake and others.

194. McDaniel's claim that she was the Director of Operations and Events is inconsistent with her allegation in her Amended Complaint in her case against Timberlake and others that she was a waitress, bartender and General Manager.

195. McDaniel also falsely represented her date of birth to the Preserve at Boulder Hills.

196. On July 31, 2020, McDaniel completed an Accident Waiver and Release of Liability for purposes of her participation in a zipline activity at the Preserve at Boulder Hills.

197. McDaniel misidentified her date of birth on the Accident Waiver and Release of Liability.

198. McDaniel's misidentification of her date of birth made it appear that she was younger by six years.

**CLAIMS ON BEHALF OF**
**DEFENDANT/COUNTERCLAIM PLAINTIFF PRESERVE AT BOULDER HILLS**

**COUNT ONE**
**CONVERSION**

199. Paragraphs 1 through 198 are incorporated herein and made a part hereof as if again set forth in full.

200. To assist her with her consulting work, the Preserve at Boulder Hills entrusted McDaniel with a laptop computer and a 3-terabyte external hard drive containing data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills.

201. The Preserve at Boulder Hills made demand on McDaniel for return of the laptop computer, the 3-terabyte external hard drive and the data, digital photos, digital videos and other

files belonging to the Preserve at Boulder Hills. McDaniel refused to do so unless the Preserve at Boulder Hills paid her $50,000 for the return of its property.

202. To date, McDaniel has not returned the laptop computer, the 3-terabyte external hard drive or the data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills.

203. When the Preserve at Boulder Hills demanded return of its 3-terabyte external hard drive, McDaniel demanded $50,000 for its return, which demand had no legal or factual basis or support.

204. McDaniel's continued wrongful exercise of dominion over the Preserve at Boulder Hills's laptop computer, its 3-terabyte external hard drive and the data, digital photos, digital videos and other files thereon constitutes conversion.

205. The Preserve at Boulder Hills is entitled to damage against McDaniel for all amounts proved at trial.

## COUNT TWO
## CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO
## R.I. GEN. LAWS § 9-1-2
## (FRAUDULENT CONVERSION)

206. Paragraphs 1 through 205 are incorporated herein and made a part hereof as if again set forth in full.

207. R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

208. R.I. Gen. Laws § 9-1-2 further provides, in part, that "whenever any person shall be guilty of larceny, he or she shall be liable to the owner of the money or articles taken for twice the value thereof, unless the money or articles are restored, and for the value thereof in case of restoration."

209. R.I. Gen. Laws § 11-41-3 makes fraudulent conversion a crime punishable by fine not more than fifty thousand dollars ($50,000) or three (3) times the value of the money or property thus converted, whichever is greater, or imprisonment not more than twenty (20) years, or both, except that if the sum or value of the property embezzled is less than one hundred dollars ($100), he or she shall be fined not more than one thousand dollars ($1,000), or imprisoned not more than one year, or both.

210. R.I. Gen. Laws § 11-41-3 provides, in part: "Every . . . person to whom any . . . property shall be entrusted for any specific purpose . . . who shall . . . fraudulently convert to his or her own use, or who shall take or secrete, with intent to . . . fraudulently convert to his or her own use, any . . . property which shall have come into his or her possession or shall be under his or her care or charge by virtue of his or her employment or for that specific purpose . . . shall be deemed guilty of larceny.

211. Under Rhode Island law, fraudulent conversion is a larceny. *See* R.I. Gen. Laws § 11-41-3.

212. The Preserve at Boulder Hills entrusted McDaniel with its property, including a laptop computer and a 3-terabyte external hard drive containing data, digital photos, digital videos and other files, for purposes of her work as an independent contractor for the Preserve at Boulder Hills through the Alison McDaniel's Agency.

213.     McDaniel wrongfully took or secreted the Preserve at Boulder Hill's laptop computer and its 3-terabyte external hard drive containing data, digital photos, digital videos and other files, with the intent to fraudulently convert that property for her own use and McDaniel, in fact, did fraudulently convert that property for her own use.

214.     The Preserve at Boulder Hills made demand on McDaniel for return of the laptop computer, the 3-terabyte external hard drive and the data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills.

