UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALISON MCDANIEL, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C.A. No.: 1:23-CV-00292-WES-LDA |
| | : |
| PRESERVE PROPERTY MANAGEMENT | : |
| COMPANY, LLC, THE PRESERVE AT BOULDER | : |
| HILLS, LLC and PAUL MIHAILIDES, | : |
| | : |
| Defendants. | : |

**DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local R. 56, Defendants The Preserve at Boulder Hills, LLC, Preserve Property Management Company, LLC and Paul Mihailides ("Defendants") hereby move for Partial Summary Judgment on Counts I – VI and X – XII of Plaintiff Alison McDaniel's Second Amended Complaint.[1]

The grounds for Defendants' motion are set forth in the accompanying memorandum of law.

---

[1] Count I (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count II (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count III (Violation of the Civil Rights Act of 1964, 41 U.S.C. § 2000e-3(a), Retaliation); Count IV (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count V (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count VI (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-7(5), Retaliation); Count VII (Breach of Contract); Count VIII (Violation of the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1, et al., Discrimination Based on Sex – Hostile Work Environment – Sexual Harassment); Count IX (Violation of the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1 et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count X (Violation of R.I. Gen. Laws § 28-14-1 et seq., Failure to Pay Wages Due), Count XI (Violation of R.I. Gen. Laws § 28-14-19.1, Misclassification of Employee) and Count XII (Defamation).

DEFENDANT/COUNTERCLAIM PLAINTIFFS
THE PRESERVE AT BOULDER HILLS, LLC
AND PAUL MIHAILIDES AND DEFENDANT
PRESERVE PROPERTY MANAGEMENT
COMPANY, LLC,
By their Attorneys:


/s/ Nicole J. Benjamin
John A. Tarantino (#2586)
jtarantino@apslaw.com
Nicole J. Benjamin (#7540)
nbenjamin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI  02903-1345
Tel:  401-274-7200
Fax:  401-351-4607
July 2, 2024


## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2024, I electronically served and filed *via the Electronic Court Filing (CM/ECF) system* a true copy of the within pleading on all counsel of record and it is available for viewing and downloading from the ECF system.

/s/ Nicole Benjamin

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALISON MCDANIEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No.: 1:23-CV-00292-WES-LDA |
| | : | |
| PRESERVE PROPERTY MANAGEMENT COMPANY, LLC, THE PRESERVE AT BOULDER HILLS, LLC and PAUL MIHAILIDES, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

I.  Standard of Review............................................................................................... 4

II.  Summary Judgment Should Enter in Favor of Defendants on Counts I-VII, X-XI of Plaintiff's Second Amended Complaint Because Plaintiff Was Not an Employee of Either PBH or PPMC.................................................................................................. 5

A.  Plaintiff Cannot Maintain Title VII or FEPA Claims Against PBH Because PBH Has No Employees. ............................................................................................... 6

B.  Plaintiff Cannot Maintain Any Employment-Based Claim Against PPMC Because Plaintiff Does Not Even Purport to Have Worked for PPMC. ..................... 7

C.  Plaintiff Cannot Maintain Any Employment-Based Claim Against Defendants Because the Undisputed Material Facts Demonstrate that Plaintiff was an Independent Contractor as a Matter of Law. .................................................................. 9

1.  Plaintiff Must be an Employee to Pursue Her Employment-Based Claims. .......... 9

(a)  Title VII ....................................................................................................... 9

(b)  FEPA............................................................................................................ 10

(c)  RIPWA......................................................................................................... 11

2.  The Undisputed Material Facts Demonstrate that Plaintiff was Not an Employee as a Matter of Law.................................................................................................. 12

(a)  The Nature of Plaintiff's Work Demonstrates Her Status as an Independent Contractor. ................................................................................................... 12

(b)  The Skill Required of a Professional Model, Spokesperson, Actress, Photographer, Editor, and Social Media Consultant Demonstrates Plaintiff's Status as an Independent Contractor............................................................ 13

(c)  Plaintiff Operation of Her Own Distinct Business Demonstrates Her Independent Contractor Status................................................................................... 14

(d)  Plaintiff's Compensation Demonstrates Her Independent Contractor Status.... 15

(e) PBH Classified Plaintiff's Compensation as Deriving from Professional Services Rendered.............................................................................. 20

(f) Plaintiff Classified the Compensation She Received from PBH as Deriving from Professional Services Rendered. ...................................................... 21

(g) Plaintiff Was Not Entitled to and Did Not Receive Any Employee Benefits. .. 24

(h) Plaintiff's Sporadic Work on Site at the Preserve Demonstrates Her Independent Contractor Status.................................................................. 26

(i) Plaintiff Supplied Some of the Tools and Equipment Necessary for the Work. 27

(j) PBH Did Not Exercise Control Over Plaintiff's Work..................................... 28

(k) Plaintiff Did Not Have a Set Work Schedule for the Work She Performed for PBH.................................................................................................... 29

(l) Plaintiff Performed Other Work as an Independent Contractor During the Time She Performed Work for PBH. .......................................................... 31

(m)Plaintiff's Availability to Perform Work for PBH was Dependent on Her Other Work and Volunteer Commitments. .................................................. 41

(n) When Plaintiff Was Unavailable She Could Substitute Others and When Plaintiff Required Additional Assistance, She Enlisted the Assistance of Others. 44

(o) Plaintiff Described PBH as her Client and Likened it to Her Other Clients...... 45

D. Plaintiff Cannot Maintain a Claim for Breach of Contract Based on a Purported Breach of an Agreement to Pay her a Salary When the Undisputed Material Facts Demonstrate that Plaintiff was an Independent Contractor.............................................................. 49

III. Plaintiff's Sexual Harassment Claims under Title VII, FEPA and RICRA Are Barred by the Statute of Limitations....................................................................................... 50

A. Claims Under Title VII Must be Brought within 300 Days of the Alleged Discrimination................................................................................................. 51

B. Claims Under FEPA Must be Brought Within One Year of the Alleged Discrimination. ........................................................................................................ 51

C. RICRA Claims Must be Brought Within Three Years of the Alleged Discrimination. ........................................................................................................ 51

D. Plaintiff's Sexual Harassment Claims under Title VII, FEPA and RICRA Are All Untimely. .................................................................................................. 51

IV.  Plaintiff's Defamation Claim is Barred by the Statute of Limitations. ............................ 53

CONCLUSION .................................................................................................................... 54

## TABLE OF AUTHORITIES

**Cases**

*Aero Serv. Corp. v. Gordy*,
    109 A.2d 393 (Del. Super. Ct. 1954) ............................................................................. 49

*Alberty-Vélez v. Corporación de P.R. Para La Difusión Pública*,
    361 F.3d 1 (1st Cir. 2004) ................................................................................... *passim*

*Aly v. Mohegan Council*,
    711 F.3d 34 (1st Cir. 2013) ........................................................................................ 6

*Aymes v. Bonelli*,
    980 F.2d 857 (2d Cir. 1992) ...................................................................................... 13

*Berman v. Meravic, Inc.*,
    No. 06-0922, 2007 U.S. Dist. LEXIS 107211 (M.D. Tenn. Oct. 15, 2007) ..................... 31

*Campbell v. Stucki*,
    220 S.W.3d 562 (Tex. App. 2007) .............................................................................. 49

*Capak v. Epps*,
    No. 18-cv-4325, 2020 U.S. Dist. LEXIS 101589 (S.D.N.Y. 2020) ................................. 29

*Chaiken v. VV Pub. Corp.*,
    119 F.3d 1018 (2d Cir. 1997) .................................................................................... 45

*Chorney v. Cullen*,
    692 A.2d 694 (R.I. 1997) ......................................................................................... 53

*Cibotti v. Commissioner*,
    No. 15402-10S, 2012 Tax Ct. Summary LEXIS 19 (T.C. Mar. 6, 2012) ......................... 27

*Cilecek v. Inova Health Sys. Servs.*,
    115 F.3d 256 (4th Cir. 1997) .................................................................................... 41

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989) ................................................................................................ 25

*D. D. Bean & Sons Co. v. United States*,
    Civil No. 73-216., 1975 U.S. Dist. LEXIS 12179 (D.N.H. May 28, 1975) ..................... 44

*DeLia v. Verizon Commc'ns. Inc.*,
    656 F.3d 1 (1st Cir. 2011) ..................................................................................... 9, 10

*Doe v. Medeiros*,
    266 F. Supp. 3d 479 (D. Mass. 2017) ............................................................................. 21

*Dykes v. Depuy, Inc.*,
    140 F.3d 31 (1st Cir. 1998) ............................................................................................. 12

*English v. Kienke*,
    848 P.2d 153 (Utah 1993) ............................................................................................... 50

*Fam. Christian World, Inc. v. Olds*,
    100 N.E.3d 277 (Ind. Ct. App. 2018) ............................................................................. 22

*Fantini v. Salem State Coll.*,
    557 F.3d 22 (1st Cir. 2009) ............................................................................................. 10

*Farlow v. Wachovia Bank of N.C., N.A.*,
    259 F.3d 309 (4th Cir. 2001) .................................................................................... 25, 45

*Gibbs v. Brown Univ.*,
    No. 09-cv-392, 2011 U.S. Dist. LEXIS 34834 (D.R.I. Mar. 31, 2011) ........................... 51

*Glascock v. Linn Cty. Emergency Med., PC*,
    698 F.3d 695 (8th Cir. 2012) .......................................................................................... 21

*Grossman v. Martin*,
    566 F. Supp. 3d 136 (D.R.I. 2021) ................................................................................... 4

*Horn v. S. Union Co.*,
    927 A.2d 292 (R.I. 2007) ................................................................................................ 51

*Hovanski v. Am. Income Life Ins. Co.*,
    No. 03-CV-0838, 2006 U.S. Dist. LEXIS 113221 (N.D. Ala. Jan. 11, 2006) ................. 29

*Idaho Pac. Lumber Co. v. Celestial Land Co.*,
    348 P.3d 950 (Colo. Ct. App. 2009) ............................................................................... 49

*Janette v. Am. Fid. Grp., Ltd.*,
    298 F. App'x 467 (6th Cir. 2008) .................................................................................... 16

*Kassel v. Gannett Co.*,
    875 F.2d 935 (1st Cir. 1989) ........................................................................................... 14

*Liberman-Sack, D.M.D. v. Harvard Cmty. Health Plan of New England, Inc.*,
    882 F. Supp. 249 (D.R.I. 1995) ...................................................................................... 10

*Lindsley v. BellSouth Telecomms., Inc.*,
 No. 07-6569, 2009 U.S. Dist. LEXIS 18482 (E.D. La. Feb. 27, 2009) ........................... 22

*Linkevich v. Smithfield Foods, Inc.*,
 520 F. Supp. 3d 150 (D.R.I. 2021).................................................................... 11

*Local 777, Democratic Union Org. Comm. v. NLRB*,
 603 F.2d 862 (D.C. Cir. 1978)....................................................................... 49

*Lockett v. Allstate Ins. Co.*,
 364 F. Supp. 2d 1368 (M.D. Ga. 2005) ............................................................. 29

*Lopez v. Massachusetts*,
 588 F.3d 69 (1st Cir. 2009).............................................................. 10, 26, 45

*Madden v. Rittal N. Am., LLC*,
 643 F. Supp. 3d 305 (D.R.I. 2022)................................................................... 6

*Mahoney v. Morgan*,
 No. 08-10879, 2010 U.S. Dist. LEXIS 97224 (D. Mass. Sep. 16, 2010) ........................ 21

*Mancini v. City of Providence*,
 155 A.3d 159 (R.I. 2017)............................................................................ 11

*Martin v. USCORP*,
 No. CIV 07-048, 2008 U.S. Dist. LEXIS 139777 (D. Ariz. Aug. 15, 2008)............... 16, 46

*McDonald v. S. Farm Bureau Life Ins. Co.*,
 291 F.3d 718 (11th Cir. 2002) ...................................................................... 24

*Nationwide Mut. Ins. Co. v. Darden*,
 503 U.S. 318 (1992)................................................................................. 21

*O'Dell v. Qualscript, LLC*,
 No. 21-CV-00260, 2023 U.S. Dist. LEXIS 53084 (E.D. Ark. Mar. 28, 2023) ............... 22

*Oestman v. Nat'l Farmers Union Ins. Co.*,
 958 F.2d 303 (10th Cir. 1992) ...................................................................... 28

*Oliver v. Johanson*,
 No. 17-CV-5129, 2018 U.S. Dist. LEXIS 198484 (W.D. Ark. Nov. 21, 2018)... 16, 17, 26

*Olson v. Townsend*,
 530 A.2d 566 (Vt. 1987)............................................................................. 50

*Oshiver v. Levin, Fishbein, Sedran & Berman,*
    910 F. Supp. 225 (E.D. Pa. 1996) ...................................................................... 16

*Peakspeed, Inc. v. Emerson,*
    No. 20-1630, 2020 U.S. Dist. LEXIS 248635 (D. Minn. Dec. 29, 2020).................. 16, 26

*Pimentel v. R.I. Dep't of Lab. & Training,*
    No. PC-2011-0542, 2016 R.I. Super. LEXIS 2 (R.I. Super. Ct. Jan. 12, 2016) ......... 11, 12

*Rivera-Rodríguez v. Frito Lay Snacks Caribbean,*
    265 F.3d 15 (1st Cir. 2001) ............................................................................ 51

*Savage Ent., LLC v. Ortiz,*
    No. 22-247, 2023 U.S. Dist. LEXIS 213054 (D.R.I. Nov. 30, 2023)................................ 4

*Sec'y of Lab., U.S. Dep't of Lab. v. Lauritzen,*
    835 F.2d 1529 (7th Cir. 1987) ........................................................................ 16

*Silviotti v. Morning Call,*
    No. 01-4692, 2002 U.S. Dist. LEXIS 24410 (E.D. Pa. Dec. 12, 2002)...................... 26, 31

*Smith v. Mikki More, LLC,*
    59 F. Supp. 3d 595 (S.D.N.Y. Oct. 9, 2014)........................................................ 14, 27, 46

*Speen v. Crown Clothing Corp.,*
    102 F.3d 625 (1st Cir. 1996) ............................................................................ 12