215.     To date, McDaniel has not returned the laptop computer, the 3-terabyte external hard drive or the data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills.

216.     Rather, when the Preserve at Boulder Hills demanded return of its 3-terabyte external hard drive, McDaniel demanded $50,000 for its return.

217.     Thereafter, when Phil Santomaro, the General Manager at the Preserve, called McDaniel from a blocked number and renewed the Preserve at Boulder Hills's demand for return of its 3-terabyte external hard drive, McDaniel told him to tell Mihailides she would return the property when Mihailides paid her $100,000 she claimed was owed to her, doubling her initial $50,000 extortion demand for return of the property.

218.     McDaniel's actions constitute fraudulent conversion, a larceny.

219.     The Preserve at Boulder Hills has been injured by reason of McDaniel's commission of the crime of fraudulent conversion and larceny in violation of R.I. Gen. Laws § 9-1-2.

220.     The Preserve at Boulder Hills is entitled to damages against McDaniel for all amounts proved at trial, including twice the value of the articles taken pursuant to R.I. Gen. Laws § 9-1-2.

## COUNT THREE
## CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO
## R.I. GEN. LAWS § 9-1-2
## (EXTORTION)

221.     Paragraphs 1 through 220 are incorporated herein and made a part hereof as if again set forth in full.

222.     R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

223.     R.I. Gen. Laws § 11-42-2 makes extortion a crime punishable by imprisonment for not more than 15 years or by a fine of not more than $25,000.

224.     R.I. Gen. Laws § 11-42-2 provides, in part:  "Whoever . . . by a verbal or written communication maliciously threatens any injury to the . . . property . . . of another, or threatens to engage in other criminal conduct with intent to extort money or any unlawful pecuniary advantage . . . shall be punished by imprisonment in the adult correctional institution for not more than fifteen (15) years or by a fine of not more than twenty-five thousand dollars ($25,000), or both."

225.     In or about February 2022, after the Preserve at Boulder Hills asked her to return its property, McDaniel contacted the Preserve and demanded $50,000 to return the 3-terabyte external drive to the Preserve at Boulder Hills.

226. McDaniel threatened to retain the 3-terabyte external drive for her own use unless the Preserve at Boulder Hills paid her the $50,000 she demanded.

227. McDaniel's threat of fraudulent conversion and larceny was made with the intent to extort money from the Preserve at Boulder Hills.

228. McDaniel's demand for $50,000 to return to the Preserve at Boulder Hills an external hard drive and the data contained thereon belonging to it constitutes the crime of extortion.

229. The Preserve at Boulder Hills has been injured by reason of McDaniel's commission of the crime of extortion in violation of R.I. Gen. Laws § 9-1-2.

230. The Preserve at Boulder Hills is entitled to damages against McDaniel for all amounts proved at trial.

**COUNT FOUR**
**CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO**
**R.I. GEN. LAWS § 9-1-2**
**(WIRE FRAUD)**

231. Paragraphs 1 through 230 are incorporated herein and made a part hereof as if again set forth in full.

232. R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

233. 18 U.S.C. § 1343 makes fraud by wire, radio, or television a crime which shall be punished by fine or imprisonment of not more than 20 years, or both.

234. Telephone calls and electronic communications, such as email and text messages, are wires for purposes of the statute.

235.     18 U.S.C. § 1343 provides, in part:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of
> false or fraudulent pretenses, representations, or promises, transmits
> or causes to be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any writings,
> signs, signals, pictures, or sounds for the purpose of executing such
> scheme or artifice, shall be fined under this title or imprisoned not
> more than 20 years, or both.

236.     In or about February 2022, after the Preserve at Boulder Hills asked her to return its property, McDaniel contacted the Preserve by phone and demanded $50,000 to return the 3-terabyte external drive to the Preserve at Boulder Hills.

237.     McDaniel threatened to retain the 3-terabyte external drive for her own use unless the Preserve at Boulder Hills paid her the $50,000 she demanded.

238.     McDaniel's threat was part of a scheme to defraud for purposes of obtaining money from the Preserve.

239.     McDaniel's scheme to defraud involved material misstatements, including that she was owned money by the Preserve at Boulder Hills (which was false) and that, somehow this false assertion entitled her to withhold the Preserve at Boulder Hills's property.