*Tokarz v. Ventaire Corp.,*
    No. 03-CV-149, 2006 U.S. Dist. LEXIS 45902 (N.D. Ind. June 26, 2006) ................... 15

*Town of Westport v. Monsanto Co.,*
    877 F.3d 58 (1st Cir. 2017).............................................................................. 4, 5

*U.S. v. President & Fellows of Harvard Coll.,*
    323 F. Supp. 2d 151 (D.Mass. 2004) ................................................................ 21

*Walker v. United States,*
    758 F. Supp. 2d 753 (S.D. Ind. 2010) ................................................................ 14

*Weary v. Cochran,*
    377 F.3d 522 (6th Cir. 2004) ........................................................................... 31

*Williamson v. Coastal Physician Servs. of the Se.,*
    554 S.E.2d 739 (Ga. Ct. App. 2001)................................................................... 41

*Wright v. Violet Energy, Inc.*,
    No. 22-cv-151, 2024 U.S. Dist. LEXIS 87468 (D. Or. May 15, 2024) ..................... 16, 17

*Zarlengo v. Caz & Assoc.*,
    No. 13-CV-98, 2014 U.S. Dist. LEXIS 130321 (N.D.W. Va. Sep. 17, 2014) ................ 41

**Statutes**

41 U.S.C. § 2000e-3 ......................................................................................................... 5

42 U.S.C. § 2000e ........................................................................................................ 5, 6

42 U.S.C. § 2000e-5 ....................................................................................................... 51

R.I. Gen. Laws § 28-14-1 .......................................................................................... 5, 11

R.I. Gen. Laws § 28-14-19.1 ........................................................................................... 6

R.I. Gen. Laws § 28-5-1 ................................................................................................... 5

R.I. Gen. Laws § 28-5-17 ............................................................................................... 51

R.I. Gen. Laws § 28-5-6 ................................................................................................... 6

R.I. Gen. Laws § 28-5-7 ........................................................................................... 5, 10

R.I. Gen. Laws § 42-112-2 ............................................................................................. 51

R.I. Gen. Laws § 42-30.1-12.1 ...................................................................................... 48

R.I. Gen. Laws § 42-30.1-5 ........................................................................................... 48

R.I. Gen. Laws § 9-1-14 ................................................................................................. 53

**Other Authorities**

*Black's Law Dictionary* (9th ed. 2009) ........................................................................ 49

**Treatises**

Restatement (Second) of Agency § 220 ......................................................................... 11

Defendants The Preserve at Boulder Hills, LLC ("PBH"), Preserve Property Management Company, LLC ("PPMC") and Paul Mihailides (together with PBH and PPMC, "Defendants") submit this memorandum of law in support of their Motion for Partial Summary Judgment on Counts I – XII of Plaintiff Alison McDaniel's Second Amended Complaint.[1]

## **INTRODUCTION**

This is a case that Plaintiff's counsel has characterized as "legal extortion."[2] But summary judgment exists to prevent such extortion where there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law. Summary judgment is warranted here.

Through her Second Amended Complaint, Plaintiff advances eight claims that may only be brought by an employee and a claim for breach of contract that is dependent on a finding that she is an employee.[3] The Plaintiff's problem, however, is that the undisputed material facts show

---

[1]    Count I (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count II (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count III (Violation of the Civil Rights Act of 1964, 41 U.S.C. § 2000e-3(a), Retaliation); Count IV (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count V (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count VI (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-7(5), Retaliation); Count VII (Breach of Contract); Count VIII (Violation of the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1, et al., Discrimination Based on Sex – Hostile Work Environment – Sexual Harassment); Count IX (Violation of the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1 et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count X (Violation of R.I. Gen. Laws § 28-14-1 et seq., Failure to Pay Wages Due), Count XI (Violation of R.I. Gen. Laws § 28-14-19.1, Misclassification of Employee) and Count XII (Defamation).

[2]    **Ex. 13** to SUF, June 21, 2024 Deposition of Paul Mihailides ("Mihailides Dep.") at 263:01-263:08 ("We call it legal extortion as plaintiffs' lawyers. Sorry.").

[3]    Counts I (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count II (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count III (Violation of the Civil Rights Act of 1964, 41 U.S.C. § 2000e-3(a), Retaliation); Count IV (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count V (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count VI (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen.

that at no time was Plaintiff ever an employee of either PBH or PPMC.  PBH—the entity that paid Plaintiff—has never had any employees and PPMC did not even exist at the time Plaintiff began providing the services at issue.

There is overwhelming undisputed evidence demonstrating that Plaintiff was not an employee of either PBH or PPMC as a matter of law.

Plaintiff holds herself out as a professional model, spokesperson, actress,[4] photographer, editor and social media specialist.  She also operates her own distinct business, the Ali McDaniel Agency, through which, among other things, she helps non-profits meet their fundraising goals at charity events.

Throughout the time Plaintiff provided the services at issue, she worked as an independent contractor for numerous other businesses and organizations, including the National Wild Turkey Federation, the NRA Foundation, Inc., Jovani (a women's clothing manufacturer), American Broadcasting Co., Ducks Unlimited, Sporting Clays for Charity, and the Federated Rhode Island Sportsmen.  She also received modeling assignments through The Campbell Agency.

When her schedule allowed, Plaintiff also worked on projects for PBH.  Plaintiff did not have a set work schedule and she worked sporadically on site at the Preserve.  She also performed work from home and, when she did so, she utilized her home office and home utilities for which

---

Laws § 28-5-7(5), Retaliation); Count VII (Breach of Contract); Count X (Violation of R.I. Gen. Laws § 28-14-1 et seq., Failure to Pay Wages Due), Count XI (Violation of R.I. Gen. Laws § 28-14-19.1, Misclassification of Employee).

[4]      Although Plaintiff holds herself out as having been an actress in Hunger Games Catching Fire, she testified at deposition that she ultimately did not "make the cut."  **Ex. 1** to SUF, Pl's Dep. (Feb. 21, 2024) at 78:16-94:6.

she claimed and received tax deductions.  When she was unavailable, she sometimes substituted others and when she required additional assistance she enlisted the assistance of others.

In exchange for the services she provided, Plaintiff was paid in lump sums and irregular amounts.  Sometimes Plaintiff presented invoices, other times she informed PBH the amount she charged for her services.  PBH was responsible for paying Plaintiff and, at no time, did PPMC ever issue any payment to Plaintiff.

At all times, PBH classified Plaintiff's compensation as deriving from professional services rendered, having issued to her form 1099s.  Likewise, at all times, Plaintiff classified the compensation she received as deriving from professional services rendered, having completed and signed an IRS Form W-9 under the penalties of perjury, having completed, signed and filed tax returns under the penalties of perjury claiming income under Schedule C titled "Profit or Loss from Business (Sole Proprietorship)" and claiming thousands of dollars in business expenses each year.[5]  Plaintiff also was never entitled to employee benefits, to which employees at PPMC were entitled.  Consistent with her tax treatment of the income she received from PBH, Plaintiff described PBH publicly as her client and likened it to her other clients, even after her work concluded.

Accordingly, summary judgment should enter in favor of Defendants on Plaintiff's employment-based claims, as well as her claim for breach of contract which is dependent upon a finding that she was an employee.

Plaintiff claims she was subjected to sexual harassment and advances claims under Title VII, the Fair Employment Practices Act ("FEPA") and the Rhode Island Civil Rights Act

---

[5]    The amount of income Plaintiff claimed on her tax returns cannot be reconciled with the 1099s she received.

("RICRA").   However, it is undisputed that the alleged harassment that forms the basis of Plaintiff's employment-based claims and her RICRA claims began in March 2019, making her claims untimely.  By Plaintiff's own admission, the alleged harassment began the first day she was on site at the Preserve in March 2019, and it became severe enough that she started documenting it in April 2020.

Plaintiff also advances a claim for defamation (slander) but admits that the words that form the basis of that claim were spoken before December 19, 2021, making her claim untimely. Accordingly, summary judgment should enter in favor of Defendants on each of Plaintiff's time-barred claims.

On the basis of the overwhelming and undisputed evidence set forth in Defendants' accompanying Statement of Undisputed Facts ("SUF") and for the reasons set forth herein, summary judgment should enter in favor of Defendants on Counts I – XII of Plaintiff's Second Amended Complaint.

## ARGUMENT

### I. Standard of Review

"'Summary judgment is proper when the pleadings, discovery, and affidavits, show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Savage Ent., LLC v. Ortiz*, No. 22-247, 2023 U.S. Dist. LEXIS 213054, at *4-5 (D.R.I. Nov. 30, 2023) (internal quotation marks omitted) (quoting *Grossman v. Martin*, 566 F. Supp. 3d 136, 142 (D.R.I. 2021)); *see also* Fed. R. Civ. P. 56.

To survive summary judgment, "[a] 'nonmovant [who] bears the ultimate burden of proof' must provide 'definite, competent evidence.'"  *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66 (1st Cir. 2017) (second alteration in original) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991)).  Thus, a nonmovant may not "rest on 'conclusory allegations, improbable inferences, [or] unsupported speculation' to defeat a motion for summary judgment."  *Id.* (alteration in original) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

"While '[i]t is well-settled that a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage,' 'it is equally clear that judges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment.'"  *Town of Westport*, 877 F.3d at 66 (alteration in original) (quoting *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014)).  Thus, a district judge may not "'draw *unreasonable* inferences or credit bald assertions.'"  *Id.* (emphasis in original) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)).

## II. Summary Judgment Should Enter in Favor of Defendants on Counts I-VII, X-XI of Plaintiff's Second Amended Complaint Because Plaintiff Was Not an Employee of Either PBH or PPMC.

Count I (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count II (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count III (Violation of the Civil Rights Act of 1964, 41 U.S.C. § 2000e-3(a), Retaliation); Count IV (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Hostile Work Environment – Sexual Harassment); Count V (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et al., Discrimination Based on Sex, Quid Pro Quo Sexual Harassment); Count VI (Violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-7(5), Retaliation); Count X (Violation of R.I. Gen. Laws § 28-14-1 et seq., Failure to Pay Wages Due)

5

and Count XI (Violation of R.I. Gen. Laws § 28-14-19.1, Misclassification of Employee) are all claims that may only be asserted by an employee.

In addition, Plaintiff may only proceed on Count VII (Breach of Contract) if she first demonstrates she was an employee, because she claims she had a contract to pay her a salary and wages.

The undisputed material facts establish that Plaintiff was not an employee of any of the Defendants. Accordingly, summary judgment should enter in Defendants' favor on each of these Counts.

### A.    Plaintiff Cannot Maintain Title VII or FEPA Claims Against PBH Because PBH Has No Employees.

Plaintiff cannot maintain a claim against PBH under Title VII or FEPA because PBH has no employees.

Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b) (2013). To prevail on a Title VII claim, a "plaintiff bears the burden of demonstrating by a preponderance of the evidence that the employer meets the 15-employee threshold." *Aly v. Mohegan Council*, 711 F.3d 34, 45 (1st Cir. 2013) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)).

FEPA defines an "[e]mployer" as including "the state and all political subdivisions of the state and any person in this state employing four (4) or more individuals, and any person acting in the interest of an employer directly or indirectly." R.I. Gen. Laws § 28-5-6(9)(i); *see also Madden v. Rittal N. Am., LLC*, 643 F. Supp. 3d 305, 314 (D.R.I. 2022).

6

Here, it is undisputed that PBH has never had any employees.  SUF ¶ 75.  PBH did not have any employees at the time Plaintiff provided services to it and it has never had any employees, let alone any employees in any of the working days in each of the twenty or more calendar weeks in this year or last year.  *Id*.

Accordingly, Plaintiff cannot demonstrate that PBH is an employer within the meaning of Title VII or FEPA.

> **B.    Plaintiff Cannot Maintain Any Employment-Based Claim Against PPMC Because Plaintiff Does Not Even Purport to Have Worked for PPMC.**

Plaintiff cannot maintain any employment-based claim against PPMC because Plaintiff does not even purport to have worked for PPMC.  Plaintiff's claims against PPMC are based entirely on unreasonable inferences.  Accordingly, summary judgment should enter in favor of PPMC on Plaintiff's claims under Title VII, FEPA and the Rhode Island Payment of Wages Act ("RIPWA") (Counts I – VI and X – XI).

Plaintiff admits that she "believed in good faith" that she worked for PBH.  SUF ¶¶ 131, 132.  She claims, however, that she has named PPMC as a defendant because, "in a Position Statement filed with the EEOC in response to [her] Charge of Discrimination, it is alleged that Preserve Property Management Company, LLC was the entity for whom [she] worked."  SUF ¶ 128.  No such allegation was made in response to Plaintiff's Charge of Discrimination.

In 2022, Plaintiff filed a Charge of Discrimination with the EEOC against The Preserve Sporting Club.  SUF ¶ 437.  There is no legal entity with that name.  SUF ¶ 441.  The response to Plaintiff's Charge of Discrimination stated:

> Ms. McDaniel's Charge of Discrimination names The Preserve Sporting Club as a respondent.  There is no legal entity with that name.  While Preserve Sporting Club and Residences is a fictious

7

name used by Preserve Property Management Company, LLC that entity did not employ Ms. McDaniel as an employee and neither the Alison McDaniel Agency nor Ms. McDaniel served as an independent contractor, consultant or otherwise for the Preserve Property Management Company, LLC. The Preserve Property Management Company, LLC made no payments to the Alison McDaniel Agency or Ms. McDaniel at any point in time. Preserve Property Management Company, LLC submits this Position Statement without waiving its defense that it is not the proper respondent in this matter.

SUF ¶ 443 (internal citations omitted).

It is undisputed that PPMC was not even formed at the time Plaintiff began performing work as an independent contractor at the Preserve. SUF ¶ 89. PPMC is a limited liability company formed under the laws of the State of Rhode Island. SUF ¶ 88. PPMC was organized on February 27, 2020 and its organization became effective February 28, 2020, nearly a year after Plaintiff first performed work as an independent contractor at the Preserve. SUF ¶ 89. On September 12, 2022, PPMC registered the fictitious name Preserve Sporting Club & Residences. SUF ¶ 90.