240.     McDaniel's scheme to defraud would have resulted upon completion in the loss of money.

241.     McDaniel's demand, communicated by McDaniel to the Preserve by telephone, for $50,000 to return to the Preserve at Boulder Hills an external hard drive and the data contained thereon belonging to it constitutes wire fraud.

242.     The Preserve at Boulder Hills has been injured by reason of McDaniel's commission of the crime of wire fraud in violation of R.I. Gen. Laws § 9-1-2.

243.     The Preserve at Boulder Hills is entitled to damages against McDaniel for all amounts proved at trial.

## COUNT FIVE
## CIVIL LIABILITY FOR COMPUTER THEFT
## R.I. GEN. LAWS §§ 11-52-4 AND 11-52-6

244.     Paragraphs 1 through 243 are incorporated herein and made a part hereof as if again set forth in full.

245.     R.I. Gen. Laws § 11-52-6 authorizes a civil action for compensatory damages, punitive damages, court costs and other relief that the court deems appropriate, including reasonable attorneys' fees, for violation of R.I. Gen. Laws § 11-52-4, which makes computer theft a crime.

246.     R.I. Gen. Laws § 11-52-6(a) provides:

> Any person injured as a result of a violation of this chapter may bring a civil action against the violator for compensatory damages, punitive damages, court costs, and any other relief that the court deems appropriate, including reasonable attorneys' fees.

247.     R.I. Gen. Laws § 11-52-4 makes computer theft a crime.

248.     R.I. Gen. Laws § 11-52-4 provides:

> Whoever, intentionally and without claim of right, takes, transfers, conceals or retains possession of any computer, computer system, computer network, computer software, computer program, or data contained in a computer, computer system, computer program, or computer network with a value in excess of five hundred dollars ($500) shall be guilty of a felony and shall be subject to the penalties set forth in § 11-52-5. If the value is five hundred dollars ($500) or less, then the person shall be guilty of a misdemeanor and may be punishable by imprisonment for a term not exceeding one year or by a fine of not more than one thousand dollars ($1,000), or both.

249. The Preserve at Boulder Hill's laptop and 3-terabyte external hard drive and the data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills contained thereon have a value in excess of $500.

250. McDaniel, intentionally and without a claim of right, took and/or retained possession of the Preserve at Boulder Hills's laptop and 3-terabyte external hard drive and the data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills contained thereon.

251. The Preserve at Boulder Hills's laptop and the 3-terabyte external drive each constitute a "computer" pursuant to R.I. Gen. Laws § 11-52-1(2).

252. The data, digital photos, digital videos and other files belonging to the Preserve at Boulder Hills contained on the 3-terabyte external drive constitute "computer data" pursuant to R.I. Gen. Laws § 11-52-1(3).

253. McDaniel's actions constitute the crime of computer theft and, as such, she is civilly liable to the Preserve at Boulder Hills for compensatory damages, punitive damages, court costs and other relief that the court deems appropriate, including reasonable attorneys' fees.

**COUNT SIX**
**CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO**
**R.I. GEN. LAWS § 9-1-2**
**(COMPUTER THEFT)**

254. Paragraphs 1 through 253 are incorporated herein and made a part hereof as if again set forth in full.

255. R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender,

and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

256. R.I. Gen. Laws § 11-52-6, which authorizes a civil action for the crime of computer theft, provides, in subsection (e): "The provisions of this section shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law."

257. McDaniel's actions, which constitute the crime of computer theft, also give rise to civil liability for crimes and offenses pursuant to R.I. Gen. Laws § 9-1-2.

258. The Preserve at Boulder Hills has been injured by reason of McDaniel's commission of the crime of computer theft in violation of R.I. Gen. Laws § 9-1-2.

259. The Preserve at Boulder Hills is entitled to damages against McDaniel for all amounts proved at trial.

## COUNT SIX
## CIVIL LIABILITY FOR COMPUTER TRESPASS
## R.I. GEN. LAWS §§ 11-52-4.1 AND 11-52-6

260. Paragraphs 1 through 259 are incorporated herein and made a part hereof as if again set forth in full.

261. R.I. Gen. Laws § 11-52-6 authorizes a civil action for compensatory damages, punitive damages, court costs and other relief that the court deems appropriate, including reasonable attorneys' fees, for violation of R.I. Gen. Laws § 11-52-4.1, which makes computer trespass a crime.