It is also undisputed that when PPMC was formed, it was managed by the Ocean House Management Company. SUF ¶ 92. The Ocean House Management Company is separate and distinct from the Preserve. SUF ¶ 93. All of the employees who worked for PPMC were, at that time, under the control and management of The Ocean House Management Company. SUF ¶ 94. When the Ocean House Management Company's management ended, employees were transitioned to PPMC. SUF ¶ 95. Thereafter, from June 1, 2023 – June 8, 2024 PPMC was managed by Pyramid Benchmark Global. SUF ¶ 97. Plaintiff does not claim to have been an employee of Ocean House Management Company or Pyramid Benchmark Global, and it is undisputed that she was not an employee of either of those management companies. SUF ¶¶ 96, 98.

8

Here, Plaintiff's claim against PPMC is based solely on Plaintiff's mistaken reading of the response to her Charge of Discrimination. PPMC did not even exist when Plaintiff began performing work as an independent contractor at the Preserve and, when it was formed, it was managed by the Ocean House Management Company, an entity for which Plaintiff does not purport to have worked for and for which she was never an employee. Accordingly, Plaintiff cannot establish that she was employed by PPMC as a matter of law.

**C.**   **Plaintiff Cannot Maintain Any Employment-Based Claim Against Defendants Because the Undisputed Material Facts Demonstrate that Plaintiff was an Independent Contractor as a Matter of Law.**

Summary judgment should also enter in favor of each of the Defendants on Plaintiff's employment-based claims under Title VII, FEPA and RIPWA (Counts I – VI and X – XI) because the undisputed material facts demonstrate that Plaintiff was an independent contractor. Therefore, Plaintiff cannot maintain any of these employment-based claims.

**1.**   **Plaintiff Must be an Employee to Pursue Her Employment-Based Claims.**

Each of Plaintiff's employment-based claims under Title VII, FEPA and RIPWA (Counts I – VI and X – XI) require proof that Plaintiff was an employee.

**(a) Title VII**

Counts I – III of Plaintiff's Second Amended Complaint purport to state claims under Title VII. Title VII protects "employees" from harassment and retaliation. *DeLia v. Verizon Commc'ns. Inc.*, 656 F.3d 1, 4, 6 (1st Cir. 2011). It "does not cover independent contractors." *Alberty-Vélez v. Corporación de P.R. Para La Difusión Pública*, 361 F.3d 1, 6 (1st Cir. 2004).

The First Circuit has "construed Supreme Court decisions as establishing the proposition that 'the terms "employer" and "employee" under Title VII are to be defined with reference to [ ]

common law agency principles.'" *DeLia*, 656 F.3d at 4 (alteration in original) (quoting *Lopez v. Massachusetts*, 588 F.3d 69, 83 (1st Cir. 2009)).  Common law agency principles utilize a series of nonexclusive factors to determine if a person is an employee or an independent contractor. *Lopez*, 588 F.3d at 83.  They include:

> [T]he hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is a business; the provision of employee benefits; and the tax treatment of the hired party.

*Id*. at 83-84 n.14 (second alteration in original).

Title VII does not impose individual liability on employees.  *Fantini v. Salem State Coll.*, 557 F.3d 22, 30 (1st Cir. 2009).

### (b) FEPA

Counts IV – VI of Plaintiff's Second Amended Complaint purport to state claims under FEPA.  FEPA protects employees from discharge, discipline and retaliation based on sex and gender, among other things.  R.I. Gen. Laws § 28-5-7(1)(ii).  The Rhode Island Supreme Court has instructed courts to follow Title VII case law for guidance in construing FEPA.  *Liberman-Sack, D.M.D. v. Harvard Cmty. Health Plan of New England, Inc*., 882 F. Supp. 249, 254 (D.R.I. 1995) (citing *Newport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights*, 484 A.2d 893 (R.I. 1984)).  Accordingly, the same factors utilized to determine whether a person is an employee or an independent contractor under Title VII apply to a FEPA claim.

10

FEPA does not provide for individual liability of an employee of a defendant employer. *Mancini v. City of Providence*, 155 A.3d 159, 161 (R.I. 2017).

### (c) RIPWA

Counts X and XI of Plaintiff's Second Amended Complaint purport to state claims under RIPWA. "RIPWA provides a cause of action to employees who have not been paid wages by their employers." *Linkevich v. Smithfield Foods, Inc.*, 520 F. Supp. 3d 150, 153 (D.R.I. 2021). RIPWA expressly states that an "[e]mployee means any person [] permitted to work by an employer, except [] independent contractors or subcontractors." R.I. Gen. Laws § 28-14-1. The statute does not define what constitutes an independent contractor. *Pimentel v. R.I. Dep't of Lab. & Training*, No. PC-2011-0542, 2016 R.I. Super. LEXIS 2, at *9 (R.I. Super. Ct. Jan. 12, 2016).

As with Title VII jurisprudence, there is no hard and fast rule for determining whether a person is an employee or an independent contractor for purposes of the RIPWA. *Id.* Accordingly, Rhode Island courts look to the Restatement (Second) of Agency § 220, which provides guidelines to determine whether an individual is an employee or an independent contractor. *Id.* at 11. Those guidelines include:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.

*Id.* (internal quotations omitted) (quoting Restatement (Second) of Agency § 220 (1958)).  The final test "is not the actual exercise of the power of control, but the right of the employer to exercise power of control."  *Id.* at 10 (quoting *O'Connor v. Narragansett Elec. Co.*, 172 A. 889, 890 (R.I. 1934)).

### 2.  The Undisputed Material Facts Demonstrate that Plaintiff was Not an Employee as a Matter of Law.

There is overwhelming undisputed evidence in this case demonstrating that Plaintiff was not an employee of either PBH or PPMC as a matter of law.

The First Circuit has held that a court "may decide the employee/independent contractor question as a matter of law if the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion."  *Alberty-Vélez*, 361 F.3d at 7; *see also Dykes v. Depuy, Inc.*, 140 F.3d 31, 38-39 (1st Cir. 1998) (affirming grant of summary judgment concluding individual was independent contractor); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 634 (1st Cir. 1996) (affirming grant of judgment as a matter of law concluding individual was independent contractor).

Accordingly, based on the overwhelming undisputed evidence demonstrating that Plaintiff was not an employee of either PBH or PPMC as a matter of law, summary judgment should enter in favor of Defendants on each of Plaintiff's employment-based claims.

### (a) The Nature of Plaintiff's Work Demonstrates Her Status as an Independent Contractor.

From the beginning, Plaintiff's status as an independent contractor was clear.  On November 24, 2019, Mr. Mihailides emailed Plaintiff a list of suggestions on areas where she could be of assistance.  SUF ¶ 18.  Mr. Mihailides explained that there was a need for corporate awareness in New York and sales for events and retreats, a concierge to coordinate those events,

12

creative support, including ad creation, assistance with Instagram and Facebook and building OEL, among other things.  SUF ¶ 19.  Mr. Mihailides wrote:  "Only you know what the best opportunity for us is and the time you can commit."  SUF ¶ 20.  With respect to compensation, Mr. Mihailides explained:  "I am happy to give you a stipend / partnership/ percentage split whether we can do to make this happen as much or as little as you can handle."  SUF ¶ 21.

Plaintiff alleges that Defendants hired her to perform the following job duties at the Preserve:

> Acting as a Spokesperson for The Preserve; acting in commercials; creating and appearing in videos for social media; providing her image for print, social media, advertisements, and magazines; acting as the social media manager; appearing at special events; appearing in videos for the Sporting Shoppe located on The Preserve property; creating marketing campaigns and ideas; shooting photography and videography; editing social media videos, brochures, and ad campaigns; creating the 3rd Hobbit House Concept; collaborations with other brands and/or people; working as editor for OEL magazine and managing its *Instagram* page; working and staffing trade shows to represent The Preserve in North Carolina, Texas and Pennsylvania; creating Fall Hobbit House décor; and hiring other professionals such as actors and videographers.

Second Amend. Compl. ¶ 24.  Viewing Plaintiff's allegations in the light most favorable to her for purposes of summary judgment only, the nature of Plaintiff's work demonstrates her status as an independent contractor.

### (b) The Skill Required of a Professional Model, Spokesperson, Actress, Photographer, Editor, and Social Media Consultant Demonstrates Plaintiff's Status as an Independent Contractor.

When the hired party is a skilled professional, that factor weighs in favor of independent contractor status.  *Alberty-Vélez*, 361 F.3d at 7 (recognizing that "a television actress is a skilled position requiring talent and training not available on-the-job"); *see also Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992) ("[C]ourts that have addressed the level of skill necessary to indicate

that a party is an independent contractor have held architects, photographers, . . . artists, [and] drafters . . . to be highly skilled independent contractors."); *Smith v. Mikki More, LLC*, 59 F. Supp. 3d 595 (S.D.N.Y. Oct. 9, 2014) (granting summary judgment on the grounds that website designer was an independent contractor where, among other things, website design required substantial skill, both technical—graphic design—and social media savvy).

Here, Plaintiff has worked as an actress and professional model since 2005.  Second Amend. Compl. ¶ 22.  She has more than 15 years of experience in the creative industry and has had the opportunity to learn from some of the top creatives in the industry.  SUF ¶¶ 1-2.  For her modeling work, Plaintiff has utilized several agencies, including the Lauren Green Agency in New York and the Campbell Agency.  SUF ¶¶ 4-5.

Each of the services Plaintiff claims to have performed—professional model, actress, photographer, editor and social media consultant—required a high degree of skill and supports her status as an independent contractor.

### (c) Plaintiff Operation of Her Own Distinct Business Demonstrates Her Independent Contractor Status.

A worker's operation of her own distinct business is also supportive of a finding that the worker is an independent contractor.  *See Kassel v. Gannett Co.*, 875 F.2d 935, 942 n.5 (1st Cir. 1989) (recognizing that, "[i]n determining whether one acting for another is a servant or an independent contractor" consideration is given to "whether or not the one employed is engaged in a distinct occupation or business").  Thus, "[i]f a worker has his or her own business then '[t]his factor weighs in favor of [his or] her status as an independent contractor."  *Walker v. United States*, 758 F. Supp. 2d 753, 760 (S.D. Ind. 2010) (second and third alteration in original) (quoting *Guillaume v. Hall Farms, Inc.*, 914 N.E.2d 784, 789 (Ind.Ct.App.2009)) (recognizing that under

14

the Restatement (Second) of Agency consideration is given to "whether or not the one employed is engaged in a distinct business or occupation" (quoting *Walker v. Martin*, 887 N.E.2d 125, 132 (Ind. Ct. App. 2008))); *see also Tokarz v. Ventaire Corp.*, No. 03-CV-149, 2006 U.S. Dist. LEXIS 45902, at *19-20 (N.D. Ind. June 26, 2006).

Here, at all relevant times, Plaintiff has operated her own distinct business.  In 2019 and continuing to the present, Plaintiff owned and operated the Ali McDaniel Agency (the "Agency").  SUF ¶ 6.  The Agency is not separately incorporated and does not have employees but operates as a business.  SUF ¶¶ 7, 8.  The Agency helps non-profits meet their fundraising goals at charity events, among other things.  SUF ¶ 9.  The Agency contracts to provide "raffle girls" to assist with raffles at charitable events across the country.  SUF ¶ 10.  Plaintiff is one of the raffle girls who works on behalf of the Agency.  SUF ¶ 11.

Thus, this factor also supports the conclusion that Plaintiff is an independent contractor.

### (d) Plaintiff's Compensation Demonstrates Her Independent Contractor Status.

Plaintiff's compensation further supports the conclusion that she was an independent contractor for PBH and that she was neither an employee nor an independent contractor of PPMC.  As Mr. Mihailides' initial email made clear, he was happy to work through a compensation arrangement, but that compensation arrangement never included any proposal for wages.  SUF ¶ 21.  Rather, Mr. Mihailides explained:  "I am happy to give you a stipend / partnership/ percentage split whether we can do to make this happen as much or as little as you can handle."  *Id*.

**1.  Plaintiff Performed Services for PBH and PBH Paid Plaintiff in Lump Sums and Irregular Amounts for those Services.**

The payments PBH made to Plaintiff in exchange for the services she rendered further support her status as an independent contractor.

As a general matter, "lack of a consistent salary supports a conclusion that one is an independent contractor." *Janette v. Am. Fid. Grp., Ltd.*, 298 F. App'x 467, 475 (6th Cir. 2008) (affirming grant of summary judgment on grounds that worker was an independent contractor). Thus, lump sum payments, flat fee payments, irregular payments, and payments by invoice all support a conclusion that one is an independent contractor. *Id.*; *Alberty-Vélez*, 361 F.3d at 8 (lump sum fee favored independent contractor status); *Sec'y of Lab., U.S. Dep't of Lab. v. Lauritzen,* 835 F.2d 1529, 1542 (7th Cir. 1987) (Easterbrook, J., concurring) ("One common feature of an independent contractor relation is compensation by a flat fee."); *Peakspeed, Inc. v. Emerson*, No. 20-1630, 2020 U.S. Dist. LEXIS 248635, at *19 (D. Minn. Dec. 29, 2020) (irregular payments); *Wright v. Violet Energy, Inc.*, No. 22-cv-151, 2024 U.S. Dist. LEXIS 87468, at *4-5 (D. Or. May 15, 2024) (observing that the plaintiff's claim that he was an employee was inconsistent with the fact that he was, at the same time, billing for work performed); *Oliver v. Johanson,* No. 17-CV-5129, 2018 U.S. Dist. LEXIS 198484 (W.D. Ark. Nov. 21, 2018) (granting summary judgment on the grounds that worker was an independent contractor when, *inter alia,* he submitted invoices for his services, as opposed to using a time clock at the company); *Martin v. USCORP*, No. CIV 07-048, 2008 U.S. Dist. LEXIS 139777, at *12-14 (D. Ariz. Aug. 15, 2008) (granting summary judgment on the grounds that worker was an independent contractor when, *inter alia,* he submitted invoices for reimbursement of expenses); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 910 F. Supp. 225, 229 (E.D. Pa. 1996) ("The fact that Oshiver submitted invoices to the Firm, that they

were for 'services rendered' and that they were printed on her own letterhead are indications that she was an outsider to the Firm.").