262. R.I. Gen. Laws § 11-52-4.1 provides, in part:

> (a) It shall be unlawful for any person to use a computer or computer network without authority and with the intent to:
>
> (1) Temporarily or permanently remove, halt, or otherwise disable any computer data, computer programs, or computer software from a computer or computer network;

. . .

> (3) Alter or erase any computer data, computer programs, or computer software.

263.    R.I. Gen. Laws § 11-52-4.1 makes computer trespass a crime.

264.    R.I. Gen. Laws § 11-52-4.1(b) provides, in part:

> Whoever violates this section shall be guilty of a felony and shall be subject to the penalties set forth in § 11-52-2. If the value is five hundred dollars ($500) or less, then the person shall be guilty of a misdemeanor and may be punishable by imprisonment for a term not exceeding one year or by a fine of not more than one thousand dollars ($1,000) or both.

265.    The Preserve at Boulder Hills derives significant economic value from its Instagram page and presence.

266.    The value of the Preserve's Instagram page and presence is in excess of $500.

267.    The Preserve's Instagram page is hosted on a computer and/or computer network as defined by R.I. Gen. Laws § 11-52-1(2) and § 11-52-1(4), respectively.

268.    At no time after December 18, 2021 did McDaniel have authority to access the Preserve's Instagram page, change the Preserve's passwords or change or later the content of its Instagram page or account.

269.    After December 18, 2021 and before January 22, 2022, McDaniel accessed a computer and/or computer network with the intent to access the Preserve's Instagram page without authority and with the intent to temporarily or permanently remove the Preserve's computer data on that page.

270.    At some time between December 18, 2021 and January 22, 2022, McDaniel did, in fact, access the Preserve's Instagram page without authority and temporarily removed, halted or otherwise disabled the data thereon and/or altered or erased computer data thereon.

271.     On or about January 22, 2022, Mihailides, Evans and others at the Preserve learned that the Preserve's Instagram site was inaccessible as McDaniel had hijacked the account.

272.     In addition, in lieu of the content typically available on the Preserve's Instagram page, a message appeared stating "User not found" and "No posts yet."

273.     After contacting Meta (the parent company for Facebook and Instagram), learned that McDaniel had used the Preserve's log-in information without authorization to access the Preserve's Instagram page "@thepreserveri", changed the contact information for the lead administrator role to her personal email address (ali@alisonmcdaniel.com) and her personal phone number and then canceled the account.

274.     The Preserve, through the assistance of a Meta employee, was able to secure its Instagram account on February 16, 2022.

275.     If the Preserve had not acted quickly to do so it would have lost all of its data 31 days after McDaniel canceled the account.

276.     McDaniel's actions constitute the crime of computer trespass and, as such, she is civilly liable to the Preserve for compensatory damages, punitive damages, court costs and other relief that the court deems appropriate, including reasonable attorneys' fees.

**COUNT SEVEN**
**CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO**
**R.I. GEN. LAWS § 9-1-2**
**(COMPUTER TRESPASS)**

277.     Paragraphs 1 through 276 are incorporated herein and made a part hereof as if again set forth in full.

278.     R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender,

and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

279.     R.I. Gen. Laws § 11-52-6, which authorizes a civil action for the crime of computer trespass, provides, in subsection (e):  "The provisions of this section shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law."

280.     McDaniel's actions, which constitute the crime of computer trespass, also give rise to civil liability for crimes and offenses pursuant to R.I. Gen. Laws § 9-1-2.

281.     The Preserve has been injured by reason of McDaniel's commission of the crime of computer trespass in violation of R.I. Gen. Laws § 9-1-2.