Payments made for "consulting" services are likewise indicia of independent contractor status. *Wright*, 2024 U.S. Dist. LEXIS 87468, at *4-5. And, where a worker is paid through his or her own company, that fact too indicates independent contractor status. *Oliver*, 2018 U.S. Dist. LEXIS 198484 (granting summary judgment on the grounds that worker was an independent contractor when, *inter alia*, he was paid through his own company).

Here, from the start, PBH made clear it was looking to retain Plaintiff on a per-project basis. On February 22, 2019, after having met Plaintiff at a fundraiser, Mr. Mihailides texted Plaintiff:

> Ali . . . After meeting with Ray he said that your schedule is crazy. I am looking for an outdoor spokesperson for a program we will be running for women at the preserve. 2. I would like to discuss that as well as several high end events that will be happening this year. If you [sic] schedule doesn't permit could you make a refferal [sic]. Thank [you] Paul.

SUF ¶ 12. Plaintiff responded: "Hi Paul! I will totally make myself available. I want to help!" SUF ¶ 13.

In March 2019, Plaintiff visited the Preserve for the first time and, in mid-2019, PBH engaged Plaintiff to provide some modeling services. SUF ¶¶ 14, 15. PBH paid Plaintiff for those services. On July 9, 2019, PBH issued a check to Plaintiff in the amount of $2,000. SUF ¶ 16. The "memo" line on the July 9, 2019 check states: "Promo Services Model." SUF ¶ 17. Most often, PBH issued payment directly to Plaintiff's business, the Ali McDaniel Agency. *See infra*.

In exchange for her services, beginning on December 8, 2019 and continuing through December 18, 2022, PBH issued periodic payments to Plaintiff in lump sum amounts. SUF ¶¶ 22-

17

69.  On December 8, 2019, PBH issued a check to the Ali McDaniel Agency in the amount of $6,000 for "consulting" services.  SUF ¶ 22.  The "memo" line on the December 8, 2019 check states: "Consulting."  SUF ¶ 23.  On January 16, 2020, PBH issued a check to the Alison McDaniel Agency in the amount of $7,457.  SUF ¶ 25.  The "memo" line on the January 16, 2020 check states: "JANUARY / DALLAS SAFARI CLUB."  SUF ¶ 26.  On February 29, 2020, PBH issued a check to the Ali McDaniel Agency in the amount of $6,430.  SUF ¶ 28.  The "memo" line on the February 29, 2020 check states: "Consulting."  SUF ¶ 29.

In early April 2020, after the start of the pandemic, Plaintiff emailed wire instructions for her bank account.  SUF ¶ 31.  On April 7, 2020, PBH wired $6,000 to Plaintiff's account.  SUF ¶ 32.  On May 29, 2020, PBH wired another $3,000 to Plaintiff's account.  SUF ¶ 34.  On July 13, 2020, PBH issued a check to the Ali McDaniel Agency in the amount of $1,500.  SUF ¶ 35.  The "memo" line on the July 13, 2020 check states: "Consulting."  SUF ¶ 36.

On August 3, 2020, Plaintiff texted Mihailides that the amount due for her services was $4,350.  SUF ¶ 37.  In turn, that same day, PBH issued a check to the Alison McDaniels Agency in the amount of $4,350.  SUF ¶ 38.  On December 21, 2020, PBH issued a check to the Alison McDaniels Agency in the amount of $1,350.  SUF ¶ 39.  On February 14, 2021, PBH issued a check to the Alison McDaniels Agency in the amount of $1,500.  SUF ¶ 41.  On March 29, 2021, PBH issued a check to the Alison McDaniels Agency in the amount of $2,000.  SUF ¶ 43.  On April 2, 2021, PBH issued a check to the Alison McDaniels Agency in the amount of $1,200.  SUF ¶ 45.  On May 12, 2021, PBH issued a check to the Alison McDaniels Agency in the amount of $5,500.  SUF ¶ 47.   On June 1, 2021, PBH issued a check to Alison McDaniel in the amount of $2,150.  SUF ¶ 49.  On August 10, 2021, MTM Development issued a check to Alison McDaniel

18

in the amount of $4,247.  SUF ¶ 51.[6]  The "memo" line on the check states:  "Reimbursement and Pay."  SUF ¶ 53.  On August 24, 2021, MTM Development issued a check to Alison McDaniel in the amount of $3,000.  SUF ¶ 55.[7]  On September 27, 2021, PBH issued a check to Alison McDaniel in the amount of $1,500.  SUF ¶ 58.  The "memo" line on the check stated: "Consulting."  SUF ¶ 59.

On or about October 19, 2021, Plaintiff submitted an invoice from the Ali McDaniel Agency to PBH.  SUF ¶ 61.  The October 19, 2021 invoice included an $8,000 charge for September and October services, which Plaintiff described as "Influencer Weekend/Hobbit House/NY Rangers/Equestrian Video/Dining and Spa filming/Photos and Videos around property/First Hunt."  SUF ¶ 62.  The invoice also included a $2,700 charge for expenses for the months of September and October and expenses incurred for services to be delivered in the month of December.  Additionally, the invoice reflected a $1,000 charge for a "Dec Hunt."  *Id.*  The invoice stated that the "Balance Due" on the account was $11,700.  *Id.*  Plaintiff later informed Mr. Mihailides that PBH owed an additional $650, which Mr. Mihailides noted on the invoice, bringing the total amount due to $12,350.  SUF ¶ 63.  On December 18, 2021, PBH paid the October 19, 2021 invoice (plus the additional $650) and issued its final payment to the Alison McDaniel Agency in the amount of $12,350.00.  SUF ¶ 64.  The "memo" line on the check states: "Influencer, Modeling, Advertising Coordination Mgr."  SUF ¶ 65.  In accordance with the invoice, PBH made the check payable to the Ali Mcdaniel Agency.  SUF ¶ 66.

---

[6]    This payment was issued by MTM Development for convenience purposes.  Subsequently, an intercompany transfer was made so that these payments were accounted for on the Preserve at Boulder Hills's books.  SUF ¶ 52.

[7]    This payment also was issued by MTM Development for convenience purposes.  SUF ¶ 56.

Plaintiff's lack of a consistent salary and her receipt of lump sum, flat fee payments on an irregular basis all support the conclusion that she was an independent contractor.  Additionally, PBH's issuance of checks to the Ali McDaniel Agency and the memo lines on its checks further support the conclusion that Plaintiff was an independent contractor.  Finally, Plaintiff's issuance of the October 2021 invoice on the Ali McDaniel Agency's letterhead is inconsistent with status as an employee and further supports the conclusion that Plaintiff was an independent contractor.

### 2.  PPMC Never Issued Any Payment to Plaintiff.

As Defendants demonstrated in Section II.B. *supra*, Plaintiff cannot maintain any employment-based claim against PPMC because Plaintiff does not even purport to have worked for PPMC.  Further dispositive of Plaintiff's claim that she was employed by PPMC is the fact that PPMC never issued any payment to her.

It is undisputed that Plaintiff has never received any payroll checks from PPMC and she does not claim to have received any payment of any kind from PPMC.  SUF ¶¶ 105, 107.  To be sure, PPMC utilizes a payroll company to run its payroll and Plaintiff's name has never been listed on PPMC's payroll.  SUF ¶¶ 103, 104.  Plaintiff never received any W2 forms or 1099 forms from PPMC or claimed any wages or income from PPMC on her federal or state income tax returns for the years 2019 to the present.  SUF ¶¶ 106-09.   Thus, Plaintiff was neither an employee nor an independent contractor of PPMC as a matter of law.

### (e)  PBH Classified Plaintiff's Compensation as Deriving from Professional Services Rendered.

PBH's tax treatment favors Plaintiff's status as an independent contractor.  PBH classified Plaintiff's compensation as deriving from professional services rendered.  SUF ¶ 132; *see Alberty-Vélez*, 361 F.3d at 8 (finding that company's classification of plaintiff's income as deriving from

professional services rather than wages earned suggested independent contractor status). PBH's issuance of IRS Form 1099s to Plaintiff in connection with her work further supports her status as an independent contractor. SUF ¶¶ 131-35; *see Speen*, 102 F.3d at 633 (finding that the fact that a worker "received Form 1099s rather than W-2s for federal tax purposes" supported his status as an independent contractor); *U.S. v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 170 (D. Mass. 2004) (recognizing that IRS Form 1099 is used for payments to independent contractors rather than a Form W-2 for employees).

Moreover, at no time did PBH withhold any payroll taxes from its payments to the Alison McDaniel Agency or McDaniel. SUF ¶ 68; *see Doe v. Medeiros*, 266 F. Supp. 3d 479, 488 (D. Mass. 2017) (granting summary judgment on the grounds that worker was an independent contractor where his "salary was never subject to taxes, withholdings or any other deductions"); *Mahoney v. Morgan*, No. 08-10879, 2010 U.S. Dist. LEXIS 97224, at *21 (D. Mass. Sep. 16, 2010) ("Paying individuals without benefits and without tax withholdings weighs in favor of characterizing [a worker] as an independent contractor rather than an employee.").

### (f) Plaintiff Classified the Compensation She Received from PBH as Deriving from Professional Services Rendered.

Plaintiff's own tax treatment also favors Plaintiff's status as an independent contractor. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) (recognizing that the tax treatment of the hired party is a relevant consideration under common law agency principles).

In each of the years that Plaintiff performed work for PBH, Plaintiff paid a self-employment tax. *See Glascock v. Linn Cty. Emergency Med., PC*, 698 F.3d 695, 699 (8th Cir. 2012) (affirming district court's grant of summary judgment where plaintiff, among other things, paid her own self-employment taxes).

21

Consistent therewith, during her work for PBH, Plaintiff completed and signed an IRS Form W-9 under the penalties of perjury and provided it to PBH.  SUF ¶ 129.  A Form W-9 "provides information about an independent contractor necessary for the hiring party to report at a later date on a Form 1099-MISC for payments made."  *Fam. Christian World, Inc. v. Olds*, 100 N.E.3d 277, 280 n.2 (Ind. Ct. App. 2018).  Plaintiff did not complete or sign a Form W-4, which "employers use to determine withholding from an employee's wages on a Form W-2."  *Id*. at 284-85 (finding that this factor "weighs significantly in favor of independent contractor status").

Because of her classification, Plaintiff was able to file a Schedule C with her taxes, claiming thousands of dollars in business expenses each year, further demonstrating her status as an independent contractor.  *See O'Dell v. Qualscript, LLC*, No. 21-CV-00260, 2023 U.S. Dist. LEXIS 53084, at *7-8 (E.D. Ark. Mar. 28, 2023) (granting summary judgment in favor of defendant on the grounds that plaintiff was an independent contractor where, *inter alia*, she signed a W-9 in which she indicated she was an "Individual/sole proprietor" and that she was "not subject to backup withholding," was issued a Form 1099, and because of her classification, was able to file a Schedule C with her taxes, claiming thousands of dollars of business expenses each year); *Lindsley v. BellSouth Telecomms., Inc.*, No. 07-6569, 2009 U.S. Dist. LEXIS 18482, at *9 (E.D. La. Feb. 27, 2009) (granting summary judgment where plaintiff, among other things, "paid self-employment taxes and estimated taxes, and he availed himself of deductions for business expenses and depreciation on his income tax return").

For example, when Plaintiff prepared her federal tax return for Tax Year 2019, she identified her occupation as "Actress, independent contractor."  SUF ¶ 137.  Plaintiff paid a self-employment tax in Tax Year 2019 and completed Schedule C titled "Profit or Loss from Business (Sole Proprietorship)" and identified her "[p]rincipal business or profession, including product or

service" as "Actress." SUF ¶¶ 138, 142. Plaintiff reported that she "'materially participat[ed]' in the operation of this business during 2019." SUF ¶ 139. Plaintiff deducted expenses for travel, meals and utilities, as well as for her website, additional travel, audition websites, headshots and clothes. SUF ¶ 140. On IRS Form 8995 Plaintiff identified her trade or business as Actress. SUF ¶ 143. Plaintiff signed her federal tax return for Tax Year 2019 under the penalties of perjury. SUF ¶ 144.

When Plaintiff prepared her federal tax return for Tax Year 2020, she again identified her occupation as "Actress, independent contractor." SUF ¶ 145. Plaintiff again paid a self-employment tax and completed Schedule C titled "Profit or Loss from Business (Sole Proprietorship)" and identified her "[p]rincipal business or profession, including product or service" as "Actress." SUF ¶¶ 146, 149. Plaintiff reported that she "'materially participat[ed]' in the operation of this business during 2020." SUF ¶ 147. Plaintiff deducted expenses for advertising, car and truck expenses, contract labor, supplies, travel, meals, and utilities, as well as audition websites, headshots and clothes. SUF ¶ 148. Plaintiff signed her federal tax return for Tax Year 2020 under the penalties of perjury. SUF ¶ 150.

When Plaintiff prepared her federal tax return for Tax Year 2021, she again identified her occupation as "Actress/Model." SUF ¶ 151. Plaintiff again paid a self-employment tax and completed Schedule C titled "Profit or Loss from Business (Sole Proprietorship)" and identified her "[p]rincipal business or profession, including product or service" as "Model." SUF ¶¶ 152, 155. Plaintiff reported that she "'materially participat[ed]' in the operation of this business during 2021." SUF ¶ 153. Plaintiff deducted expenses for advertising, car and truck expenses, office expense, other business property, repairs and maintenance, supplies, travel, and other expenses, as well as clothes for acting jobs, hair maintenance for work and manicures required by work. SUF

23

¶ 154.  Plaintiff signed her federal tax return for Tax Year 2021 under the penalties of perjury. SUF ¶ 156.

When she prepared her federal tax return for Tax Year 2021, Plaintiff completed Form 8919 for Uncollected Social Security and Medicare Taxes on Wages and confirmed under the penalties of perjury that she had filed a Form SS-8 with the IRS and had not received a reply.  SUF ¶ 159.  A Form SS-8 allows the worker to obtain a determination from the IRS as to whether he is an employee or independent contractor for tax purposes.  *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 725 (11th Cir. 2002).  Plaintiff was aware of the existence of the IRS Form SS-8 at the time she submitted her federal tax return for Tax Year 2021 to the IRS.  SUF ¶ 158.