282.     The Preserve is entitled to damages against McDaniel for all amounts proved at trial.

## COUNT EIGHT
## CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO
## R.I. GEN. LAWS § 9-1-2
## (ALTERATION OR FORGERY OF CHECK)

283.     Paragraphs 1 through 282 are incorporated herein and made a part hereof as if again set forth in full.

284.     R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

285.     R.I. Gen. Laws § 11-17-1, which makes the alteration or forgery of a check a crime, provides, in part:

> Every person who shall falsely make, alter, forge . . . any . . . order . . . for the payment of money . . . with intent to defraud, or who shall utter and publish as true or shall procure to be uttered and published as true any such false, forged, altered, or counterfeited record, deed, or other writing as provided in this section, knowing it to be false, forged, altered, or counterfeited, with intent to defraud, shall be punished by imprisonment for not more than ten (10) years, or by a fine of not more than one thousand dollars ($1,000), or both.

286.     The crime of forgery at common law as well as under R.I. Gen. Laws § 11-17-1, is committed and complete upon the fraudulent making of a false writing, the particular nature of which is set out in R.I. Gen. Laws § 11-17-1.

287.     The crime of uttering and publishing, at common law as well as under R.I. Gen. Laws § 11-17-1, is committed by the offering of a known false writing such as designated in § 11-17-1 with an intent to defraud.

288.     On December 18, 2021, the Preserve paid the Alison McDaniel Agency's October 19, 2021 invoice (plus an additional $650) and issued its final payment to the Alison McDaniel Agency in the amount of $12,350.00.

289.     The "memo" line on the check reads:    "Influencer, Modeling, Advertising Coordination Mgr."

290.     In accordance with the invoice, the Preserve at Boulder Hills made the check payable to the Ali Mcdaniel Agency.

291.     On information and belief, although the Preserve at Boulder Hills issued that check to "Ali Mcdaniel Agency," before McDaniel cashed the check, McDaniel altered the check.

292.     On information and belief, McDaniel struck the word "Agency" from the "Pay to the Order of" line and fraudulently initialed the strikeout "PM."

293. In doing so, McDaniel committed the common law crime of forgery and the corresponding statutory crime set forth in R.I. Gen. Laws § 11-17-1.

294. McDaniel then offered the check with the known false writing with an intent to defraud.

295. In doing so, McDaniel committed the common law crime of uttering and publishing and the corresponding statutory crime set forth in R.I. Gen. Laws § 11-17-1.

296. McDaniel ultimately passed and/or cashed the check.

297. The Preserve at Boulder Hills has confirmed, based on a review of the Preserve at Boulder Hills's records, that the check Mihailides issued was made payable to "Ali Mcdaniel Agency," and that the strike out and initials that appear on the cashed check were not made by him.

298. Upon this discovery, the Preserve at Boulder Hills promptly notified its bank.

299. McDaniel's actions constitute the common law crimes of forgery and/or uttering and publishing, which are both separate crimes pursuant to R.I. Gen. Laws § 11-17-1.

300. The Preserve at Boulder Hills has been injured by reason of McDaniel's commission of the common law crimes of forgery and/or uttering and publishing and those same crimes pursuant to R.I. Gen. Laws § 9-1-2.

301. The Preserve at Boulder Hills is entitled to damages against McDaniel for all amounts proved at trial pursuant to R.I. Gen. Laws § 9-1-2.

## COUNT NINE
## CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO
## R.I. GEN. LAWS § 11-52-7.1
## (ONLINE IMPERSONATION)

302. Paragraphs 1 through 301 are incorporated herein and made a part hereof as if again set forth in full.

303. R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

304. R.I. Gen. Laws § 11-52-7.1, which makes online impersonation a crime, provides, in part:

> (b) A person commits the crime of online impersonation if the person:
>
> (1) Uses the name or persona of another person to create a web page on or to post one or more messages on a commercial social networking site or sends an electronic mail, instant message, text message, or similar communication without obtaining the other person's consent and with the intent to harm, defraud, intimidate, or threaten any person;

305. After December 18, 2021 and before January 22, 2022, McDaniel used, without consent, the user name, password, email address and/or phone number associated with the Preserve with the intent to access the Preserve's Instagram page without authority.

306. At some time between December 18, 2021 and January 22, 2022, McDaniel did, in fact, access the Preserve's Instagram page by using, without consent, the name, password, email address and/or phone number associated with the Preserve and temporarily removed, halted or otherwise disabled the data thereon and/or altered or erased computer data thereon for purposes of harming the Preserve and its property.

307. The Preserve at Boulder Hills is entitled to damages against McDaniel for all amounts proved at trial pursuant to R.I. Gen. Laws § 9-1-2.