Contrary to her confirmation to the IRS that she had filed a Form SS-8, during her first deposition in this case, Plaintiff testified that she had not submitted an IRS Form SS-8 to the IRS. SUF ¶ 160.  However, at her second deposition, Plaintiff testified that, after her first deposition, she mailed the document to the IRS and did not retain a copy of it.  SUF ¶ 161.[8]  Regardless, Plaintiff's after-the-fact submission of the Form SS-8 to the IRS does not create an issue of material fact.

### (g) Plaintiff Was Not Entitled to and Did Not Receive Any Employee Benefits.

In analyzing the employee benefits factor courts look to whether traditional employee benefits were provided.  *Alberty-Vélez*, 361 F.3d at 8 (recognizing that a lack of benefits indicates

---

[8]      Plaintiff further testified that after her first deposition she was concerned that she had done something wrong by not filing the SS-8 Form but that she later found out "from the IRS, that . . . she did not do anything wrong by not sending the form."  SUF ¶ 162.  When pressed, however, Plaintiff testified that she did not speak with the IRS but "I spoke to someone I know."  SUF ¶ 163.  When further pressed, Plaintiff said she did not, in fact, speak to the IRS but, rather, "found out that there was nothing wrong, and you can easily look it up online."  SUF ¶ 164.

independent contractor status and concluded that worker was an independent contractor where she did not receive paid leave, health insurance, life insurance, or retirement benefits); *Farlow v. Wachovia Bank of N.C., N.A.*, 259 F.3d 309, 315 (4th Cir. 2001) (quoting *Aymes*, 980 F.2d at 862) ("The failure of an employer to extend employment benefits or to pay any payroll taxes is 'highly indicative' that the employee is an independent contractor); *see also Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 753 (1989) (finding a sculptor was an independent contractor where the organization did not pay payroll or Social Security taxes, provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds).

Here, it is undisputed that Plaintiff did not receive any employee benefits from PBH.  In fact, because PBH did not have any employees, it did not pay payroll or social security taxes, provide any employee benefits, contribute to unemployment insurance or maintain any workers' compensation insurance.  SUF ¶¶ 75-79, 85.  Accordingly, Plaintiff never received any health insurance benefits or paid personal time off from PBH.  SUF ¶¶ 80-84.  Plaintiff also never received any vacation time or vacation pay from PBH, nor did she ever even inquire about her entitlement to vacation days.  SUF ¶¶ 82-84.  PBH never maintained any workers' compensation insurance that would cover Plaintiff and Plaintiff never inquired about her entitlement to such insurance.  SUF ¶¶ 85-86.  Given that no workers' compensation insurance covered Plaintiff, in July 2020, when Plaintiff wanted to take part in a zipline activity at the Preserve, at PBH's request, Plaintiff signed an Accident Waiver and Release of Liability form with respect to activities organized by The Preserve at Boulder Hills, LLC.  SUF ¶ 87.

It is also undisputed that Plaintiff did not receive any employee benefits from PPMC.  Full time employees of PPMC are eligible to receive health insurance benefits, however, Plaintiff never received any pay, let alone health insurance benefits from PPMC.  SUF ¶¶ 110-11.  Plaintiff never

received any retirement benefits from PPMC.  SUF ¶ 112.  Employees of PPMC are eligible for paid vacation time, however, Plaintiff never received any vacation time or vacation pay from PPMC and did not even inquire about her entitlement to vacation days.  SUF ¶¶ 113-16.  Plaintiff did not receive overtime if she worked on the weekends.  SUF ¶ 117.  Employees of PPMC are eligible for paid personal time off, however, Plaintiff never received any paid personal time off.  SUF ¶¶ 118-119.  Finally, PPMC maintains workers' compensation insurance for its employees, however, PPMC's workers' compensation coverage does not cover Plaintiff and Plaintiff did not even ask PPMC whether it maintained workers' compensation insurance coverage applicable to her.  SUF ¶¶ 122-124.

The undisputed fact that Plaintiff did not receive any traditional employment benefits is highly indicative of her status as an independent contractor.

### (h) Plaintiff's Sporadic Work on Site at the Preserve Demonstrates Her Independent Contractor Status.

Courts also consider the location of work when deciding whether to classify a worker as an employee or independent contractor.  *See Lopez*, 588 F.3d at 83.  A worker's performance of some or all of her work from home favors classification as an independent contractor.  *Peakspeed, Inc.*, 2020 U.S. Dist. LEXIS 248635 ("Indicia of independent contractor status include working from home."); *see, e.g.*, *Oliver*, 2018 U.S. Dist. LEXIS 198484 (granting summary judgment on the grounds that worker was an independent contractor when he worked from home approximately 3 days a week, spending only two days a week in the office); *Silviotti v. Morning Call*, No. 01-4692, 2002 U.S. Dist. LEXIS 24410 (E.D. Pa. Dec. 12, 2002) (granting motion for summary judgment on the grounds that worker was an independent contractor where, *inter alia*, she worked from home on equipment she purchased and maintained).

Here, throughout the parties' business relationship, Plaintiff was on site at the Preserve only sporadically. For example, in 2019, Plaintiff was only physically present on site at the Preserve property in Rhode Island on certain days during the months of March, July and December. SUF ¶ 194. In 2020, Plaintiff was only physically present on site at the Preserve property in Rhode Island on certain days during the months of January, February, June, July, August and December. SUF ¶ 195. And, in 2021, Plaintiff was physically present on site at the Preserve property in Rhode Island on only 58 of the 365 days that year. SUF ¶ 196.

Plaintiff insists that she created content, posted on social media and came up with concepts from home, SUF ¶ 193, however, that fact also supports her status as an independent contractor. *See, e.g.*, *Smith*, 59 F. Supp. 3d 595 (granting summary judgment on the grounds that website designer was an independent contractor where, among other things, plaintiff carried out her social media work both in the office and at home).

Moreover, when working from home, Plaintiff utilized her home office and her home utilities, for which she claimed and received tax deductions. SUF ¶ 141. This further supports her status as an independent contractor. *See Cibotti v. Commissioner*, No. 15402-10S, 2012 Tax Ct. Summary LEXIS 19, at *11 (T.C. Mar. 6, 2012) ("Petitioner claimed a deduction for home office expenses for work done out of his home; thus this factor indicates independent contractor status." (footnote omitted)).

### (i) Plaintiff Supplied Some of the Tools and Equipment Necessary for the Work.

The fact that Plaintiff supplied some of the tools and equipment necessary for the work also supports her status as an independent contractor. *See, e.g.*, *Alberty-Vélez,* 361 F.3d at 7

27

(plaintiff provided, or obtained sponsors to provide, the costumes, jewelry, and other image-related supplies and services necessary for her appearance).

In addition to utilizing her home office, home utilities and home equipment to perform work when not on site at the Preserve, Plaintiff supplied other tools and equipment necessary to perform her work. For example, it is undisputed that "[a] lot of times," Plaintiff would wear her own clothes in photo shoots for the Preserve. SUF ¶ 430. It is also undisputed that Plaintiff occasionally used her own camera while working at the Preserve. SUF ¶¶ 426-29.

Because Plaintiff was not issued a company email account, she created on her own volition a Gmail account with an email address of preservealimac@gmail.com and used that personal email account in connection with her work for the Preserve. SUF ¶ 435. Finally, for purposes of summary judgment only, because Plaintiff was not issued a company laptop, when she was not on site at the Preserve, she used her own personal laptop to perform work. SUF ¶ 431-42. Plaintiff also utilized a computer at Kinkos because she did not have a printer. SUF ¶ 433.

This factor also favors Plaintiff's status as an independent contractor.

### (j)  PBH Did Not Exercise Control Over Plaintiff's Work.

While Plaintiff insists that Mr. Mihailides gave her direction on what to wear, that does not create an issue of material fact here.

It is well settled that "[a] company may require that it provide prior approval before an independent contractor takes an action or associates with an entity that could reflect poorly on the company." *Alberty-Vélez,* 361 F.3d at 7 n.8 (holding that a company's right to approve an actress's sponsors did not alter the conclusion that the actress was an independent contractor). The company's approval does not transform an independent contractor into an employee. *Id.*; *see also Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 306 (10th Cir. 1992) (requiring insurance

28

agent to submit advertisements for pre-approval is not necessarily indicative of employee status because company has "substantial interest" in advertising reflecting company standards, even if issued by independent contractor); *Hovanski v. Am. Income Life Ins. Co.*, No. 03-CV-0838, 2006 U.S. Dist. LEXIS 113221, at *41 (N.D. Ala. Jan. 11, 2006) (holding that the fact that the defendant had to approve all group insurance applications generated by plaintiff before policies were issued did not indicate control sufficient to deem the plaintiff an employee); *Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1378 (M.D. Ga. 2005) (requiring a worker to seek approval for various business activities does not make the worker an employee).

### (k) Plaintiff Did Not Have a Set Work Schedule for the Work She Performed for PBH.

The fact that a worker does not have a set work schedule is another factor favoring classification of the worker as an independent contractor. *See, e.g.*, *Capak v. Epps*, No. 18-cv-4325, 2020 U.S. Dist. LEXIS 101589 (S.D.N.Y. 2020) (concluding, on summary judgment, that worker who did not work daily and did not have a set schedule was an independent contractor).

Here, Plaintiff did not have a set work schedule for the work she performed for PBH. SUF ¶ 197. Because Plaintiff did not have a set work schedule for the work she performed for PBH, Mr. Mihailides would make arrangements to have calls with Plaintiff at times convenient for her schedule. For example, on December 16, 2019, Mr. Mihailides texted Plaintiff: "Good morning. Are u available for a call this am?" SUF ¶ 198. On March 13, 2020, Mr. Mihailides texted Plaintiff: "Let me know when we can schedule a call. Thanks." SUF ¶ 199. Sometimes, when Mr. Mihailides proposed a call, Plaintiff was not available. For example, on March 19, 2020, Mr. Mihailides texted Plaintiff: "Let's talk tomorrow at 9am. That works for [m]e." SUF ¶ 200. Plaintiff responded: "Not sure what you're talking about? I will not be available at 9am. I am

29

available in the afternoon.  Whatever time after 3 that works for you is fine.  You told me to set a time so I have been."  SUF ¶ 201.  On March 31, 2020, Mr. Mihailides texted Plaintiff:  "Do you have any availability today to schedule a call."  SUF ¶ 202.  Plaintiff did not respond that day.  On April 1, 2020, Mr. Mihailides texted Plaintiff:  "Can we have a call??"  SUF ¶ 203.  On May 5, 2020, Mr. Mihailides texted Plaintiff:  "Hi I called and left two messages I hope you are well we need to talk and catch up it is important at this time I am unavailable tonight but perhaps tomorrow thank you."  SUF ¶ 204.  On May 6, 2020, Plaintiff texted Mr. Mihailides:  "Are you still wanting to talk today?  Was around all day but I'm about to be on a call with my friends in 30min and won't be available."   SUF ¶ 205.

Because Plaintiff did not have a set work schedule for the work she performed for PBH, Plaintiff would often inform Mr. Mihailides when she was available to travel to the Preserve.  For example, on January 19, 2020, Plaintiff texted Mr. Mihailides:  "What time are you available tomorrow to reshoot these videos.  The audio was bad on them.  I have to be back in the city by 5:30 for a meeting so will be leaving by 2pm.  Can you be available to shoot videos around 11am?"  SUF ¶ 206.  On June 30, 2021, Plaintiff texted Mr. Mihailides:  "Good morning!  I know I mentioned trying to come up this weekend but I was in the hospital the last couple of days because of my asthma (I'm home now and doing much better).  I'm not sure I'm going to come back north this weekend.  I will keep you posted.  If I don't make it in this weekend I can plan to come next week sometime."  SUF ¶ 207.  And, on July 31, 2021, Plaintiff texted Mr. Mihailides:  "Tried calling earlier. Planning to come to the preserve tomorrow night or Monday morning."  SUF ¶ 208.

Moreover, because Plaintiff did not live in Rhode Island and, rather, had residences in Texas and New York, there were times when Plaintiff's schedule would not permit her to travel to Rhode Island for work on short notice.  SUF ¶ 209.

30

### (l) Plaintiff Performed Other Work as an Independent Contractor During the Time She Performed Work for PBH.

The fact that a worker is free to perform work for others further supports the workers' status as an independent contractor. *See Alberty-Vélez*, 361 F.3d at 4 (in concluding plaintiff was an independent contractor, considering that during plaintiff's "off" time, she "worked other jobs," including acting on another show, hosting a concert and acting as the master of ceremonies for a graduation); *see also, e.g.*, *Weary v. Cochran*, 377 F.3d 522, 526 (6th Cir. 2004) (affirming summary judgment under the common law test on the basis that the worker was an independent contractor where, *inter alia*, "he was free to take other jobs—and, in fact, sold insurance policies for approximately fourteen other insurance companies"); *Berman v. Meravic, Inc.*, No. 06-0922, 2007 U.S. Dist. LEXIS 107211, at *23 (M.D. Tenn. Oct. 15, 2007) (granting summary judgment under the common law test on the basis that the worker was an independent contractor where, *inter alia*, he performed work for other entities during the term of his agreement with the defendant); *Silviotti*, 2002 U.S. Dist. LEXIS 24410, at *18 (granting summary judgment under the common law test on the basis that the worker was an independent contractor where, *inter alia*, she was free to perform work for others).

A worker's flexibility to work for others further demonstrates the workers' lack of a set work schedule and, thus, favors independent contractor status. Courts also consider the manner in which the worker is compensated for other jobs. *See Alberty-Vélez*, 361 F.3d at 4 n.2 (observing that plaintiff had a similar lump sum payment arrangement for her other work).

Here, during the time she performed services for PBH, Plaintiff also worked for and received 1099 compensation from numerous other entities.

31

1. **In 2019, Plaintiff Performed Other Work as an Independent Contractor.**

In 2019, in addition to the work she performed for PBH, Plaintiff (either on her own behalf of through the Ali McDaniel Agency) performed work for the National Wild Turkey Federation and the NRA Foundation, Inc. SUF ¶ 211. In connection with her work for The NRA Foundation, Inc., Plaintiff completed, signed and provided The NRA Foundation, Inc. a W-9 form and The NRA Foundation, Inc., in turn, compensated Plaintiff as an independent contractor and issued a 1099 form to her. SUF ¶ 212.