## CLAIMS ON BEHALF OF
## DEFENDANT/COUNTERCLAIM PLAINTIFF MIHAILIDES

## COUNT TEN
## CIVIL LIABILITY FOR CYBERSTALKING AND CYBER HARASSMENT
## R.I. GEN. LAWS §§ 11-52-4.2(a) AND 11-52-6

308.    Paragraphs 1 through 307 are incorporated herein and made a part hereof as if again set forth in full.

309.    R.I. Gen. Laws § 11-52-6 authorizes a civil action for compensatory damages, punitive damages, court costs and other relief that the court deems appropriate, including reasonable attorneys' fees, for violation of R.I. Gen. Laws § 11-52-4.2(a), which makes cyberstalking and cyber harassment a crime.

310.    R.I. Gen. Laws § 11-52-4.2(a), which makes cyberstalking and cyber harassment a crime, provides:

> Whoever transmits any communication by computer or other electronic device to any person or causes any person to be contacted for the sole purpose of harassing that person or his or her family is guilty of a misdemeanor, and shall be punished by a fine of not more than five hundred dollars ($500), by imprisonment for not more than one year, or both.  For the purpose of this section, "harassing" means any knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or bothers the person, and which serves no legitimate purpose. The course of conduct must be of a kind that would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury. "Course of conduct" means a pattern of conduct composed of a series of acts over a period of time, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of "course of conduct."

311.    After her independent contractor relationship with the Preserve at Boulder Hills ended, McDaniel embarked on a deliberate, purposeful and public campaign to harass, embarrass, threaten, intimate, annoy and bother Mihailides.

312.   To that end, McDaniel transmitted communications through social media posts, including a series of Instagram stories, for the purposes of causing Mihailides to be contacted for the sole purpose of harassing Mihailides and his family.

313.   Over the course of time, McDaniel posted 63 Instagram stories that either depicted Mihailides or were directed at him.

314.   In at least 14 of the posts, McDaniel included a photograph of herself with Mihailides and drew a red "x" across his face.  In some of the posts, the word "No" was also superimposed across Mihailides' face.

315.   In other posts, McDaniel included other photographs of herself with Mihailides, including a magazine cover that featured McDaniel and Mihailides.

316.   In other posts, McDaniel mentioned the Preserve by name or referenced the Preserve's Instagram handle @preservesportingclub.

317.   McDaniel's posts evidence a continuity of purpose.

318.   McDaniel's actions constitute a knowing and willful course of conduct directed at Mihailides.

319.   McDaniel's course of conduct, was of a kind that would cause a reasonable person to suffer substantial emotional distress or be in fear of bodily injury.

320.   McDaniel's course of conduct seriously alarmed, annoyed and bothered Mihailides and served no legitimate purpose.

321.   McDaniel's actions constitute the crime of cyberstalking and cyber harassment and, as such, she is civilly liable to the Mihailides for compensatory damages, punitive damages, court costs and other relief that the court deems appropriate, including reasonable attorneys' fees.

## COUNT ELEVEN
## CIVIL LIABILITY FOR CRIMES AND OFFENSES PURSUANT TO
## R.I. GEN. LAWS § 9-1-2
## (CYBERSTALKING AND CYBER HARASSMENT)

322. Paragraphs 1 through 321 are incorporated herein and made a part hereof as if again set forth in full.

323. R.I. Gen. Laws § 9-1-2 provides, in part, that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made."

324. R.I. Gen. Laws § 11-52-6, which authorizes a civil action for the crimes of cyberstalking and cyber harassment, provides, in subsection (e): "The provisions of this section shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law."

325. McDaniel's actions, which constitute the crimes of cyberstalking and cyber harassment, also give rise to civil liability for crimes and offenses pursuant to R.I. Gen. Laws § 9-1-2.

326. Mihailides has been injured by reason of McDaniel's commission of the crimes of cyberstalking and cyber harassment in violation of R.I. Gen. Laws § 9-1-2.