Throughout the year, Plaintiff worked at numerous fundraisers. On February 8, 2019, Plaintiff worked at an event for the National Wild Turkey Federation Saline County at the Benton Event Center in Benton, Arkansas on behalf of the Ali McDaniel Agency. SUF ¶ 214. On March 2, 2019, Plaintiff worked at an event for the Arc Valley Chapter of the National Wild Turkey Federation in Wichita, Kansas on behalf of the Ali McDaniel Agency. SUF ¶ 215. On March 8, 2019, Plaintiff worked at an event for the National Wild Turkey Federation in Bartlesville, Oklahoma on behalf of the Ali McDaniel Agency. SUF ¶ 216. On March 23, 2019, Plaintiff worked at an event for the National Wild Turkey Federation in Crawford County on behalf of the Ali McDaniel Agency. SUF ¶ 217. On May 4, 2019, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and earned $1,065. SUF ¶ 218. On May 11, 2019, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and earned $835. SUF ¶ 219. On May 18, 2019, Plaintiff worked at an event at John Dow's request for the Massachusetts Chapter of Ducks Unlimited. SUF ¶ 220. On June 1, 2019, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and earned $970. SUF ¶ 221. On June 8, 2019, Plaintiff worked at an event for the Western Oklahoma Chapter of the National Wild Turkey Federation in Ardmore, Oklahoma on behalf of the Ali

McDaniel Agency.  SUF ¶ 222.  On August 10, 2019, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and earned $1,635.  SUF ¶ 223.  On August 16, 2019, Plaintiff worked at a National Wild Turkey Federation banquet at Parsons Stadium in Springdale, Arkansas on behalf of the Ali McDaniel Agency.  SUF ¶ 224.  On August 17, 2019, Plaintiff worked at a banquet for the Toad Suck Limbhangers in Conway, Arkansas on behalf of the Ali McDaniel Agency and at the Sebastian Co. Boss Gobblers banquet in Fort Smith (Greenwood), Arkansas for the National Wild Turkey Federation.  SUF ¶¶ 225-26.   On August 17, 2019, Plaintiff also worked at a fundraiser for the NRA Foundation, Inc. and earned $790.  SUF ¶ 227.  On September 10, 2019, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and earned $1,065.  SUF ¶ 228.  On September 19, 2019, Plaintiff worked at another event.  SUF ¶ 229.  On September 20, 2019, Plaintiff worked at a Ducks Unlimited event in Rhode Island on behalf of the Ali McDaniel Agency.  SUF ¶ 230.  On September 20, 2019, Plaintiff also worked at a fundraiser for the NRA Foundation, Inc. and earned $832.  SUF ¶ 231.

On or about October 13, 2019, Plaintiff worked at a fundraiser for the Rhode Island chapter of Friends of the NRA and earned $862.  SUF ¶ 232.  On or about October 30, 2019, Plaintiff worked at a fundraiser for Ducks Unlimited New York on or about October 30, 2019.  SUF ¶ 233. Finally, on December 7, 2019, Plaintiff worked at a Christmas event for Ducks Unlimited in Massachusetts.  SUF ¶ 234.

## 2. In 2020, Plaintiff Performed Other Work as an Independent Contractor.

In 2020, in addition to the work she performed for PBH, Plaintiff (either on her own behalf of through the Ali McDaniel Agency) performed work for and received compensation from Jovani, American Broadcasting Co., Ducks Unlimited, SCC and The NRA Foundation, Inc.  SUF ¶ 235.

33

Plaintiff was issued an IRS form 1099 for the work she performed for Jovani, American Broadcasting Co., Ducks Unlimited, SCC and The NRA Foundation, Inc. in 2020.  SUF ¶¶ 236, 237.

On January 11, 2020, Plaintiff worked at a Ducks Unlimited event on Cape Cod.  SUF ¶ 238.  On January 18, 2020, Plaintiff modeled for Melissa Garcia Styling on Good Morning America.  SUF ¶ 239.  On February 7, 2020, Plaintiff worked modeling a Brandon Maxwell dress on Good Morning America.  SUF ¶ 240.

In March 2020, Plaintiff spent no days on site at the Preserve and, during that month traveled to Colorado for other work.  SUF ¶¶ 241-43.  Plaintiff did not spend any days on site at the Preserve in April or May 2020.  SUF ¶¶ 244-45.  On July 18-19, 2020, Plaintiff attended the Prairie Wings Golf Tournament in Stuttgart, Arkansas and on August 4, 2020, Plaintiff performed work for a dog rescue.  SUF ¶¶ 246-47.  Plaintiff spent no days on site at the Preserve in September 2020.  SUF ¶ 248.  Instead, on September 8, 2020, Plaintiff worked at an event for Friends of the NRA and earned $1,275.  SUF ¶ 249.  On or about September 19, 2020, Plaintiff worked at the Boy Scouts New York Charity Clay Shoot.  SUF ¶ 250.  On September 19, 2020, Plaintiff worked an event for Friends of the NRA and earned $900.  SUF ¶ 251.

Plaintiff did not spend any days at the Preserve in October 2020.  SUF ¶ 253.  Instead, Plaintiff began performing work as an independent contractor for clothing manufacturer, Jovani, and continued performing independent contractor services for others.  SUF ¶¶ 254-67.  In connection with her commencement of work for Jovani, Plaintiff completed and signed an IRS Form W-9 and provided it to Jovani.  SUF ¶ 259.

On October 14, 2020 and October 15, 2020, Plaintiff performed work for Jovani and was compensated for two full days at the rate of $200 per day for that work.  SUF ¶¶ 254-57.  Plaintiff

also completed and signed an Independent Contractor Work Form with respect to her work for Jovani on October 14, 2020 and October 15, 2020.  SUF ¶ 258-59.

On October 17, 2020, Plaintiff represented Paws of War in Washington, D.C. at a Pledge Statue unveiling.  SUF ¶ 260.  On October 20, 2020, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and earned $1,200.  SUF ¶ 261.  On October 24, 2020, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and earned $1,305. SUF ¶ 262.  On October 26, 2020 and October 27, 2020, Plaintiff performed work for Jovani and was compensated for a full day on each day at the rate of $200/day for her work.  SUF ¶¶ 263-66.  Plaintiff completed an Independent Contractor Work Form with respect to her work for Jovani on October 26, 2020 and October 27, 2020.  SUF ¶ 267.

Plaintiff did not spend any days on site at the Preserve in November 2020 and again, spent her time working as an independent contractor for others.  SUF ¶ 268.  On November 2, 2020 and November 3, 2020, Plaintiff performed work for Jovani and was compensated by Jovani for a full day for each day at the rate of $200/day for her work.  SUF ¶¶ 269-72.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on November 2, 2020 and November 3, 2020.  SUF ¶ 273.

On November 9, 2020, Plaintiff performed work for Jovani and was compensated by Jovani for a full day at the rate of $200 for her work on November 9, 2020.  SUF ¶¶ 274-75.  On November 12, 2020, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for her work on November 12, 2020.  SUF ¶¶ 276-77.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on November 12, 2020. SUF ¶ 278.

On November 13, 2020, Plaintiff worked at a Sporting Clays for Charity event benefiting the West Point Skeet & Trap Team at the Ten Mile River Preserve in Dover Plains, New York. SUF ¶ 279.  On November 23, 2020, Plaintiff performed work for Jovani and was compensated by Jovani in the amount of $133 for that work.  SUF ¶¶ 280-81.

On December 3, 2020, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for that work.   SUF ¶¶ 282-83.   Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on December 3, 2020. SUF ¶ 284.  On December 8, 2020, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for that work.  SUF ¶¶ 285-86.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on December 8, 2020. SUF ¶ 287.  On December 10, 2020, Plaintiff performed work for Jovani and was compensated for a half day in the amount of $100 for that work.  SUF ¶¶ 288-89.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on December 10, 2020. SUF ¶ 290.  On December 15, 2020 and December 16, 2020, Plaintiff performed work for Jovani and was compensated for full day on each day at the rate of $200/day for that work.  SUF ¶¶ 291-92, 294-95.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on December 15, 2020 and December 16, 2020.  SUF ¶¶ 293, 296.

Plaintiff was issued an IRS Form 1099 for the work she performed for Jovani, American Broadcasting Co., Ducks Unlimited and SCC in 2020.  SUF ¶ 297.

### 3.  In 2021, Plaintiff Performed Work for Others as an Independent Contractor.

In 2021, in addition to the work she performed for PBH, Plaintiff performed work for and received compensation from Jovani, Friends of the NRA, The Campbell Agency, SCC and the

Federated Rhode Island Sportsmen.  SUF ¶¶ 298-99.  Plaintiff was issued an IRS Form 1099 for the work she performed for Jovani, Friends of the NRA, The Campbell Agency and SCC in 2021. SUF ¶ 300.

Plaintiff spent no days on site at the Preserve in January 2021.  SUF ¶ 301.  Instead, on January 26, 2021, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for that work.  SUF ¶¶ 302-03.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on January 26, 2021.  SUF ¶ 304.

In February 2021, Plaintiff was on site at the Preserve only one day.  SUF ¶ 305.  On February 23, 2021, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for that work.  SUF ¶¶ 306-07.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on February 23, 2021.  SUF ¶ 308.  On February 25, 2021, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for her work on February 25, 2021.  SUF ¶¶ 309-310.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on February 25, 2021. SUF ¶ 311.  Then, on February 28, 2021, while working on a project for someone other than the Preserve, Plaintiff came up with an idea for the Preserve's consideration.  SUF ¶¶ 312, 314.

Plaintiff spent four days on site at the Preserve in March 2021.  SUF ¶ 313.  On March 1, 2021, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for that work.  SUF ¶¶ 315-16.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on March 1, 2021.  SUF ¶ 317.  On March 30, 2021, Plaintiff performed work for Jovani and was compensated by Jovani for a full day at the rate of $200 for that work.  SUF ¶¶ 318-19.  When Mr. Mihailides tried to reach her that day, Plaintiff sent him a text message stating:

> Good morning!  Sorry I missed you [sic] call.  Didn't get back from dropping the car at the airport until really late and then working on filming/editing audition all morning before work.  I'll call when I get off work after 5.

SUF ¶ 320.  On March 31, 2021, Plaintiff performed work for Jovani and was compensated for a full day at the rate of $200 for that work.  SUF ¶¶ 321-22.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on March 30, 2021 and March 31, 2021.  SUF ¶ 323.

In April 2021, Plaintiff spent two days on site at the Preserve.  SUF ¶ 324.  On April 10, 2021, Plaintiff worked a fundraiser for the Northern County Full Fan Chapter of the National Wild Turkey Federation in Carbondale, Pennsylvania.  SUF ¶ 325.  On April 19, 2021 and April 20, 2021, Plaintiff worked for Jovani and was compensated for that work.  SUF ¶¶ 326-29.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on April 19, 2021 and April 20, 2021.  SUF ¶ 330.

On April 20, 2021, Plaintiff sent a text message to Mr. Mihailides stating:  "Tried to call on my way to work.  I can make it work for this weekend."  SUF ¶ 331.  On April 22, 2021, Plaintiff sent a text message to Mr. Mihailides stating:  "Good morning – I'll give you a call **when I get off work** and am on the road to NC so you can give me the details I need for tomorrow."  SUF ¶ 332 (emphasis added).  On April 27, 2021, Plaintiff worked a half day for Jovani and was compensated for her work.  SUF ¶¶ 333-34.   Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on April 27, 2021.  SUF ¶ 335.

In May 2021, Plaintiff spent only eight days on site at the Preserve.  SUF ¶ 336.  On May 4, 2021, Plaintiff performed work for Jovani and was compensated for a half day for that work.  SUF ¶¶ 337-38.  On May 13, 2021, Plaintiff performed work for Jovani and was compensated for

a half day for that work.  SUF ¶¶ 339-40.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on May 4, 2021 and May 13, 2021. SUF ¶ 341.  On May 18, 2021, Plaintiff performed work for Jovani and was compensated for four hours for that work.  SUF ¶¶ 342-43.  Plaintiff completed and signed an Independent Contractor Work Form with respect to her work for Jovani on May 18, 2021.  SUF ¶ 344.

In June 2021, Plaintiff spent one day on site at the Preserve.  SUF ¶ 345.  On June 7, 2021, Plaintiff attended a fundraising event for Ben Bay Kiwanis Foundation Inc. on Long Island, New York.  SUF ¶¶ 346-47.  On June 8, 2021, Plaintiff performed work for Jovani and was compensated for a half day for that work.  SUF ¶¶ 348-49.  Plaintiff completed and signed a Model Payment Slip with respect to her work for Jovani on June 8, 2021.  SUF ¶ 350.

From June 16, 2021 to June 19, 2021, Plaintiff was in Arkansas for the Miss Arkansas Outstanding Teen 2021 event where she served as a judge for the event.  SUF ¶ 351.  On June 18, 2021, Plaintiff visited Ronald McDonald House Charities Arkansas with other judges from the Miss Arkansas Outstanding Teen 2021 event.  SUF ¶ 352.

On June 23, 2021, Plaintiff performed work for Jovani and was compensated for that work. SUF ¶¶ 353-54.  Plaintiff completed and signed a Model Payment Slip with respect to her work for Jovani on June 23, 2021.  SUF ¶ 355.

Plaintiff spent no days on site at the Preserve in July 2021.  SUF ¶ 356.  From July 17, 2021 to July 18, 2021, Plaintiff was in Stuttgart, Arkansas.  SUF ¶ 357.  On July 28, 2021, Plaintiff performed work for Jovani and was compensated for a full day for that work.  SUF ¶¶ 358-59. Plaintiff completed and signed a Model Payment Slip with respect to her work for Jovani on July 28, 2021.  SUF ¶ 360.

On August 11, 2021, Plaintiff performed five hours of work for Jovani and was compensated for that work. SUF ¶¶ 361-62. Plaintiff completed and signed a Model Payment Slip with respect to her work for Jovani on August 11, 2021. SUF ¶ 363.