327. Mihailides is entitled to damages against McDaniel for all amounts proved at trial.

## COUNT TWELVE
## DEFAMATION – LIBEL

328. Paragraphs 1 through 327 are incorporated herein and made a part hereof as if again set forth in full.

329. McDaniel published false and defamatory statements about Mihailides by printing or writing or by signs or pictures.

330. The false and defamatory statements included those published on her Instagram page, which included, among other things:

    a. Accusations that Mihailides lies;

    b. Accusations that Mihailides tried to kiss her and other women;

    c. Accusations of inappropriate behavior by Mihailides.

331. The foregoing were false and malicious and imputed conduct which injuriously affects Mihailides's reputation, tends to degrade him in society and brings him into public disfavor and contempt.

332. McDaniel communicated and published the false and defamatory statements to third parties.

333. The communication and publication of these false and defamatory statements to third parties were not privileged.

334. McDaniel knew the defamatory statements were false when she communicated them to third parties.

335. McDaniel was negligent for allowing the false and defamatory statements to be communicated and published them to third parties.

336. Mihailides has been injured by reason of McDaniel's defamatory statements.

337. Mihailides is entitled to damages against McDaniel for all amounts proved at trial.

**COUNT THIRTEEN**
**DEFAMATION – LIBEL PER SE**

338. Paragraphs 1 through 337 are incorporated herein and made a part hereof as if again set forth in full.

339. McDaniel published false and defamatory statements about Mihailides by printing or writing or by signs or pictures.

340. The false and defamatory statements included those published on her Instagram page, which included, among other things:

    a. Accusations that Mihailides lies;

    b. Accusations that Mihailides tried to kiss her and other women;

    c. Accusations of inappropriate behavior by Mihailides.

341. The foregoing were false and malicious and imputed conduct which injuriously affects Mihailides's reputation, tends to degrade him in society and brings him into public disfavor and contempt.

342. McDaniel communicated and published the false and defamatory statements to third parties.

343. The communication and publication of these false and defamatory statements to third parties were not privileged.

344. McDaniel knew the defamatory statements were false when she communicated and published them to third parties.

345. McDaniel was negligent for allowing the false and defamatory statements to be communicated and published to third parties.

346. The false and defamatory statements constitute defamation *per se* because they charged Mihailides with lying, sexual misconduct and inappropriate behavior, among other things.

347. The false and defamatory statements constitute defamation *per se* because they charged Mihailides with lying, sexual misconduct and inappropriate behavior, among other things—matters incompatible with his business, trade or profession.

348. Mihailides is entitled to damages against McDaniel for all amounts proved at trial.

## COUNT FOURTEEN
## UNAUTHORIZED USE OF NAME, PORTRAIT OR PICTURE

349. Paragraphs 1 through 348 are incorporated herein and made a part hereof as if again set forth in full.

350. R.I. Gen. Laws § 9-1-28(a) provides:

> Any person whose name, portrait, or picture is used within the state for commercial purposes without his or her written consent may bring an action in the superior court against the person so using his or her name, portrait, or picture to prevent and restrain the use thereof, and may recover damages for any injuries sustained by reason of such use. If the defendant shall have knowingly used the person's name, portrait, or picture in such manner as is prohibited or unlawful, the court, in its discretion, may award the plaintiff treble the amount of the damages sustained by him or her.

351. On numerous occasions McDaniel has used Mihailides's name, portrait and/or picture for commercial purposes without Mihailides's written consent.

352. For example, McDaniel operates a website with the name Pardon Moi Productions New York City, which is accessible at https://www.pardonmoinyc.com/ (last accessed July 18, 2023).

353. The "About" page on the Pardon Moi Productions website includes a 7 minute, 15 second video under the heading: "My Latest Project: OH Collection x The Preserve."

354. That video includes Mihailides's name and picture, as depicted below, which McDaniel used within this state for commercial purposes without Mihailides's written consent.



355. McDaniel also operates a website with the name Alison McDaniel, which is accessible at https://www.alisonmcdaniel.com/ (last accessed July 18, 2023).

356. The "Commercials" page on the Alison McDaniel website includes the same 7 minute, 15 second video, which includes Mihailides's name and picture, which McDaniel used within this state for commercial purposes without Mihailides's written consent.

357. McDaniel's use of Mihailides's name, portrait and/or picture for commercial purposes was within the State of Rhode Island as her social media posts were intended to reach and did, in fact, reach an audience in Rhode Island.