On September 9, 2021, Plaintiff performed work for Good Morning America. SUF ¶ 364. On October 17, 2021, Plaintiff worked at the Second Annual Federated RI Sportsmen's Clubs Grant Program Dinner at the Crowne Plaza in Warwick, Rhode Island and was compensated $2,012 for that work. SUF ¶¶ 365-66. On October 27, 2021, Plaintiff posted on the Ali McDaniel Agency Facebook page about fundraising in Arkansas. SUF ¶ 367.

Plaintiff spent no days on site at the Preserve in November 2021. SUF ¶ 368. On November 1, 2021, Plaintiff posted on the Ali McDaniel Agency Facebook page about fundraising in Texas. SUF ¶ 369. On November 6, 2021, Plaintiff worked at a fundraiser for the NRA Foundation, Inc. and was compensated $655 for that work. SUF ¶¶ 370-71. On November 15, 2021, Plaintiff posted on the Ali McDaniel Agency Facebook page about fundraising for West Point. SUF ¶ 372. On or about November 16, 2021, Plaintiff worked at a fundraising event for Friends of the NRA in Arkansas. SUF ¶ 373.

In December 2021, Plaintiff spent three days on site at the Preserve. SUF ¶ 374. On December 13, 2021, Plaintiff performed work for Jovani and was compensated for four hours for that work. SUF ¶¶ 375-76. Plaintiff completed an Independent Contractor Work Form with respect to her work for Jovani on December 13, 2021. SUF ¶ 377.

Plaintiff was issued an IRS Form 1099 for the work she performed for Jovani, Friends of the FNRA, The Campbell Agency and SCC in 2021. SUF ¶ 378.

Much like the Plaintiff in *Alberty-Vélez*, during her "off" time, Plaintiff worked numerous other jobs, attended fundraisers, and represented organizations at various events. *See Alberty-*

40

*Vélez*, 361 F.3d at 4.  To the extent she was paid for other work, she was paid as an independent contractor, as she was with respect to her work for PBH.  *Id*. at 4 n.2.  This overwhelming evidence of independent contractor jobs that Plaintiff undertook during the time she purports to have been an employee of PBH strongly demonstrates her status as an independent contractor as a matter of law.

### (m) Plaintiff's Availability to Perform Work for PBH was Dependent on Her Other Work and Volunteer Commitments.

The fact that a worker performs work based on his or her availability weighs in favor of a finding that the worker is an independent contractor.  *See, e.g.*, *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 262 (4th Cir. 1997) (finding physician was an independent contractor when he proposed when he was willing to work and varied his hours to work at other facilities); *Williamson v. Coastal Physician Servs. of the Se.*, 554 S.E.2d 739, 741 (Ga. Ct. App. 2001) (granting summary judgment and finding independent contractor status where hospital scheduled doctor based on doctor's notification of his availability); *Zarlengo v. Caz & Assoc.*, No. 13-CV-98, 2014 U.S. Dist. LEXIS 130321, at *8 (N.D.W. Va. Sep. 17, 2014) (fact that massage therapist told hotel when he was available and hotel then assigned him based on that availability favored worker's independent contractor status).

From the start, Mr. Mihailides made it clear that he understood Plaintiff's availability was limited, given her other work responsibilities.  On February 22, 2019, after having met Plaintiff at a fundraiser, Mr. Mihailides texted Plaintiff:

> Ali . . . After meeting with Ray ***he said that your schedule is crazy***. I am looking for an outdoor spokesperson for a program we will be running for women at the preserve.  2. I would like to discuss that as well as several high end events that will be happening this year. ***If you [sic] schedule doesn't permit*** could you make a nstagra [sic]. Thank [you] Paul."

SUF ¶ 12 (emphasis added).  When Mr. Mihailides emailed Plaintiff a list of suggestions on areas where the Ali McDaniel Agency could be of assistance he noted:  "Only you know what the best opportunity for us is *and the time you can commit*."  SUF ¶¶ 19-20 (emphasis added).

Plaintiff's availability to perform work for PBH was dependent on her other work commitments.  On some occasions, Plaintiff communicated to Mr. Mihailides that she would fit her work for PBH into her existing schedule.  For example, on January 14, 2020, Plaintiff sent a text message to Mr. Mihailides stating:

> I also still do not have a confirmation from good morning America about my fitting, if I don't hear from them by the end of day, I will assume tomorrow is open for me to come to preserve.  I will update you this evening.

SUF ¶ 398.  On February 27, 2020, Plaintiff sent a text message to Mr. Mihailides stating:  "Ok I will head that way tomorrow as soon as I'm done with work."  SUF ¶ 399.  On July 20, 2020, Plaintiff sent a text message to Mr. Mihaildes stating:

> I was thinking I can come on Thursday and we can shoot with KJP if he's available to do the idea me, him and drew discussed and then also ocean house if they are available.  I'm filming beginning of the week but am available to come to preserve Thursday/Friday/sat, possibly wed if needed.

SUF ¶ 400.  On August 27, 2020, Plaintiff sent a text message to Mr. Mihailides stating:  "I am available Monday and Tuesday of next week or possibly Thursday."  SUF ¶ 403.

As Plaintiff's schedule began filling up with other work, on September 24, 2020, Plaintiff emailed the following to Mr. Mihailides:

> Good morning!  I just wanted to touch base.  With the filming for my tv show, filming commercials and events picking up, my schedule is filling up quickly.  I wanted to get any dates you might need me at the Preserve in the calendar ASAP so that I can make sure I'm available.  If you need me for filming or any of the

> upcoming hunts please let me know as soon as you can!  I hope you
> and your family are doing well!

SUF ¶ 252.

On other occasions, Plaintiff made it clear that she could not attend to her work for PBH

because she was occupied with work for others.  For example, on July 29, 2020, Plaintiff texted

Mr. Mihailides: "Hi! I can't talk right now I'm working."  SUF ¶ 401.  On August 5, 2020, Plaintiff

texted Mr. Mihailides stating:

> Will send you our bourbon video and the rest of the photos from the
> weekend by tonight.  I sent the zip lining last night.  It was a bit
> hectic yesterday when I got back in town.  I had to go film something
> for the dog rescue and didn't get home until late.  ***I'm working this
> morning so I'm a little behind trying to edit video*** but I should be
> home by 6 and will get the tasks completed for you.

SUF ¶ 402 (emphasis added).

Plaintiff's availability to perform work for PBH was not only dependent on her other work

for compensation but it was also dependent on her volunteer and other commitments.

For example, on May 1, 2019, Plaintiff attended a Havana-themed fundraiser for the

Associate Board of the Samuel Waxman Cancer Research Foundation.  SUF ¶ 404.  On May 13,

2019, Plaintiff attended the Ronald McDonald House New York Gala.  SUF ¶ 405.  On June 19,

2019, Plaintiff attended the Ronald McDonald House New York House Heros Volunteer Event at

Gustavino's in New York.  SUF ¶ 406.  On September 12, 2019, Plaintiff attended a fundraiser for

the Ronald McDonald House.  SUF ¶ 407.  On September 15, 2019, Plaintiff attended the 11th

Annual Hogs 4 Hope Fundraiser to benefit the Ronald McDonald House New York.  SUF ¶ 407.

On or about October 26, 2019, Plaintiff attended a fundraiser for St. Dominic's Family Services.

SUF ¶ 408.  On December 3, 2019, Plaintiff attended a Ducks Unlimited Table Captains event.

SUF ¶ 409.  On December 4, 2019, Plaintiff attended the Ronald McDonald House New York's

Annual Holiday Open House in celebration of its 40th Anniversary.  SUF ¶ 410.  In 2019, Plaintiff also was engaged to help create the Christmas card photo for Miss New York and Miss Teen New York.  SUF ¶ 411.

On January 30, 2020, Plaintiff was at the Ronald McDonald House New York.  SUF ¶ 412.  On March 8, 2020, Plaintiff participated in an event at Madison Square Garden for Paws of War.  SUF ¶ 413.  On October 19, 2020, Plaintiff attended the St. John's Bread and Life's First Annual Golf Tournament.  SUF ¶ 414.

Thus, all of this militates in favor of a finding that Plaintiff was an independent contractor.

### (n) When Plaintiff Was Unavailable She Could Substitute Others and When Plaintiff Required Additional Assistance, She Enlisted the Assistance of Others.

An independent contractor "normally has the right to employ helpers or substitute others to do the work and to make a profit on their services because the independent contractor is the one that is in control of the work."  *D. D. Bean & Sons Co. v. United States*, Civil No. 73-216., 1975 U.S. Dist. LEXIS 12179, at *12 (D.N.H. May 28, 1975).

Here, on certain occasions when Plaintiff was not available because of other work commitments, she worked with Mr. Mihailides to identify substitutes for her.  For example, on December 29, 2019, Plaintiff texted Mr. Mihailides to inform him that she had a conflict with the dates set for a Dallas Safari Club (scheduled for January 7 – 10, 2020).  SUF ¶ 393.  Plaintiff informed Mr. Mihailides that she would need to leave on January 9, 2020 to be present at a Ducks Unlimited event on Cape Cod.  *Id.*  As an alternative, Plaintiff suggested that Mr. Mihailides hire "one of [her] girls who does fundraising events to work the weekend."  She wrote: "let me know and I will see who is available."  SUF ¶ 394.  Mr. Mihailides responded:  "Ok let me know how much.  Thank u."  SUF ¶ 395.  Plaintiff replied:  "My best girl is available to work the weekend

(Sat/Sun) at the safari club which will be the busiest time.  It would be $300 a day to use her but she's amazing and will know a lot of people there."  SUF ¶ 396.  Mr. Mihailides responded:  "Ok she's Hired."  SUF ¶ 397.

When Plaintiff required additional assistance, she enlisted the help of others.  For example, in July 2020, Plaintiff texted Mr. Mihailides:

> I got the girl who works for me, Colleen and her boyfriend committed to come to the Preserve to help with videos July 31st and told them in exchange they could stay the night and enjoy the preserve on Saturday.  I also have another one of my girls available to film with us for $500 pay. She will just come Friday, 7/31 and work for the day and leave.

SUF ¶ 415.  Thereafter, on July 23, 2020, Plaintiff texted Mr. Mihailides:

> I got the video outline.  I just need one question answered ASAP.  I have another couple that is available to come film on Friday for a trade like what we are doing with Colleen, I told them they could say the rest of the weekend and chill if they would be apart of the videos Friday.  Great looking people.  That would give us two guys and 4 girls( including myself) [sic] Do you want them too or no?

SUF ¶ 416.  Mr. Mihailides replied that the Preserve did not have availability to accommodate additional guests that weekend after which Plaintiff replied:  "Ok gotcha.  I could always leave Friday evening so someone could stay in my place if that would help."  SUF ¶ 417.

### (o) Plaintiff Described PBH as her Client and Likened it to Her Other Clients.

The fact that Plaintiff herself believed that PBH was *her client* further supports her status as an independent contractor.  *See Lopez*, 588 F.3d at 85 (considering whether parties reasonably believed they established an employer-employee relationship); *Farlow*, 259 F.3d at 313 (observing that "the parties' beliefs regarding the nature of the employment relationship are significant"); *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997) (recognizing that the intent/belief of the parties creating the relationship is a factor considered under the common law test).  Thus, a

worker's reference to a person or entity as his client is a strong indication of the worker's independent contractor status. *See Martin*, 2008 U.S. Dist. LEXIS 139777, at *12-14 (granting summary judgment on the grounds that plaintiff was an independent contractor where plaintiff, *inter alia*, referred to defendant "as a client" when communicating with others); *see also Smith*, 59 F. Supp. 3d at 613 (granting summary judgment and finding worker was an independent contractor where entity "likened himself to [the worker's] other 'clients'").

Here, both during and after her work for PBH, Plaintiff referred to PBH on numerous occasions as her "client." SUF ¶ 178. Plaintiff also described herself as a "contract worker." SUF ¶ 179. During the course of her work for PBH, Plaintiff referred to her clients in communications with Mr. Mihailides. SUF ¶ 180. For example, on November 10, 2021, Plaintiff texted Mr. Mihailides: "Good morning. That photo that you shared of mine was sold *to another client* who has a Medspa. You can't share it with the text advertising the OH Spa. Sorry. Please delete it off your Instagram." SUF ¶ 187 (emphasis added). Plaintiff also referred to the Preserve as her client in her communications with other independent contractors of PBH. SUF ¶ 189. For example, on March 27, 2020, Plaintiff sent an email from the email address ali@alisonmcdaniel.com to Andrew Romano at the email address drew@romanovideo.com with a copy to Mr. Mihailides at paul@thepreserveri.com stating:

> Got it. Also, I saw that you posted this video on Instagram. I'm not sure why you would post our latest marketing video before we even post it ourselves. I've never known a videographer that would be disrespectful enough [sic] release *a client's work* before them.

SUF ¶ 190 (emphasis added).

After her last day of work on site at the Preserve, Plaintiff made a number of Instagram posts explaining the nature of her business relationship with the Preserve, stating that she is "a

contract worker" and questioning why the Preserve continued to hire her for projects if she was not performing well and describing the Preserve Sporting Club as her "client" and "former client."  SUF ¶ 179.  For example, in one Instagram post Plaintiff wrote:

> ***This client*** continues to spread the narrative that I am after his money. Lol. This would imply that I think he has money which [emoji]. And that me speaking out is "retaliation" for me not being good at my job and getting fired (after I already cut ties over a month ago). I was hired to be the spokesperson, which was essentially to be the face of the property. So me being bad at my job means??????lol. ***why hire me over and over? I'm a contract worker.*** I didn't make myself the spokesperson.

SUF ¶ 180 (emphasis added).  In another Instagram post, Plaintiff referred to the Preserve as her former client, writing:  "Speaking of standing up for yourself and other women.  I have cut all ties with ***my former client*** @preservesportingclub because of the owner's disgusting and inappropriate behavior towards me."  SUF ¶¶ 181-82 (emphasis added).  Beneath another Instagram post, which included a photograph of Plaintiff and Mr. Mihailides, Plaintiff wrote:  "Hello again.  I have heard that ***this client*** is lying to people and pretending that he decided to 'fire' me.  This is a laughable lie.  But not unexpected.  People like this will always to cover their tracks when called out.  This is why I have documented everything."  SUF ¶ 183 (emphasis added).  In yet another Instagram post, which included a photograph of Plaintiff and Mr. Mihailides, Plaintiff wrote:  "Yes I should have cut ***this client*** off a long time ago."  SUF ¶ 184 (emphasis added).  And in another Instagram post, which included a photograph of Plaintiff and Mr. Mihailides, Plaintiff wrote:

> I will say, in all honesty, what bothers me most is that I know God was prompting me to leave this situation many, many months ago. If I'm gut checking myself I guess I just did not trust God to provide for me even though He has always been faithful before.  As if God didn't part the seas and close the mouths of lions.  How could I not trust he would bring ***a better client*** and provide other gigs even during a pandemic and with crazy restrictions?