358. The "Clients & Collabs" page on the Pardon Moi Productions website includes a 1 minute, 12 second video under a heading "In collaboration with The Preserve Rhode Island."

359. That video includes Mihailides's name and picture, as depicted below, which McDaniel used within this state for commercial purposes without Mihailides's written consent.



360. McDaniel knowingly used Mihailides's name, portrait and/or picture in such a manner as it prohibited and/or unlawful.

361. Mihailides has been injured by reason of McDaniel's unauthorized use of his name, portrait or picture.

362. Mihailides is entitled to damages against McDaniel for all amounts proved at trial, which shall be trebled on account of McDaniel's knowing use of Mihailides's name, portrait or picture in such a manner as is prohibited or unlawful.

## COUNT FIFTEEN
## INVASION OF PRIVACY
## APPROPRIATION OF ONE'S NAME OR LIKENESS

363. Paragraphs 1 through 362 are incorporated herein and made a part hereof as if again set forth in full.

364. R.I. Gen. Law § 9-1-28.1(a)(2) establishes the policy of the State of Rhode Island that every person in this state shall have a right to privacy, which shall include the right to be secure from an appropriation of one's name or likeness.

365. R.I. Gen. Laws § 9-1-28.1(b) provides:

> **Right of action.** Every person who subjects or causes to be subjected any citizen of this state or other person within the jurisdiction thereof to a deprivation and/or violation of his or her right to privacy shall be liable to the party injured in an action at law, suit in equity, or any other appropriate proceedings for redress in either the superior court or district court of this state. The court having jurisdiction of an action brought pursuant to this section may award reasonable attorneys' fees and court costs to the prevailing party.

366. To recover for a violation of the right to be secure from an appropriation of one's name or likeness, it must be established that the act was done without permission of the claimant and the act is of a benefit to someone other than the claimant. R.I. Gen. Laws § 9-1-28.1(a)(2)(i).

367. McDaniel has used and continues to use photos and videos of Mihailides, without permission, for both commercial and non-commercial purposes.

368. Mihailides has been injured by reason of McDaniel's appropriation of his name or likeness.

369. Mihailides is entitled to damages against McDaniel for all amounts proved at trial, as well as reasonable attorneys' fees and court costs pursuant to R.I. Gen. Laws § 9-1-28.1(b).

WHEREFORE, Defendant/Counterclaim Plaintiff the Preserve at Boulder Hills demands judgment against McDaniel as follows:

    a. all damages proved at trial;

    b. compensatory damages on Counts 1, 2, 3, 4, 5, 6, 7, 8 and 9;

    c. twice the value of the laptop, the 3-terabyte external hard drive and the data, digital photos, digital videos and other file thereon on Count 2;

    d. attorneys' fees and costs on Counts 5 and 6;

    e. punitive and/or exemplary damages on Counts 5 and 6;

    f. such other and further relief as the Court deems reasonable and just.

WHEREFORE, Defendant/Counterclaim Plaintiff Mihailides demands judgment against McDaniel as follows:

    a. all damages proved at trial;

    b. compensatory damages on Counts 10, 11, 12, 13, 14 and 15;

    c. trebled damages on Count 14;

    d. attorneys' fees and costs on Counts 10 and 15;

    e. punitive and/or exemplary damages on Counts 10 and 15;

    f. such other and further relief as the Court deems reasonable and just.

## JURY TRIAL DEMAND

Defendants hereby demand a trial by jury on all counts so triable.

DEFENDANT/COUNTERCLAIM PLAINTIFF
THE PRESERVE AT BOULDER HILLS, LLC
AND DEFENDANT/COUNTERCLAIM
PLAINTIFF PAUL MIHAILIDES,
By their Attorneys:

/s/ Nicole J. Benjamin
John A. Tarantino (#2586)
jtarantino@apslaw.com
Nicole J. Benjamin (#7540)
nbenjamin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI  02903-1345
Tel:  401-274-7200
Fax:  401-351-4607
July 20, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2023, I electronically served and filed *via the Electronic Court Filing (CM/ECF) system* a true copy of the within pleading on all counsel of record and it is available for viewing and downloading from the ECF system.

/s/ Nicole Benjamin

4867-4791-8448, v. 1