SUF ¶ 185 (emphasis added).

Thereafter, in an email titled "Ending Relationship with Preserve," Plaintiff claimed that Mihailides's conduct was "more than anyone should have to endure from *a client*."  SUF ¶ 188 (emphasis added).  Finally, Plaintiff's website, Pardon Moi Productions NYC, lists The Preserve Sporting Club Rhode Island under the heading "Clients & Collaborations."  SUF ¶¶ 191-92.

Thus, Plaintiff's own belief that PBH was her client and the fact that she likened PBH to other clients is another strong indicator of her status as an independent contractor.

For all of these reasons, the undisputed evidence demonstrates that Plaintiff was an independent contractor as a matter of law.  As such, summary judgment should enter in favor of Defendants on Plaintiff's employment-based claims.[9]

---

[9]    Plaintiff also cannot pursue her claims of retaliation because she failed to exhaust her administrative remedies with respect to those claims.  On March 14, 2024, Plaintiff signed under the penalties of perjury an Amended Charge of Discrimination with the Rhode Island Commission for Human Rights claiming that she was retaliated against when PPMC and PBH filed a criminal complaint against her on December 4, 2023.  SUF ¶¶ 470, 471.  The March 14, 2024 Amended Charge of Discrimination purports to be notarized by Attorney Mark P. Gagliardi, states that it was "subscribed and sworn to before me this date 14th day of March, 2024" and includes a notarial stamp stating:  "MARK P. GAGLIARDI Notary Public-State of Rhode Island My Commission Expires 7/9/24."  SUF ¶ 472.  Plaintiff was not physically present in Rhode Island when she signed the March 14, 2024 Amended Charge of Discrimination.  SUF ¶ 473.  Rather, Plaintiff signed the March 14, 2024 Amended Charge of Discrimination from outside of Rhode Island and provided it to her attorney.  SUF ¶ 474.  Under Rhode Island law, "[i]f a notarial act relates to a statement made in, or a signature executed upon, a record, the individual making the statement shall appear personally before the notarial officer."  R.I. Gen. Laws § 42-30.1-5.  While notarial acts may be performed for remotely located individuals under Rhode Island law, there is no evidence that the prerequisites for such a notarial act were satisfied here, nor does the notarial certification so indicate as required by law.  R.I. Gen. Laws § 42-30.1-12.1.  Where, as here, the Amended Charge of Discrimination was not properly notarized, it should not be used as evidence of Plaintiff's exhaustion of her administrative remedies.  Moreover, if the notary's statement that the Amended Charge of Discrimination was subscribed and sworn to constitutes fraud or deceit, such fraud or decide would be governed by R.I. Gen. Laws § 42-30.1-21.

**D.    Plaintiff Cannot Maintain a Claim for Breach of Contract Based on a Purported Breach of an Agreement to Pay her a Salary When the Undisputed Material Facts Demonstrate that Plaintiff was an Independent Contractor.**

Summary judgment should also enter in favor of each of the Defendants on Plaintiff's breach of contract claim (Count VII) because that claim is predicated on a purported breach of an agreement to pay her a salary and wages. Because the undisputed material facts demonstrate that Plaintiff was an independent contractor as a matter of law, there are no circumstances in which Plaintiff can establish a breach of the alleged agreement.

It is black-letter law that an employer is an entity that "pays the worker's salary or wages." *Black's Law Dictionary* 604 (9th ed. 2009). "It takes no citation of authority to conclude that wages, salary and overtime are definitions of the kind of financial compensation paid, not to the independent contractor, but rather to the worker in the master and servant relationship or to [a] salaried employee." *Aero Serv. Corp. v. Gordy*, 109 A.2d 393, 394 (Del. Super. Ct. 1954).

> In the law, there always has been a difference, and a big difference, between "employees" and "independent contractors". "Employees" work for wages or salaries under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is upon profits.

*Local 777, Democratic Union Org. Comm. v. NLRB*, 603 F.2d 862, 905 (D.C. Cir. 1978); *see also Idaho Pac. Lumber Co. v. Celestial Land Co.*, 348 P.3d 950, 953-54 (Colo. Ct. App. 2009) (concluding that terms such as "wages" and "salary" imply an employer/employee relationship, not a relationship to an independent contractor); *Campbell v. Stucki*, 220 S.W.3d 562, 566-67 (Tex. App. 2007) ("The term 'wages for personal service' necessarily implies a relationship of master and servant, or employer and employee, and excludes compensation due to

49

an independent contractor as such."); *English v. Kienke*, 848 P.2d 153, 157 (Utah 1993) ("Speaking in generality: an employee is one who is hired and paid a salary, a wage, or at a fixed rate . . . . In contrast, an independent contractor is one who is engaged to do some particular project or piece of work, usually for a set total sum."); *Olson v. Townsend*, 530 A.2d 566, 568 (Vt. 1987) ("'[E]arnings' is defined as either 'wages, salary, commission, bonus, or otherwise,' all words which are commonly understood to apply within an employer-employee relationship.").

Here, Plaintiff claims that she had a contract with all Defendants whereby Defendants agreed to pay her a "salary" beginning in December 2019 in exchange for her work at the Preserve. Second Amend. Compl. ¶ 268. Plaintiff claims to have satisfied her performance obligation by working at the Preserve and that she is entitled to "wages." *Id*. ¶ 270. Plaintiff alleges that Defendants breached the terms of that agreement by failing to pay her the "salary" and "wages" for which she purportedly contracted. *Id*. ¶¶ 268-72.

Plaintiff's breach of contract claim fails for the same reasons that her employment-based claims fail. The undisputed material facts demonstrate that Plaintiff was an independent contractor as a matter of law. As such, she has no contractual entitlement to a salary or wages as she claims.

### III. Plaintiff's Sexual Harassment Claims under Title VII, FEPA and RICRA Are Barred by the Statute of Limitations.

Not only do Plaintiff's sexual harassment claims under Title VII and FEPA fail because Plaintiff was not an employee of either PBH or PPMC as a matter of law, Plaintiff's sexual harassment claims under Title VII and FEPA (Counts I and II; IV and V) are also barred by the applicable statute of limitations.

50

Moreover, Plaintiff's sexual harassment claims under RICRA (Counts VIII and IX) are also barred by the three-year statute of limitations applicable to such claims under Rhode Island law.

### A.     Claims Under Title VII Must be Brought within 300 Days of the Alleged Discrimination.

To pursue a claim under Title VII, a plaintiff must file an employment-discrimination charge with the EEOC within 300 days of the alleged discrimination.  42 U.S.C. § 2000e-5(e)(1) (2000) (noting Title VII's charge-filing requirement); *Rivera-Rodríguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 21 (1st Cir. 2001).  "A plaintiff generally cannot litigate claims based on conduct falling outside of this period."  *Rivera-Rodríguez*, 265 F.3d at 21 (citing *Provencher v. CVS Pharmacy*, 145 F.3d 5, 13-14 (1st Cir. 1998)).

### B.     Claims Under FEPA Must be Brought Within One Year of the Alleged Discrimination.

To pursue a claim under FEPA, a plaintiff must file a charge of discrimination within one year of the alleged discrimination.  R.I. Gen. Laws § 28-5-17(a); *see also Horn v. S. Union Co.*, 927 A.2d 292, 293 (R.I. 2007); *Gibbs v. Brown Univ.*, No. 09-cv-392, 2011 U.S. Dist. LEXIS 34834, at *4 (D.R.I. Mar. 31, 2011).

### C.     RICRA Claims Must be Brought Within Three Years of the Alleged Discrimination.

To pursue a claim under RICRA, a plaintiff must commence a civil action within three years after the occurrence of the alleged violation.  R.I. Gen. Laws § 42-112-2.

### D.     Plaintiff's Sexual Harassment Claims under Title VII, FEPA and RICRA Are All Untimely.

It is undisputed that the alleged harassment that forms the basis of Plaintiff's employment-based claims and RICRA claims began in March 2019, more than 1,380 days before she filed her

charge of discrimination and more than four years before she commenced any civil action.  Plaintiff

testified that she felt that Mr. Mihailides had acted inappropriately "from the first day that [she]

was there" in March of 2019.  SUF ¶ 445.  According to Plaintiff, Mr. Mihailides' "harassment

began the first day [she] went to the property to talk to him about work in March of 2019."  SUF

¶ 446.  In October 2022, when a Federal Investigator with the EEOC asked Plaintiff when the

sexual harassment began, Plaintiff answered: "I documented it beginning in April.  *However, the*

*harassment began the first day I went to see the property in March of 2019*."  SUF ¶ 447

(emphasis added).  Based on the responses that Plaintiff provided to the Federal Investigator, on

December 7, 2022, the Federal Investigator prepared and sent Plaintiff a statement to review and

sign.  SUF ¶ 448.  Plaintiff reviewed the statement and responded to the Federal Investigator that

same day that "*the 'earliest date' was wrong as the sexual harassment started immediately in*

*2019 but progressively got worse and ended Dec 2021*."  SUF ¶ 449 (emphasis added).  To be

sure, Plaintiff responded to the Federal Investigator a second time on December 8, 2022 stating:

"*This date is still wrong.  Does that matter?  The earliest would be March of 2019*."  SUF ¶ 450

(emphasis added).  On December 9, 2022, Plaintiff signed a charge of discrimination with the

Rhode Island Commission for Human Rights, which stated:  "*Please note, the sexual harassment*

*began in 2019 until my forced resignation*."  SUF ¶ 451 (emphasis added).  On January 4, 2023,

Plaintiff made a correction to the EEOC statement to note that the earliest date of harassment was

in March of 2019 and returned the signed copy to the Federal Investigator at the EEOC.  SUF

¶ 452.

      While the alleged harassment began in March 2019, it is also undisputed that it became

severe enough that Plaintiff started documenting it in April 2020, more than 1,380 days before

Plaintiff filed any charge of discrimination and more than three years before Plaintiff commenced

any civil action.  Both in her deposition testimony and in her communications with the EEOC, Plaintiff acknowledged that she started documenting Mr. Mihailides' alleged harassment in April 2020.  SUF ¶ 453.  At that time, Mr. Mihaildes "started really bothering [Plaintiff]."  SUF ¶ 454.  And, that was when Plaintiff "started taking notice" of Mr. Mihailides' conduct.  SUF ¶ 455.

Beginning in April of 2020, Mr. Mihailides' conduct "rose to the level that [Plaintiff] started recording it."  SUF ¶ 456.  At that time, Mr. Mihailides "started acting very inappropriate."  SUF ¶ 457.

Plaintiff's claims accrued in March 2019, when she allegedly first experienced harassment by Mr. Mihailides and, alternatively, no later than April 2020, when Mr. Mihailides' alleged harassment became so severe that Plaintiff began documenting it.  As such, her employment-based claims and her RICRA claims are barred by the applicable statutes of limitation.

**IV. Plaintiff's Defamation Claim is Barred by the Statute of Limitations.**

Summary judgment should also enter on Plaintiff's defamation claim (Count XII) against Mr. Mihailides because that claim is based on words spoken and is therefore barred by the statute of limitations for slander.

The statute of limitations for slander is one year.  R.I. Gen. Laws § 9-1-14(a) ("Actions for words spoken shall be commenced and sued within one year next after the words spoken, and not after."); *see also Chorney v. Cullen*, 692 A.2d 694, 694 (R.I. 1997) (affirming grant of summary judgment on the grounds that slander claim was time barred).

Plaintiff's Second Amended Complaint alleges that "Mihailides uttered false and defamatory statements about McDaniel when he stated that she was involved in a sexual relationship with him by telling others that she was his mistress."  Second Amend. Compl. ¶ 324.  That allegation refers to verbal statements Mr. Mihailides made while in Plaintiff's presence.  SUF

¶ 460.   As one example, the Second Amended Complaint alleges that "[o]n May 31, 2021, Mihailides told multiple guests at The Preserve that McDaniel was his 'mistress,' 'future ex-wife,' and 'girlfriend.'"  Second Amend. Compl. ¶ 45.

Importantly, the last time Plaintiff was in Mr. Mihailides presence was on December 19, 2021.  SUF ¶ 461.  Whatever Plaintiff heard Mr. Mihailides say to others about her being his mistress was before December 19, 2021.  SUF ¶ 462.  To the extent that Mr. Mihailides made allegedly defamatory statements that others witnessed, those persons heard Mr. Mihailides make those statements before December 19, 2021.  SUF ¶ 465.

Plaintiff commenced this action on July 11, 2023.  Compl. (Doc. 1).  The statute of limitations on her defamation claim ran 6 months and 22 days before Plaintiff filed suit. Accordingly, summary judgment should enter in Mr. Mihailides favor on Count XII of Plaintiff's Second Amended Complaint.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should grant summary judgment in favor of PBH, PPMC and Mr. Mihailides on Counts I – VI and X – XII of Plaintiff Alison McDaniel's Second Amended Complaint.

DEFENDANT/COUNTERCLAIM PLAINTIFFS
THE PRESERVE AT BOULDER HILLS, LLC
AND PAUL MIHAILIDES AND DEFENDANT
PRESERVE PROPERTY MANAGEMENT
COMPANY, LLC,
By their Attorneys:


/s/ Nicole J. Benjamin
John A. Tarantino (#2586)
jtarantino@apslaw.com
Nicole J. Benjamin (#7540)
nbenjamin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI  02903-1345
Tel:  401-274-7200
Fax:  401-351-4607
July 2, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2024, I electronically served and filed *via the Electronic Court Filing (CM/ECF) system* a true copy of the within pleading on all counsel of record and it is available for viewing and downloading from the ECF system.

/s/ Nicole Benjamin